

E<sup>x</sup>ponent®

MICHAEL DRIVER, TERRY
CLAYTON, MICHAEL BOYD,
NICHOLAS SWORDS, and ROY
SHOFNER, individually and as
representatives of a class of all similarly
situated individuals, Plaintiffs

v.

THE MARION COUNTY SHERIFF,
and, THE CONSOLIDIATED CITY OF
INDIANAPOLIS AND MARION
COUNTY, Defendant.

CAUSE NO. 1:14-cv-2076-RLY-MJD

EXHIBIT
3

Blumberg No. 5118

**MICHAEL DRIVER, TERRY CLAYTON, MICHAEL BOYD, NICHOLAS SWORDS, and ROY SHOFNER, individually and as representatives of a class of all similarly situated individuals, Plaintiffs**

**v.**

**THE MARION COUNTY SHERIFF, and, THE CONSOLIDIATED CITY OF INDIANAPOLIS AND MARION COUNTY, Defendant.**

**CAUSE NO. 1:14-cv-2076-RLY -MJD**

Prepared for

Frost Brown Todd LLC
201 North Illinois Street
Suite 1900
Indianapolis, Indiana 46204-4236

Prepared by

Brian D'Andrade, CISSP, CSQE, PMP, Ph.D.
Exponent, Inc.
17000 Science Drive
Suite 200
Bowie, MD 20715

January 31, 2019

© Exponent, Inc.

January 31, 2019

# Contents

|  | Page |
|---|---|
| Acronyms and Abbreviations | iii |
| Introduction | 1 |
| Qualifications | 4 |
|   Education | 4 |
|   Employment Experience | 4 |
|   Licenses, Certifications, and Awards | 8 |
| Background | 13 |
| Methodology and Analysis | 20 |
|   Software | 20 |
|   Data Reviewed | 22 |
|   Analysis of Sandy Report Methodology | 25 |
| Discussion on the Sandy Report's Final Results | 30 |
|   Specific Deficiencies | 31 |
|     Sentences Calculated on Time Served | 31 |
|     Latest Court Releases Were Not Used | 31 |
|     Some Incarcerations Could Not Be Validated | 32 |
|     Incarcerations with MC and Non-MC Cases | 32 |
|     Numeric Inconsistencies Found in the Sandy Report | 33 |
|   General Deficiencies | 34 |
| Conclusions | 40 |
| Limitations | 2 |
| Appendix A  Curriculum Vitae of Brian D'Andrade | |
| Appendix B  Prior Testimony of Brian D'Andrade | |
| Appendix C  Materials Reviewed | |
| Appendix D  SQL Code Generated | |
| Appendix E  Review of Databases and SQL Queries Produced by Plaintiffs | |

January 31, 2019

# Acronyms and Abbreviations

| | |
|---|---|
| CBP | Cash bond paid |
| Exponent | Exponent, Inc. |
| JUSTIS | Justice Information System |
| JIMS | Jail Information Management System |
| MC | Miscellaneous criminal |
| Odyssey | Odyssey Case Management System |
| OMS | Offender Management System |
| ORC | Order to release from custody |
| RDBMS | Relational Database Management Systems |
| S1 | Sandy Report SQL Script "01 - Populate HDSRelease.sql" |
| S2 | Sandy Report SQL Script "02 - Populate HDSReleaseOrder.sql" |
| S2a | Sandy Report SQL Script "02a - Populate HDSReleaseOtherAgency.sql" |
| S3 | Sandy Report SQL Script "03 - Populate HDSSentence.sql" |
| S4 | Sandy Report SQL Script "04 - Populate HDSCase.sql" |
| S5 | Sandy Report SQL Script "05 - Populate HDSPerson.sql" |
| S6 | Sandy Report SQL Script "06 - Populate HDSAddress.sql" |
| S7 | Sandy Report SQL Script "07 - Merge on Gallery#.sql" |
| S7a | Sandy Report SQL Script "07a - Merge on CaseNumber.sql" |
| S8 | Sandy Report SQL Script "08 - Merge on First Last SSN.sql" |
| S9 | Sandy Report SQL Script "09 - Merge on First Last BirthDate.sql" |
| S10 | Sandy Report SQL Script "10 - Merge on Identifying Data.sql" |
| S11 | Sandy Report SQL Script "11 - Populate HDSHold.sql" |
| S13 | Sandy Report SQL Script "13 - Update Gallery#.sql" |
| SBP | Surety bond paid |
| SQR | Sandy Report SQL Script "qryResults.sql" (SHA-1 hash value ending 0dec) |
| SQRv2 | Sandy Report SQL Script "qryResults.sql" (SHA-1 hash value ending 1974) |

January 31, 2019

| | |
|---|---|
| Sandy Report | Expert Report of Professor Robert Sandy, Steven Henderson, and Alison Shine, dated August 6, 2018 |
| SFR | Sandy Report Final Results "2018-08-01 Verified Data v5 Plaintiffs' Expert Data.xlsx" |
| SQL | Structured Query Language |
| SSMA | Microsoft SQL Server Migration Assistant for Oracle Version 7.10.0 |
| SSMS | SQL Server Management Studio v17.9 |
| SSN | Social Security Number |
| T-SQL | Transact-SQL |

January 31, 2019

# Introduction

1.   At the request of Frost Brown Todd LLC, counsel for Defendants, I was retained to investigate the opinions in the expert report of Professor Robert Sandy, Steven Henderson, and Alison Shine, dated August 6, 2018 ("Sandy Report") related to the alleged over detention of incarcerated inmates in Indiana's Marion County jails.

2.   During my investigation, I analyzed the Sandy Report, associated computer code and databases, and results relied upon by the Sandy Report to understand the validity of its claims. Additionally, I generated my own computer code to understand issues with the results detailed in the Sandy Report.

3.   Based on my investigation of the code and databases used to generate the results alleged in the Sandy Report, I found that the 42,170 results disclosed in the Sandy Report could not be reproduced from the database files because the code was either incompatible with the database files provided, incompletely disclosed, or contained syntax errors. Thus, the allegations of the Sandy Report cannot be verified and are not reliable.

4.   Additionally, I found that Plaintiffs' Experts were not careful in preserving the integrity of the digital evidence they were provided. For example, I observed that one of the database files containing forensic

January 31, 2019

evidence from the Indiana Court's Odyssey database system had been modified to an unknown extent. Generally, I found that the methodology of Plaintiffs' Experts was not fully documented and inconsistent with the text of the Sandy Report. I also found that the Sandy Report was internally inconsistent in certain aspects. For example, numbers were not consistent between tables and text in the report. These issues further demonstrate that the conclusions contained in the Sandy Report are not reliable.

5.    Finally, through my own analysis of the databases, I found thousands of instances where the results disclosed by Plaintiffs' Experts were inconsistent with the methodology disclosed in their report. In particular, I identified 3,458 incarceration results that were associated with both temporary and permanent case numbers; the Sandy Report claims to have ruled out results of this nature. I also identified 6,797 instances of results that had other types of issues. The details of those findings are omitted in this section for brevity, but are disclosed later in this report.

6.    Based on my findings, as discussed in the following sections of this report, it is my opinion that the Sandy Report is based upon unrepeatable methodology and unreliable data which are indicative of a potentially high error rate. Thus, it is my opinion that the Sandy Report and its conclusions cannot be relied upon to a reasonable degree of

**January 31, 2019**

engineering certainty as to how long inmates have been detained at the

Marion County jails beyond the time a court ordered their releases.

January 31, 2019

## Qualifications

### Education

7.   I obtained a Bachelor of Science degree in Electrical Engineering from Pennsylvania State University in 1999, which was awarded with honors and highest distinction. As part of that degree program, I learned the fundamentals of computer science including programming in various software languages and database construction.

8.   I received an M.A. in Electrical Engineering from Princeton University in 2001, and I was awarded a Ph.D. in Electrical Engineering from Princeton University in 2004. My graduate research focused on semiconductor devices for telecommunications, computer networks, televisions, and electronic devices. I have authored over 40 publications including 5 book chapters and I edited 1 book entitled, The Power Grid. I also have 24 issued United States patents.

### Employment Experience

9.   I am a Principal Engineer at Exponent, Inc. ("Exponent"), an engineering and scientific consulting firm, headquartered at 149 Commonwealth Drive, Menlo Park, California 94025. I am based in Exponent's office in Bowie, Maryland. I have 20 years of experience as a project leader on various science and engineering projects including

projects related to software engineering, software quality, and computer science.

10.  From 2004 to 2008, I was a senior scientist at Universal Display Corporation, a publicly-traded company specializing in the research and development of energy-efficient organic light emitting diode technology. At Universal Display Corporation, I was the principal investigator or project manager for multiple small business innovation research and solid-state lighting grants from the United States Department of Energy. I also assisted in the development of the Department of Energy's multi-year program plan for solid-state lighting. I successfully managed projects worth several million dollars that delivered world-record white organic light emitting diode power efficiencies to clients engaged by Universal Display Corporation. Separately, I was a subject matter expert on an enterprise software development effort to gather and summarize experimental data to be presented in real time to C-Suite executives at Universal Display Corporation.

11.  I joined Exponent in October 2008. Exponent is a multi-disciplinary engineering and scientific consulting firm that specializes in failure analysis and project management evaluation, among other areas of expertise. Exponent employs scientists, physicians, engineers, and regulatory consultants from over 90 technical disciplines to address complicated issues facing private industry and government.

January 31, 2019

12.  At Exponent, I have been a project manager on approximately 20 projects per year covering subjects as varied as software compliance, source code review, product recalls, intellectual property disputes for software and computer network equipment, risk assessment, and failure modes effects and analysis for software and other products. For example, I investigated a matter to determine the cost of delays and project management issues in the installation of an enterprise resource planning database system that was scheduled over 3 years for a large beverage manufacturer. The system installed by the client replaced a legacy system that had been used for decades. A key issue for that project was that the installation occurred while the company's business continued to operate on a daily basis, and on-site staffing with various consultants and vendor representatives was necessary to ensure continued production.

13.  While at Exponent, I have also served as an expert consultant for software projects where quality issues arose as a result of the project management methods employed, including the following engagements:

- In *Open Systems Technologies DE LLC v. Legal Copy Services Inc.*, No. 16-02922-CKB (Mich. Cir. Kent Cnty. 2016), Exponent was retained for my services as an expert to opine on risks dealing with software system replacement, agile software development, and industry standards dealing with software life cycle processes. This lawsuit involved claims of fraud in the inducement and

January 31, 2019

breach of warranties brought against a software development partner regarding a failed on-site custom software installation that was allegedly abandoned before it was completed. The software was a solution for legal case management.

- In *Ziegler v. Bentley,* No. 03-CV-2016-000980.00 (Al. Cir. Montgomery Cnty. 2016), Exponent was retained for my services as a consulting expert for the State Auditor of Alabama. This case was a putative class action brought by a State Auditor on behalf of Alabama taxpayers against the Governor of the State of Alabama, the Acting Director of Finance of the State of Alabama, the Attorney General of the State of Alabama, and a software company regarding an enterprise resource planning solution. I was retained in this matter to provide an expert opinion about whether the software program was a customized software program not subject to competitive bidding.

- For another matter, Exponent was retained for my services to analyze database software that was modified and developed specifically for the United States military. I reviewed hundreds of thousands of lines of Java code in custom-designed software for inventory tracking, personnel management, ID management, and telecommunication provisioning. Also, I reviewed hardware

components to determine any compliance issues with International
Traffic in Arms Regulations.

- I am currently acting as a consulting expert in arbitration on the
  implementation of an enterprise scale maintenance system
  employing an Oracle database. Exponent was retained for my
  services to review the manner in which a maintenance, repair, and
  operation enterprise software management system, including a
  database and client interfaces, was constructed and to render an
  expert opinion regarding whether the transition and roll out of the
  implementation was properly performed.

## Licenses, Certifications, and Awards

14.  In 2010, I was licensed as a Professional Engineer in the state
of New York. This license provides the authorization to practice
engineering using this professional title in New York. The license was
granted by the New York State Education Department's Office of the
Professions and required the completion of two 8-hour professional exams
as well as 12 years combined education and professional experience. The
professional engineer exams tested elements of software engineering,
power systems, project management, skills and tools for business practices
related to agreements, contracts, professional liability and code of ethics,
and engineering economics related to cost-benefit analyses and risk

January 31, 2019

assessments. I have since been licensed as a Professional Engineer in Colorado, Connecticut, the District of Columbia, Florida, Georgia, Idaho, Maryland, Massachusetts, Michigan, New Jersey, New Mexico, North Carolina, Pennsylvania, and Virginia. To maintain these licenses, I participate in approximately 16 hours of professional development every year, which includes publishing articles and books and taking courses on topics related to project management.

15.  In 2010, I became a Senior Member of the Institute of Electrical and Electronics Engineers, which is the world's largest technical professional organization dedicated to advancing technology for the benefit of humanity. Senior members represent about 8 percent of the organization's approximately half-million members, and they obtain that recognition by being a scientist or engineer in professional practice for at least 10 years and showing significant performance in an area over a period of at least 5 years in their profession.

16.  Since 2011, I have been a Certified Cisco Network Associate because of my education, experience, and training related to network devices such as routers, switches, access points, network protocols, and network architectures. In 2013, I became a Certified Cisco Network Professional based on additional experience with enterprise level computer network architectures, devices, and software protocols.

January 31, 2019

17.  In 2013, I became a certified software quality engineer based on the requirements from the American Society for Quality, which provides training, professional certifications, and knowledge to professionals in 130 countries. To obtain this certification, an applicant is required to successfully complete a 4-hour exam, to have 8 years of on-the-job experience, and to have a minimum of 3 years of experience in a decision-making position with the authority to define, execute, or control the management of projects and processes and to be responsible for the outcome. The certification is based in part upon project management principles and techniques as they relate to software project planning, implementation and tracking, and the evaluation and management of risk. The project management aspect of this certification is based on the Project Management Institute approach embodied in the project management body of knowledge guidelines, discussed below.

18.  In 2014, I became a Certified Information Systems Security Professional by the International Information System Security Certification Consortium, which is one of the most recognized security certifications and it indicates that I can effectively design, implement, and manage a best-in-class cybersecurity program. Candidates must have a minimum of 5 years cumulative paid work experience in two or more of the eight domains of the Certified Information Systems Security Professional knowledge areas including Security and Risk Management,

Asset Security, Security Architecture and Engineering, Communication and Network Security, Identity and Access Management, Security Assessment and Testing, and Software Development Security.

19.  As a Certified Information Systems Security Professional, I have been a board member for the National Capitol Region chapter of the Information System Security Certification Consortium for 3 years and will serve as secretary of the board in 2019. As a board member, I prepare and host monthly presentations on a variety of topics including Blockchain technology, cryptography, compliance, General Data Protection Regulation, domain name systems, and cybersecurity.

20.  In 2016, I earned the Project Management Professional credential from the Project Management Institute. To obtain this certification, an applicant must have a bachelor's degree, a minimum of 36 months of unique non-overlapping professional project management experience, 4,500 hours spent leading and directing projects, 35 hours of formal project management education, and have successfully completed a 4-hour exam. The exam tests an applicant's understanding of the well-established and widely-accepted project management body of knowledge, an American National Standards Institute guideline publication for project management professionals. The project management body of knowledge principles have interdisciplinary applications, including application to software projects such as the configuration and installation

of enterprise resource planning systems, and other large scale systems. In order to maintain the Project Management Professional certification, it is necessary to earn 60 hours of professional development credit every 3 years, which may be satisfied by maintaining current knowledge regarding developments in project management.

21.  My education, experience, and qualifications, including a list of my publications, are set forth in my curriculum vitae, attached hereto as Appendix A. My opinions, as expressed in this report, are based on my education, career, and relevant experience, as well as materials reviewed for this matter. Appendix B contains a list of matters in which I have testified as an expert at trial, provided expert reports, and provided consulting expert services.

22.  I am a salaried employee of Exponent. Exponent charges an hourly rate of $450/hour in 2019 plus expenses for my work performed in connection with this litigation. I have received no additional compensation for my work in this litigation, and my compensation does not depend upon the content of this report, any testimony I may provide, or the ultimate outcome of this litigation. I directed the work and analysis in the preparation of this report and was assisted by Exponent staff members that were under my supervision and direction.

January 31, 2019

# Background

23.  The Office of the Indiana Supreme Court uses the Odyssey Case Management System ("Odyssey") computer software to record, organize, and track cases that are heard by the court.[1] The criminal division of the Marion County Superior Courts migrated to Odyssey in anticipation of changes to Indiana's criminal code that were to take effect in 2014. This change, in part, required felonies be classified using a number-based system.[2] The previously-used Justice Information System ("JUSTIS")[3] software was replaced by Odyssey in June 2014.[4]

24.  In conjunction with the court's migration from JUSTIS to Odyssey, the Marion County jail system moved to new jail management software that was interfaced with the court's new Odyssey software. In June 2014, the Marion County jail system began using new inmate management software called the Offender Management System ("OMS").[5] This software stores inmate incarceration data and is used by the Marion County jail staff to add, transfer, or release inmates as needed.

---

[1]  Sandy Report, p. 1.

[2]  Peterson Deposition, p. 24: 15-19.

[3]  Justice Information System Inquiry Manual, p. 1

[4]  Peterson Deposition, p. 95: 22-25.

[5]  Sandy Report, p. 3.

January 31, 2019

25.  This OMS system replaced the Jail Information Management System ("JIMS") that preceded it.[6] The OMS database is automatically updated by the Odyssey software to include any new inmates or the release of current inmates on a case by case basis, as court staff enter orders into Odyssey.[7] Synchronization between OMS and Odyssey is performed through DEXTER.[8] DEXTER was implemented by the Information Services Agency, which "is the enterprise provider of information technology services and solutions for the Consolidated City of Indianapolis and Marion County."[9]

26.  A specific procedure must by followed each time an inmate is released from custody. Judges' release orders are sent from the Odyssey database through DEXTER and are received by the OMS system. A release involves checking multiple databases for other warrants or jurisdiction holds.[10] This includes the OMS and Odyssey databases for local holds, the Indiana Data & Communication System and Indiana Department of Correction databases for statewide holds, and the National

---

6   Peterson Deposition, p. 31: 9-15.

7   Loyal Deposition, p. 57: 8-14.

8   Wood Deposition, p. 70: 7-15.; Peterson Deposition, p. 35: 4-9.

9   https://web.archive.org/web/20190114024124/http://www.indy.gov/eGov/County/isa/Pages/home.aspx, accessed January 30, 2019.

10  Loyal Deposition, pp. 10-12; Layton Deposition, pp. 92-93.

January 31, 2019

Crime Information Center database for national holds, along with any emails and faxes that may be related to the case.[11]

27.  The release process includes a review in the OMS system to ensure that other issues related to the inmate's incarceration have been resolved. The inmate's identity is also verified to ensure the correct person is being released and that the inmate has no associated aliases that have warrants or holds.[12]

28.  Plaintiffs Michael Driver, Terry Clayton, Michael Boyd, Nicholas Swords, and Roy Shofner were incarcerated in Marion County jails for different periods of time between November 2014 and February 2015.[13] A class action complaint was filed on May 5, 2015, in the United States District Court Southern District of Indiana Indianapolis Division.[14] The complaint seeks "money damages"[15] for the Plaintiffs and claims violations of their constitutional and state rights because they were held in jail for "unreasonable periods of time"[16] before being released.

---

[11]  Wood Deposition, p.13: 1-21.

[12]  Loyal Deposition, p. 10: 18-24.

[13]  Plaintiffs' Third Amended Class Action Complaint, pp. 4-11.

[14]  Plaintiffs' Third Amended Class Action Complaint, p. 1.

[15]  Id.

[16]  Id.

January 31, 2019

**The Sandy Report**

29.  Dr. Robert Sandy, Steven Henderson, and Alison Shine authored their report (*i.e.*, the Sandy Report) with the stated task of analyzing "the Odyssey and OMS data to determine the length of time inmates were held by the Sheriff after courts had ordered their releases from the Marion County Jail system."[17] The Sandy Report authors were given the Odyssey files from "2012 through November of 2017" and the OMS files covering the period "from March 27, 2003 to June 10, 2018."[18]

30.  Data from the OMS and Odyssey databases were imported or migrated into a Microsoft SQL Server database for analysis.[19] In order to determine the length of time inmates had been held beyond their court release, the Sandy Report outlines 11 criteria that limit the scope of their analysis. These criteria[20] are summarized as:

- The inmate's release date was after June 5, 2014.

- There were no other outstanding warrants for the inmate.

- Only specific release codes were used in the analysis indicating the inmate should be released.

---

[17]  Sandy Report, p. 1.

[18]  Sandy Report, p. 2.

[19]  Henderson Deposition, pp. 20-21.

[20]  Sandy Report, pp. 4-6.

January 31, 2019

- The most recent sentence was used to determine if the inmate had completed their "time served."

- A release time was approximated for the cases where no release order was found, but the inmate was released.

- If inmates had multiple cases, the case with the latest release date was used.

- No inmate transfer was requested by another jail system.

- There were no probation violations.

- Release data associated with inmates who had temporary cause numbers (*i.e.,* a miscellaneous criminal ["MC"] number) as well as regular cause numbers were not included.

- The release data did not include a specific set of release types.

- Specific OMS detainer codes were not associated with an inmate's records.

31. The Sandy Report relies upon a metric they call "TimeToRelease," which its authors define as "the length of time inmates were held by the Sheriff after courts had ordered their releases from the Marion County Jail system."[21] The Sandy Report discloses a calculation of

---

[21] Sandy Report, p. 1.

42,170 TimeToRelease values. Based on these values, they disclose that 20,974 inmates were held longer than 6 hours after they were eligible for release. Their analysis also calculated 3,971 TimeToRelease events that were longer than 24 hours.[22]

32.   The Sandy Report also compared the release times as a function of year to support their opinion that the conversion to the OMS system in 2014 caused longer inmate release delays. The Sandy Report alleges that 2014 had the highest percentage of inmate release times above 24 hours at 18.5% compared to between 5.8% and 10.3% in the following years.[23] The Sandy Report also alleges that 2014 had the highest percentage of inmates released between 0 and 6 hours compared to the following years.[24] They cite the time to release after 6 hours as a metric for showing that the jail system has not improved over time. Their analysis indicates that the percentage of inmates released after 6 hours increased from 40.34% in 2014 to 61.15% in 2017.[25]

33.   The Sandy Report also breaks down most of the release data by type of release code. The authors conclude that the inmates with a court-

---

[22]  Id.

[23]  Sandy Report, p. 13.

[24]  Id.

[25]  Id.

January 31, 2019

order release code are released the fastest and those with a time-served

release code are released the slowest.[26]

34.  In summary, the Sandy Report claims that 2014 was "worse

than the other years,"[27] that the Marion County jail system "never solved

the problem of expeditiously releasing inmates,"[28] and the release time

"varied substantially by type of release."[29]

---

[26]  Sandy Report, p. 15.

[27]  Sandy Report, p. 17.

[28]  Id.

[29]  Id.

January 31, 2019

# Methodology and Analysis

35.  For the purpose of this report, I reviewed documents, databases, and scripts provided by counsel for Defendants. Appendix C is a list of materials reviewed. I also analyzed the received databases using commercially-available software.

## Software

### Oracle SQL RDBMS

36.  Oracle Database 18c[30] is produced by Oracle Corporation. It was used in my analysis to host the Marion County Sheriff's OMS database so that tables could be migrated to the Microsoft SQL server.

### Microsoft SQL RDBMS

37.  Microsoft SQL Server 2017[31] is produced by Microsoft Corporation. It was used to host databases for all SQL-based analysis work in this report.

38.  SQL Server Management Studio v17.9 was used as an SQL client to interact with the Microsoft SQL Server for tasks such as

---

[30]  https://www.oracle.com/technetwork/database/enterprise-edition/downloads/oracle18c-linux-180000-5022980.html, accessed January 30, 2019; Version Oracle Database 18c Enterprise Edition Release 18.0.0.0.0 – Production Version 18.3.0.0.0.

[31]  https://docs.microsoft.com/en-us/sql/linux/quickstart-install-connect-red-hat?view=sql-server-2017, accessed January 30, 2019; Build number used was 14.0.3037.1.

January 31, 2019

importing and querying databases from computers running Windows operating systems.

39.  SQL Operations Studio Version 0.32.9 was also used as an SQL client to query databases from computers running macOS operating systems.

40.  Microsoft SQL Server Migration Assistant for Oracle Version 7.10.0[32] is a software program for importing data from an Oracle SQL Server into a Microsoft SQL Server. It was used to import OMS data from the Oracle Database to the Microsoft SQL Server.

**SHA-1 Hash Values**

41.  When handling digital evidence, a standard practice is to maintain its integrity. Digital evidence can be inadvertently modified due to its complexity and the complexity of tools used to store it and interact with it.

42.  One commonly used technique to determine if digital evidence has been altered is the use of hashing algorithms, for example SHA-1, to generate a hash value for a digital file.[33] The hash value of a file can be recalculated periodically and compared against its original value to verify if the file has been altered. Also, by saving the hash value of digital files

---

[32] https://docs.microsoft.com/en-us/sql/ssma/oracle/installing-ssma-for-oracle-oracletosql?view=sql-server-2017, accessed January 30 2019.

[33] ISO/IEC 27037:2012, p. 4, section 3.25.

January 31, 2019

composing digital evidence, the evidence can be identified uniquely. For this reason, I have used SHA-1 hash values to uniquely identify database files and scripts referenced in this report.

## Data Reviewed

43.  In September 2018, counsel for the Defendants provided Exponent with a hard drive that contained the following data from Steven Henderson, one of the authors of the Sandy Report:

- 1 Microsoft Word document labeled "HDS Database Files.docx";

- 4 database files; and

- 15 SQL scripts contained within a folder titled "Queries."

44.  The Word document, dated June 12, 2018, contained a letterhead with "Henderson Data Solutions[LLC]," which is the name of a consulting firm that Mr. Henderson leads as Chief Executive Officer.[34] The Word document provided brief descriptions (several sentences) of the database files and scripts provided.

45.  Of the 4 database files received, 1 file contained data from the OMS database, 2 files contained data from Odyssey databases, and 1 file contained output data from the 15 SQL scripts. Additional details of the

---

[34]  Henderson Deposition, p. 6: 22-24.

database files, documented during Exponent's examination of the four database files, are disclosed in Appendix E.

46. As explained in "HDS Database Files.docx," the information contained in the Odyssey databases ("Odyssey" and "Odyssey2") was originally "imported from text files"[35] by Plaintiffs' Experts. These text files were not provided to me and thus accuracy of the data within the Odyssey databases could not be verified. Furthermore, as discussed in the next section of this report, additional tables were present in the Odyssey database, which were likely created by Mr. Henderson. It is unclear if these tables were created accidentally. Moreover, the presence of these tables indicates that Plaintiffs' Experts failed to maintain the integrity of the databases that they claim their analysis is based upon.

47. Of the 15 scripts received, 8 scripts were intended to copy information from the OMS and Odyssey databases into 8 tables in the DriverAnalysis database, 6 scripts were intended to modify the table "HDSPerson" in the DriverAnalysis database, and 1 script was intended to generate the final results ("SFR") that the Sandy Report relied upon in their allegations of inmate over detainment. The 15 scripts were required to be executed in a particular order starting with script "01 - Populate

---

[35]  HDS Database Files.docx, p. 2.

January 31, 2019

HDSRelease.sql" and ending with "QryResults.sql."[36] Appendix E contains a complete list of these scripts.

48.  As noted in more detail in Appendix E, I found that "05 – Populate HDSPerson.sql" queried data from a column that did not exist in the Odyssey2 database and thus could not be executed. Additionally, "qryResults.sql" contained syntax errors that prevented its execution. Because the 15 scripts rely upon a sequential execution flow to produce calculations of TimeToRelease, I was unable to fully reproduce Plaintiffs' Experts analysis detailed in the Sandy Report. Furthermore, based on the description in "HDS Database Files.docx.," I was unable to verify that the "10 – Merge on Identifying Data.sql" script was run, by Plaintiffs' Experts, as received because the Plaintiffs' Experts indicated that "we would run this several times with additional filters." It was not clear what these "additional filters" were and how they affected the final results.

49.  On January 21 2019, I was provided a second version of "qryResults.sql"[37] by counsel for Defendants. This script ran without issue and appeared to generate results consistent with those in SFR from the tables provided in the DriverAnalysis database; however, the DriverAnalysis database tables contain modified information from the Odyssey and OMS databases. Furthermore, the DriverAnalysis database

---

[36]  Peterson Deposition, pp. 45-46.
[37]  SHA-1 hash value 159551d58f9d38be1dd79e6f01e07116c6e81974.

January 31, 2019

tables provided by Plaintiffs' Experts were allegedly created by running the 14 other SQL scripts in sequential order. Thus, this second version of "qryResults.sql" script does not make Plaintiffs' disclosure of their methodology complete or reproducible since script 5 would not run as noted above. Stated another way, after receiving this second version of "qryResults.sql" I was unable to reproduce SFR by sequentially running the 15 SQL scripts to process the Odyssey and OMS data provided.

50.  In September 2018, counsel for Defendants also provided me with a Microsoft Excel spreadsheet[38] (*i.e.*, the SFR), which contained 42,170 rows and 15 columns of information on which the Sandy Report bases its allegations of over detainment. My analysis of this information is discussed in a later section of this report.

## Analysis of Sandy Report Methodology

51.  Based on my review of the database files and SQL scripts discussed above, I created a flow chart to visualize the data processing flow implemented to produce the results relied upon by the Sandy Report, as illustrated in Figure 1. The generation of the SFR relies upon the successful output of all 15 SQL scripts provided. Because one of the scripts could not be executed and another script was not disclosed as it was run, the SFR could not be reproduced.

---

[38]  "2018-08-01 Verified Data v5 Plaintiffs' Expert Data.xlsx."

January 31, 2019



Figure 1.    Data processing flow of the Sandy Report. HDSPerson and SFR are colored red to indicate they could not be generated from the Odyssey and OMS databases provided. The thin black arrows indicate the flow of information between tables.

52.  As shown in Figure 1, the data was sourced from three tables from the OMS database, five tables from the Odyssey database, and five tables from the Odyssey2 database. The successful generation of SFR relies upon the successful generation of all intermediate tables in the DriverAnalysis database.

53.  Eight of the SQL scripts were created for the purpose of populating eight intermediate "HDS" tables in the DriverAnalysis

database. Scripts S7, S7a, S8, S9, and S10 were created for the purpose of matching records in the HDSPerson table. SQR was found to take data stored in seven of eight intermediate "HDS" tables as input and then output the SFR.

54.  The Sandy Report notes "[i]nmates were occasionally improperly identified by the jail, so additional checks were added to identify people and match their cases to their releases." In certain circumstances, these additional checks were found to be incomplete or arbitrary. For example, in S10, OMS and Odyssey records were matched based on 14 different criteria where a seemingly arbitrary point system created by Mr. Henderson was used to determine if a sufficient number of match criteria had been met. Mr. Henderson indicated this point system was based on "[his] subjective analysis on how identifying [he] thought each field would be."[39] Additionally, in S7 records are merged based on gallery number, which Mr. Henderson indicated was used to match most OMS and Odyssey records for his analysis.[40] Mr. Henderson indicated that the gallery number field contained invalid categories,[41] however, in S7 of his analysis, the only requirement for the validity of gallery numbers is that they are not empty, not '000000000000', or not '000000000001'.

---

[39]  Henderson Deposition, pp. 62-64.
[40]  Henderson Deposition, pp. 57-58.
[41]  Henderson Deposition, p. 24: 9-11.

January 31, 2019

55. The Odyssey database provided was found to contain nine tables starting with the letters "HDS," which indicated that Plaintiffs' Experts had modified the Odyssey database and thus destroyed the integrity of this database as evidence. It is unclear if other modifications were made to the Odyssey database as the Plaintiffs' Experts had not provided the original text files that were used to create this database. These nine tables are shown in Figure 2.



Figure 2.     Screenshot of nine HDS tables (indicated in red box) found in the Odyssey database provided. The presence of these tables indicates that Plaintiffs' Experts may have unnecessarily modified data in the Odyssey database they imported it from text files.

56. The Sandy Report notes that when prisoner sentence information is updated by the courts in the Odyssey database, multiple

records are generated. With respect to these multiple records, the Sandy report notes that "the most recent version per case is the relevant record." Upon my review of "03 – populate HDSSentence.sql," however, I observed on line 14 that records for each case in Odyssey were assigned a "Rank" in decreasing order of their sentence days. For example, if one record had 10 sentence days and another had 5 sentence days, the record with 10 sentence days would have a higher "rank." Furthermore, on line 16, all records, except for the one assigned a "Rank" [42] value of "1," were ignored in Plaintiffs' analysis. This indicates that Plaintiffs' Experts did not select the most "recent version" of sentence information related to each case as they opined was important. Instead, Plaintiffs' Experts used the version of sentence information that had the greatest number of sentence days. This directly contradicts the methodology disclosed in the Sandy Report and in my opinion, renders their analysis of inmates released on time served inconsistent.

---

[42]  Sandy Report, p. 5.

January 31, 2019

# Discussion on the Sandy Report's Final Results

57. The Sandy Report bases its opinions upon the 42,170 results in SFR.[43] Using the release times and gallery numbers provided in the SFR, I checked for potential errors in the SFR using the OMS Case_Master table. The OMS Case_Master table contains a list of cases for each incarceration and is linked to the OMS booking table through a unique SysID value. The OMS booking table contains the release times and gallery number for each incarceration. Appendix E provides my analysis of the OMS tables relevant to this report.

58. At the time of this report, my understanding of the Case_Master table is that it is used to keep track of all cases that are associated with an inmate's incarceration.[44] Furthermore, my understanding is that the data in the Case_Master is used by OMS during the evaluation of an inmate's eligibility for release.[45]

59. As discussed previously, the script that was intended to output the SFR could not be run due to syntax errors. I modified the script by commenting out problematic portions to enable the script to run. Additionally, the script was also modified to output results into an SQL

---

[43] "Verified Data v5 Plaintiffs' Expert Data.xlsx."

[44] Based on my communications with Derek Peterson on September 7 2018, October 29, 2018 and November 29, 2018.

[45] Id.

table so I could query this information quickly. I verified that the number of rows in this matched the SFR. Appendix D provides all SQL scripts I wrote to analyze the SFR.

## Specific Deficiencies

### Sentences Calculated on Time Served

60.  The Sandy Report includes 988 calculations of time to release that do not have a release order time. Specifically, these 988 results are indicated in the SFR where the value in the column titled "ReleaseOrderDate" is "NULL." For these 988 results, the Sandy Report provides calculations of a release date based on a formula provided in the Sandy Report; however, they also note that the formula "was not consistently applied across the Courts in cases with a future, as opposed to time served" release.[46] This statement introduces doubt into the validity of the equation used to calculate release dates for these 988 results. Furthermore, no evidence is provided that the formula is valid for situations in which inmates were released on time served.

### Latest Court Releases Were Not Used

61.  The SFR contains 1,874 results that did not use the latest release date. For example, I found in some instances that multiple release orders were issued for the same case (or sometimes two different cases

---

[46]  Sandy Report, p. 5.

associated with an inmate's incarceration) by the Courts and the Plaintiffs' Experts had not used the latest one. This caused the calculation of time to release to be larger than it would be if a latter release date was used. I did not find a basis explaining why earlier release dates were used in the Sandy Report.

## Some Incarcerations Could Not Be Validated

62. The SFR contains 3,935 results where a release order could not be found in HDSReleaseOrder for case numbers associated with any incarceration in Case_Master. Thus, the Plaintiffs' Experts may have used case numbers that were not associated with the incarceration in the OMS system.

## Incarcerations with MC and Non-MC Cases

63. I found 3,458 results in the SFR where MC and non-MC cases were associated with incarcerations. This is inconsistent with the Sandy Report where the Plaintiffs' Experts note that "[w]e did not include any release data associated with inmates who had MC cause numbers as well as regular cause numbers."[47]

64. The 3,458 results with associated MC and non-MC cases were identified independent of the previously noted issues. Thus, it is possible that these results overlap with previously described issues I identified in

---

[47] Sandy Report, p. 6.

my scripts. For example, some of the 3,458 results may been associated with MC and non-MC cases and also calculated based on time served.

## Numeric Inconsistencies Found in the Sandy Report

65.  Page 10, first paragraph: There is a numeric inconsistency. The report reads: "There were 20,974 inmates, or 48%, who were held more than 6 hours." Table 1 on page 11, however, indicates the same value to be 19,188.

66.  Page 13: The Sandy Report is inconsistent with its findings. The last paragraph reads: "the respective percentages from 2014 through 2017 who were held beyond 6 hours is: 40.34%, 47.60%, 45.57%, 61.15%." The Sandy Report's Table 2 on page 14, however, which allegedly holds this information, does not match. The table instead includes 48.00%, 48.50%, 44.55%, and 61.15% in the row indicating values of inmates held beyond 6 hours.

67.  Page 15: Four different categories of release types and their respective counts of allegedly calculable results are provided: "The respective number of inmates by category from CBP (Cash Bond Paid), ORC, SBP (Surety Bond Paid), and Sentence Completed are: 9,287, 24,072, 2,844, 988." The sum of these values is 37,191, which falls short of the total of calculable results of 42,170 listed on page 8.

68.  Page 16, Table 3: This table indicates that there was zero change in the percentage of inmates released between hour 18 and hour 19 on a Cash Bond Paid release code. This is inconsistent with the SFR excel file provided, which indicates that more than 200 inmates were released between these two hours. Thus, Dr. Sandy has made an error in reporting or calculating Table 3.

69.  The above basic numeric inconsistencies in the Sandy Report indicate that the report was not reviewed thoroughly for obvious errors. These inconstancies also suggest that the Sandy Report may contain other numeric errors that are not immediately apparent and its alleged counts of prisoner over detainment cannot be relied upon.

## General Deficiencies

70.  The Sandy Report does not provide identifying information on the software or data used to generate the results that it relies upon. In order to reproduce computationally-derived results, it is necessary to specify the version of software used since different versions of software contain different bugs or features and consequently may produce different results. Additionally, it is standard practice to provide checksum files in order to determine if data have been modified or corrupted.[48] Plaintiffs' Experts do not provide a check sum file with the database files or scripts

---

[48]  ISO/IEC 27037:2012.

January 31, 2019

they produced; thus, I was unable to verify the integrity of the data provided.

71.   The OMS and Odyssey data relied upon by the Sandy Report are known to contain entry errors and formatting inconsistencies as evidenced by the complexity of the associated SQL scripts. The database records in both systems are manipulated manually via graphical user interfaces and are subject to human error when information is entered or modified.[49] For example, gallery numbers are automatically generated by the OMS system, but are entered manually into the Odyssey system,[50] which resulted in many instances of invalid gallery numbers. To this end, the Sandy Report notes that "[a] large amount of time was spent time [*sic*] cleaning and formatting the data to make it usable for matching."[51] Thus, the results relied upon by the Sandy Report's allegations of inmate over detention may be heavily dependent upon the methodology of the Sandy Report's authors, but are not reproducible and/or have a potentially high error rate.

72.   Furthermore, each incarceration is subject to a number of variables that are not captured in the Odyssey and OMS databases; however, Plaintiffs' Experts only rely upon this data for their calculations.

---

[49]   Peterson Deposition, p. 160: 7-8; Thamba Deposition, p. 103: 5:16.
[50]   Discussion with Brian Peterson on October 29, 2018.
[51]   Sandy Report, p. 4.

35

For example, some inmates use aliases or false names when booked into jails. Separately, some incarcerations require jail staff to communicate with law enforcement in a different county and consequently affect the time required to process inmates out of prison.[52] Amitav Thamba, the chief technology officer for the Marion Superior Court, agreed that individualized determination of how long it took to release an inmate was necessary.[53] John Layton, the Marion County Sheriff, indicated that "every inmate is different," and "there's really no set [release] time."[54] Additionally, different courts in Indiana provide different communication formats for release orders. For example, jail records staff were known to receive emails from court employees after release orders were entered in Odyssey and transmitted to OMS.[55] Modifications to the court's release orders via email may not present properly in the database records for OMS and Odyssey. Therefore, the release times for those inmates will not be captured correctly in the Sandy Report.

73.  Plaintiffs' Experts detail differences between groups of inmates. For example, they have noted 7 scenarios into which their 42,170 results fall and note that "[they] identified several scenarios we considered to be

---

[52]  Peterson Deposition, p. 50: 16-20.

[53]  Thamba Deposition, p. 76: 7-12.

[54]  Layton Deposition, pp. 8-9.

[55]  Layton Deposition, pp. 93-94; Levy Declaration of Derek Peterson 4823-4249-3046 v.1 Signed - 4844-7563-2502.1.pdf; 055-2 Second Declaration of Derek Peterson - 4820-7235-9810.1.pdf

different and deserving of individual testing."[56] As another example, the largest category of inmates reads "Multiple Release Orders, No Sentences, No Holds"[57] with 26,345 results (*i.e.*, 62%); incarcerations with multiple release orders suggest an inmate is being detained on multiple cases. This category of results could be broken down further into groups based on the exact number of cases. Jail staff would require additional time to verify an inmate's eligibility for release based on the number and type of cases.

74.   Internet connectivity issues, which resulted in the delay of synchronization between Odyssey and OMS systems, were known to be a recurring issue.[58] Beginning in 2013, an increased number of internet connectivity issues intermittently prevented data transfer between the two systems.[59] Plaintiffs' Experts did not factor this issue into their calculation of time to release or address it in their report.

75.   The Sandy Report does not adequately disclose the extent and methodology of Alison Shine's manual testing of Mr. Henderson's 42,170 results. The report indicates that manual testing the results occurred; however, they simply note that "[s]ets of random samples of individual cases by type of release code were analyzed independently to determine the appropriate and actual release dates and then compared with our

---

[56]   Sandy Report, pp. 7-8.
[57]   Sandy Report, pp. 7-8.
[58]   Thamba Deposition, pp. 102-103.
[59]   Thamba Deposition p. 104: 7-21.

January 31, 2019

calculated results."[60] They do not state how many results were in these manual testing sets and how the manual testing was performed. For example, as noted above, I identified 3,458 results in which inmates had temporary and permanent case numbers associated with their incarceration.

76.   The Sandy Report was written by Dr. Robert Sandy, however, Steven Henderson performed the data analysis that Dr. Sandy relies upon to support Plaintiffs' claims of over detention. While the majority of the report describes the methodology of Mr. Henderson's calculation of 42,170 TimeToRelease events, Mr. Henderson indicated "[he] did not write any of the physical document in its final draft"[61] In fact, when asked about the numeric inconsistencies between the text and tables in the Sandy Report, Mr. Henderson replied "[t]hese are also Bob Sandy's charts and I do not know why he has different numbers there."[62] This is evidence that discrepancies exist between Mr. Henderson's analysis and the allegations in the Sandy Report.

77.   The analysis performed by Steven Henderson relies upon a complex processing flow using Odyssey and OMS database data, which are markedly different from the actual process that Marion County jail staff

---

[60]   Sandy Report, p 7.
[61]   Henderson Deposition p. 8: 16-18.
[62]   Henderson Deposition p. 38: 6-7.

**January 31, 2019**

rely upon to determine inmate release criteria. As noted above, they rely upon communications outside of the database system to verify eligibility of inmates for release, which may take varying amounts of time to complete. Mr. Henderson's analysis also relies upon modifying information from the OMS and Odyssey database systems in order to match inmate records. This is not consistent with how jail staff determined the eligibility of inmates for release.

## Conclusions

78.  Plaintiffs' Experts have modified the Odyssey database they relied upon to produce their results. In general, they failed to ensure the integrity of their data and scripts.

79.  As discussed in previous sections, the methodology relied upon in the Sandy Report is not reproducible, for the following reasons:

- Information that uniquely identifies the software, code, and data used in their analysis was not produced.

- S5 calls on columns that do not exist in the Odyssey2 database as provided. This indicates the version of the script or the version of the Odyssey2 database file, or both, were not produced.

- S10 was modified and run multiple times to generate the results relied upon by the Sandy Report; however, the exact code that was executed cannot be produced. Additionally, the conditions used to match inmate records are provided without standards or explanations.

80.  The 42,170 results relied upon in the Sandy Report contain the following groups of issues:

- 988 results are calculated based on a sentence end date. Plaintiffs' Experts disclose in their report that the formula used to calculate

sentence end dates was used inconsistently by the courts. Additionally, they did not pick the latest sentencing information to calculate their results;

- 3,458 results rely in incarcerations with MC and non-MC cases, which are claimed not to be included in their results;

- 1,874 results rely on a release order that is not the last one provided by the courts; and

- 3,935 results rely on release orders for cases that cannot be matched to OMS data.

81.  The Sandy Report contains inconsistencies noted previously in this report that suggest the experts have disclosed an analysis with a high rate error. Moreover, the Sandy Report relies upon an analysis that uses Odyssey and OMS data in an unrealistic scenario and does not account for factors external to the database system that play a role in the release of inmates at Marion County jails.

82.  Based on my findings as detailed in the previous sections of this report, it is my opinion that the allegations of the Sandy Report are generally unreliable and based on unrepeatable methodology.

_____          January 31, 2019
Brian D'Andrade, Ph.D.                    _____
                                          Date

January 31, 2019

# Limitations

83.  At the request of Frost Brown Todd LLC, Exponent conducted an analysis of the Sandy Report, and associated computer code and data. Exponent investigated specific issues relevant to this incident as requested by Frost Brown Todd LLC. The scope of services performed during this investigation may not adequately address the needs of other users of this report, and any re-use of this report or its findings, conclusions, or recommendations presented herein are at the sole risk of the user. The opinions and comments formulated during this assessment are based on observations and information available at the time of the investigation. No guarantee or warranty as to future life or performance of any reviewed condition is expressed or implied.

84.  The findings presented herein are made to a reasonable degree of engineering certainty. We have made every effort to accurately and completely investigate all areas of concern identified during our investigation. If new data become available or there are perceived omissions or misstatements in this report regarding any aspect of those conditions, we ask that they be brought to our attention as soon as possible so that we have the opportunity to fully address them.

## Appendix A

## Curriculum Vitae of Brian D'Andrade



# E<sup>x</sup>ponent®
Engineering & Scientific Consulting

## Brian D'Andrade, Ph.D., P.E.

Principal Engineer | Electrical Engineering & Computer Science
17000 Science Drive, Suite 200 | Bowie, MD 20715
(301) 291-2559 tel | bdandrade@exponent.com

## Professional Profile

Dr. D'Andrade is a licensed professional electrical and computer engineer consultant with 20 years of experience in research, development, risk assessment, and FMEA in a variety of engineering fields including electrical, electronic, semiconductor, computer, software, and network.  His expertise is used in a variety of litigation, mediation and arbitration matters including patent, copyright, trade secret, antitrust, and commercial.  He investigates the technical aspects of claims of loss caused by flood, fire, power outage, natural disasters, misrepresentations, breach of contract, poor project management and poor quality of goods, for example.

Dr. D'Andrade applies engineering principles in his consulting practice to assess how electronic products, electrical systems or software systems fail due to thermal events, flooding or other stressors exceeding equipment specifications. His risk assessments based on compliance to product standards and FMEA for unique failure modes provide well founded data for decision makers. He has investigated losses in residential homes, apartments, universities, solar farms, data centers and commercial buildings. His technical investigations have included losses involving electrical and electronic systems including consumer appliances, hard disk drives, building wiring, stray voltage, shock and arc-flash hazards, biomedical devices, batteries, and motors.

He has 14 years of commercial experience in the semiconductor field including consulting on, research and development of light-emitting diodes (LEDs). He has reviewed numerous semiconductor recipes for GaN semiconductors and non-volatile (Flash) memories in trade-secret and patent matters. His wide band- gap semiconductor experience includes intellectual property litigation matters on MOCVD and MBE growth methods, doping and device architectures. His non-volatile memory work experience includes shallow trench isolation, interlayer dielectrics, spacers and other flash memory structures for either patent or trade secret litigation matters.

In addition, Dr. D'Andrade consults on software, network and computer engineering issues. In terms of software quality, Dr. D'Andrade helps clients navigate software requirements, FMEA, compliance, installation, breach of contract, fraudulent marketing and operational issues. He has assessed operational algorithms for embedded systems, various industrial control systems, nuclear facility safety controls and various consumer electronic device firmware. In terms of computer engineering, Dr. D'Andrade has experience with enterprise network architectures, cybersecurity, digital forensics and memory storage.

Dr. D'Andrade has examined smartphone operating systems (Android and iOS) and various apps to determine data usage, resolve IP address information, determine timestamping, location and various other smartphone log data. He has assessed apps to determine their source code and capabilities for intellectual property matters. He has examined various networked device traffic information to determine details of the communication between servers and clients including analyzing cell-tower communications, geolocation data and time logs.

## Academic Credentials & Professional Honors

Ph.D., Electrical Engineering, Princeton University, 2004

M.A., Electrical Engineering, Princeton University, 2001

B.S.E.E., Electrical Engineering, Pennsylvania State University, *with honors and highest distinction*, 1999

2015 New York Intellectual Property Law Association's Inventor of Year

## Licenses and Certifications

Project Management Professional (PMP)

Certified Cisco Network Professional (CCNP)

Certified Cisco Network Associate - Security (CCNA-Security)

Certified Fire and Explosion Investigator (CFEI)

Certified Information Systems Security Professional (CISSP)

Certified IPC Specialist (CIS)

Certified Reliability Engineer (CRE)

Certified Software Quality Engineer (CSQE)

Certified Electrical Safety Compliance Professional (CESCP)

Licensed Professional Engineer, Colorado, #PE.0051324 (Electrical Engineering)

Licensed Professional Engineer, Connecticut, #28005 (Electrical Engineering)

Licensed Professional Engineer, District of Columbia, PE906800 (Electrical Engineering)

Licensed Professional Engineer, Florida, 76547 (Electrical Engineering)Licensed Professional Engineer, Georgia, PE041462 (Electrical Engineering)

Licensed Professional Engineer, Idaho, P-17072 (Electrical Engineering)

Licensed Professional Engineer, Maryland, #39671 (Electrical Engineering)

Licensed Professional Engineer, Massachusetts, #49411 (Electrical Engineering)

Licensed Professional Engineer, Michigan, 6201064867 (Electrical Engineering)

Licensed Professional Engineer, New Jersey, 24GE05246700 (Electrical Engineering)

Licensed Professional Engineer, New Mexico, 23717 (Electrical Engineering)

Licensed Professional Engineer, New York, #088186-1 (Electrical Engineering)

Licensed Professional Engineer, North Carolina, #040606 (Electrical Engineering)

Licensed Professional Engineer, Pennsylvania, #PE083596 (Electrical Engineering)

Licensed Professional Engineer, Virginia, 0402052671 (Electrical Engineering)

## Prior Experience

Senior Scientist, Universal Display Corporation, 2004-2008

Research Assistant, Princeton University, 2000-2003

Electrical Engineering Co-op, Kimberly-Clark Corporation, 1996

## Professional Affiliations

IEEE (senior member)

IEEE Computer Society (member)

IEEE P2301 - Guide for Cloud Portability and Interoperability Profiles- working group (Vice-chair and Secretary)

$ISC^2$-National Chapter Region (Secretary 2016, 2017, 2018)

Project Management Institute (member)

## Patents

Patent 9,385,167: OLED display architecture.

Patent 9,349,954: Stable blue phosphorescent organic light emitting devices, May 24, 2016.

Patent 9,112,171: Organic light emitting device and materials for use in same, August 18, 2015.

Patent 8,866,377: Long lifetime Phosphorescent Organic Light Emitting Device (OLED) Structures, October 21, 2014.

Patent 8,557,399: Stable blue phosphorescent organic light emitting devices, October 15, 2013.

Patent 8,513,658: White phosphorescent organic light emitting devices, August 20, 2013.

Patent 8,476,822: Saturated color organic light emitting, July 2, 2013.

Patent 8,372,526: Intermediate connector for stacked organic light emitting devices, February 12, 2013.

Patent 8,148,891: Electron impeding layer for high efficiency phosphorescent OLEDs, April 3, 2012.

Patent 8,080,937: OLED having a charge transport enhancement layer, December 20, 2011.

Patent 8,053,770: Emissive Layer Patterning for OLED, November 08, 2011.

Patent 8,040,053: Organic light emitting device architecture for reducing the number of organic materials, October 18, 2011.

Patent 7,800,295: Organic light emitting device having a microcavity, September, 2010 (with Mike

Weaver).

Patent 7,776,456: Organic light emitting devices with an emissive region having emissive and non-emissive layers and method of making, August 17, 2010 (with Theodore Zhou).

Patent 7,728,512: Organic light emitting device having an external microcavity, June 1, 2010.

Patent 7,710,017: Organic light emitting device having a transparent microcavity, May, 2010 (with V. Adamovich).

Patent 7,285,907: High efficiency multi-color electro-phosphorescent OLEDs, October 2007 (with M. Thompson, S. Forrest).

Patent 7,261,954: Organic light emitting devices having carrier blocking layers comprising metal complexes, August 2007 (with M. Thompson, X. Ren, V. Adamovich, S. Cordero, B. Alleyne, S. Forrest).

Patent 7,179,543: Doping of organic opto-electronic devices to extend reliability, February 2007 (with S. Forrest, A. Chwang).

Patent 7,022,421: Organic light emitting devices having carrier blocking layers comprising metal complexes, April 2006 (with M. Thompson, X. Ren, V. Adamovich, S. Cordero, B. Alleyne, S. Forrest).

Patent 7,009,338: High efficiency multi-color electro-phosphorescent OLEDs, March 2006 (with M. Thompson, S. Forrest).

Patent 6,869,695: White light emitting OLEDs from combined monomer and aggregate emission, March 2005 (with M. Thompson, J. Brooks, V. Adamovich, S. Forrest).

Patent 6,863,997: White light emitting OLEDs from combined monomer and aggregate emission, March 2005 (with M. Thompson, J. Brooks, V. Adamovich, S. Forrest).

Patent Application No. US 2009121621: Saturated color organic light emitting devices, filed October 24, 2008.

Patent Application No. US 20070103066: Stacked OLEDs with a reflective conductive layer, filed November 4, 2005 (with R. Hewitt, K. Rajan, V. Adamovich).

## Publications

D'Andrade B, Nauhaus G.  Personal Protective Equipment and other Job Site Safety Issues presented at First Party Claims Conference 2018.

Books on Amazon author page: https://www.amazon.com/Brian-DAndrade/e/B06XDMH2NP

D'Andrade B, Sorini A, Lochner Z.  Digital evidence presented at NJDA 51st Annual Convention, 2017.

D'Andrade B. The power grid: Smart, secure, green and reliable. D'Andrade B (ed), Woodhead Publishing, 2017

Murphy PF, Kattamis AZ, Souri SJ, D'Andrade BW. Expert Roles in Antitrust Litigation. Michigan Defense Quarterly 2017; 33(3).

Murphy PF, Kattamis AZ, Souri SJ, D'Andrade BW. Role of technology experts in antitrust litigation. IDC Quarterly 2016; 26(4):38.

D'Andrade B, Schroeder D, Lester S, Miller J.  The future is now - Data privacy & cybersecurity liability. FDCC 13th Annual Corporate Counsel Symposium, 2016.

D'Andrade B, Kuehn C, Brennan J. Software recognized as a key subsystem in electrosurgery systems by FDA.  Electrical Engineering & Computer Science Newsletter, 2016.

Kothari-Phan S, Shai D, D'Andrade B. Software quality standards: An approach to reduce lifecycle costs. Electrical Engineering & Computer Science Newsletter, 2016.

D'Andrade B, Kattamis A, Murphy P.  Flexible organic electronic devices on metal foil substrates for lighting, photovoltaic and other applications.  Handbook of Flexible Organic Electronics: Materials, Manufacturing and Applications.  Stergios Logothetidis (ed), Woodhead Publishing, 2014.

D'Andrade B. Characterization approaches for blue and white phosphorescent OLEDs: Luminescence: The instrumental key to the future of nanotechnology. Gilmore A (ed), Pan Stanford Publishing, 2014.

D'Andrade B. Phosphorescent organic light-emitting diodes for solid-state lighting in organic light-emitting diodes: Materials, Devices and Applications. Buckley A (ed), Woodhead Publishing, 2013. www.woodheadpublishing.com/9780857094254

D'Andrade B. Lighting: Molecules that convert heat into light. Nature 2012: 492.

D'Andrade B. Errors in organic light emitting diode measurements. IEEE: Reliability Society 2011 Annual Technical Report, 2011.

D'Andrade B, Turner G, Kattamis A, Saleh M. Reliability of switches that generate current in the grounding conductor. IEEE: Reliability Society 2011 Annual Technical Report, 2011.

D'Andrade B, Kattamis AZ, Murphy PF, McNulty J, Souri S. Arcing enabled by tin whiskers. IEEE: Reliability Society 2010 Annual Technical Report, 2010.

Pinato A, Meneghini M, Cester A, Wrachien N, Tazzoli A, Zanoni E, Meneghesso G, D'Andrade B, Esler J, Xia S, Brown J. Improved reliability of organic light-emitting diodes with indium-zinc-oxide anode contact. IEEE International Reliability Physics Symposium, IRPS 2009, pp. 105-108, Montreal Canada, April 26-30, 2009.

D'Andrade B, Kattamis AZ. Flexible active-matrix organic light emitting displays. Silicon Valley Engineering Council Journal 2009; 1:18-21.

D'Andrade BW, Esler J, Lin C, Adamovich V, Xia S, Weaver MS, Kwong R, Brown J. White phosphorescent OLEDs. Maximizing the power efficacy lifetime product. Digest of Technical Papers of IMID/IDMC/Asia Display 2008.

D'Andrade BW, Weaver MS, Brown J. The great white organic hope. Photonics Spectra 2008; 42.

Giebink NC, D'Andrade BW, Weaver MS, Mackenzie PB, Brown JJ, Thompson ME, Forrest SR. Intrinsic luminance loss in phosphorescent small-molecule organic light emitting devices due to bimolecular annihilation reactions. Journal of Applied Physics 2008; 103(4):044509-044501.

D'Andrade BW, Weaver MS, Mackenzie PB, Yamamoto H, Brown JJ, Giebink NC, Forrest SR, Thompson ME. Blue phosphorescent organic light emitting device stability analysis. Proceedings, Society for Information Display 2008; 39.

D'Andrade BW, Esler J, Lin C, Weaver MS, Brown J. Extremely long lived white phosphorescent organic light emitting device with minimum organic materials. Proceedings, Society for Information Display 2008;

39.

D'Andrade BW, Esler J, Lin C, Adamovich V, Xia S, Weaver MS, Kwong R, Brown JJ. Realizing white phosphorescent 100 lm/W OLED efficacy. Proceedings, International Society for Optics and Photonics (SPIE) 2008; 7051.

D'Andrade B, Adamovich V, Weaver M, Lin C, Ma B, Mackenzie PB, Kwong R, Brown JJ. Phosphorescent OLEDs with saturated colors. Proceedings, International Society for Optics and Photonics (SPIE), 2007; 6655:645-647.

D'Andrade B, Canzler TW, Hack M. PIN OLEDs — Enhanced performance and lifetime by improved structures and materials. Proceedings, IMDC 2007.

D'Andrade B. White phosphorescent LEDs offer efficient answer. Nature Photonics 2007; 1(1):33-34.

D'Andrade BW, Tsai J-Y, Lin C, Weaver MS, Mackenzie PB, Brown JJ. Efficient white phosphorescent organic light-Emitting devices. Proceedings, Society for Information Display 2007; 38:1026-1029.

D'Andrade B, Weaver MS, Brown JJ. White phosphorescent organic light emitting devices. Proceedings, International Society for Optics and Photonics (SPIE) 2007; 6655:6332-6334.

Weaver MS, Adamovich VI, D'Andrade B, Ma B, Kwong RC, Brown JJ. Phosphorescent OLEDs for displays and lighting. Proceedings, IMDC 2007.

Weaver MS, Tung YJ, D'Andrade B, Esler J, Brown JJ, Lin C, Mackenzie PB, Walters RW, Tsai JY, Brown CS, Forrest SR, Thompson ME. Invited paper, Advances in blue phosphorescent organic light-emitting devices. Proceedings, Society for Information Display 2006; 37:127-130.

Canzler TW, Burghart M, Murano S, Blochwitz-Nimoth J, D'Andrade B, Hack M, Brown JJ. Highly power efficient organic light-emitting devices enabled by phosphorescent and p-i-n technologies. Proceedings, International Society for Optics and Photonics (SPIE) 2006; 6333:633311, 2006.

D'Andrade BW, Brown JJ. Organic light-emitting device luminaire for illumination applications. Applied Physics Letters 2006; 88(19):192908.

D'Andrade B, Alleyne B, Hack M, Hewitt R, Brown JJ. White phosphorescent organic light emitting devices for lighting applications. Proceedings, International Society for Optics and Photonics (SPIE) 2006; 6333:63330.

D'Andrade B, Brown JJ. White phosphorescent organic light emitting devices for display applications. Proceedings, International Society for Optics and Photonics (SPIE) 2006; 6225:622514, 2006.

D'Andrade BW, Esler J, Brown JJ. Organic light-emitting device operational stability at cryogenic temperatures. Synthetic Metals 2006; 156(5-6):405-408.

D'Andrade BW, Datta S, Forrest SR, Djurovich P, Polikarpov E, Thompson ME. Relationship between the ionization and oxidation potentials of molecular organic semiconductors. Organic Electronic 2005; 6(1):11-20.

Holmes RJ, Forrest SR, Sajoto T, Tamayo A, Djurovich PI, Thompson ME, Brooks J, Tung YJ, D'Andrade BW, Weaver MS, Kwong RC, Brown JJ. Saturated deep blue organic electrophosphorescence using a fluorine-free emitter. Applied Physics Letters 2005; 87(24):243507.

D'Andrade B, Adamovich V, Hewitt R, Hack M, Brown JJ. Phosphorescent organic light-emitting devices for solid-state lighting. Proceedings, International Society for Optics and Photonics (SPIE) 2005; 5937:1-

7.

D'Andrade B, Holmes R, Forrest S, Li J, Thompson M. Triple-doped white organic light-emitting devices grown in vacuum. Proceedings, International Society for Optics and Photonics (SPIE) 2004; 5530:17-25.

D'Andrade BW, Forrest SR. White organic light-emitting devices for solid-state lighting. Advanced Materials 2004; 16(18):1585-1595.

D'Andrade BW, Holmes RJ, Forrest SR. Efficient organic electrophosphorescent white-light-emitting device with a triple doped emissive layer. Advanced Materials 2004; 16(7):624-628, 2004.

Brooks JJ, Kwong RC, Tung Y-J, Weaver MS, D'Andrade B, Adamovich V, Thompson ME, Forrest SR, Brown JJ. Comparison of blue-emitting phosphorescent dopants: Effect of molecular energy levels on device efficiency. Proceedings, International Society For Optics And Photonics (SPIE) 2004; 5519:35-41.

D'Andrade B, Forrest SR. Effects of exciton and charge confinement on the performance of white organic p-i-n electrophosphorescent emissive excimer devices. Journal of Applied Physics 2003; 94(5):3101-3109.

D'Andrade BW, Forrest SR, Chwang AB. Operational stability of electrophosphorescent devices containing p and n doped transport layers. Applied Physics Letters 2003; 83(19):3858-3860.

D'Andrade B, Forrest SR. Formation of triplet excimers and dimers in amorphous organic thin films and light emitting devices. Chemical Physics 2003; 286(2-3):321-335.

Adamovich VI, Cordero SR, Djurovich PI, Tamayo A, Thompson ME, D'Andrade BW, Forrest SR. New charge-carrier blocking materials for high efficiency OLEDs. Organic Electronics 2003; 4(2-3):77-87.

Holmes RJ, D'Andrade BW, Forrest SR, Ren X, Li J, Thompson ME. Efficient, deep-blue organic electrophosphorescence by guest charge trapping. Applied Physics Letters 2003; 83(18):3818-3820.

D'Andrade BW, Thompson ME, Forrest SR. Controlling exciton diffusion in multilayer white phosphorescent organic light emitting devices. Advanced Materials 2002; 14(2):147-151.

D'Andrade BW, Brooks J, Adamovich V, Thompson ME, Forrest SR. White light emission using triplet excimers in electrophosphorescent organic light-emitting devices. Advanced Materials 2002; 14(15):1032-1036.

Adamovich V, Brooks J, Tamayo A, Alexander AM, Djurovich PI, D'Andrade BW, Adachi C, Forrest SR, Thompson ME. High efficiency single dopant white electrophosphorescent light emitting diodes. New Journal of Chemistry 2002; 26(9):1171-1178.

D'Andrade BW, Baldo MA, Adachi C, Brooks J, Thompson ME, Forrest SR. High-efficiency yellow double-doped organic light-emitting devices based on phosphor-sensitized fluorescence. Applied Physics Letters 2001; 79(7):1045-1047.

Klauk H, D'Andrade B, Jackson TN. All-organic integrated emissive pixels. Annual Device Research Conference Digest 1999; 162-163.

## Project Experience

**Computer Networks**

- Failure analysis of residential cable modems. Intellectual property/patent investigations of networks including Zigbee, Extranet, Internet, Intranet, VPN, WAN and LAN.

- Network Load balancing.
- Patent portfolio review.
- Patent re-examinations.
- Policy based routing and source address routing.
- Programmed routers and switches for small to medium size enterprises.
- Satellite communications.

**Condition Assessment**

- Power systems in warehouses, high-schools and skyscrapers.
- Root cause analysis of damages due to fire, wind and water.

**Cryogenics and Vacuum Systems**

- Operation and service of high and ultra high vacuum equipment, systems, and pumps.
- Operation of cryogenic systems.

**Electrical Power**

- Bonding and insulation piercing connectors.
- Installation and Megger testing of power cables.
- Installation of multi-cell conduit.
- Power utility meters.
- Root-cause analysis of power outages in large data center facilities.
- Switch gear failures.
- Solar PV failure analysis
- Testing of miniature molded case breakers.
- Transmission lines.

**Flat Panel Displays**

- Analysis of thin film transistors (TFT), manufacturing and liquid crystals.
- Design of backlights.
- Design of novel outcoupling fixtures.
- Report on the history, status, and differences in flat-panel displays.

**Illumination Engineering**

- Application of measurement standards to facilitate research goals.
- Characterization of illumination sources.
- Design of manufacturing equipment for illumination systems.
- Energy usage audits.
- LED and OLED device analyses.

**Engineering Analysis**

- LED lighting systems.
- Non-volatile memory.
- Smart phones.
- Utility smart meters
- Network PoE switches.

**Semiconductors**

- Intellectual property analysis of front-end and back-end processes, semiconductor materials and devices.
- Memory technology analysis.
- Production materials utilization and sourcing.
- Semiconductor packaging design, processing, and failure analysis.
- Semiconductor physics.
- Solar PV module reliability
- Technical due diligence.

**Software Engineering**

- Static analysis of code
- Project management good practices
- Enterprise resource planning
- Copyright infringement analysis of source code.
- Algorithm review.

**Standards and Regulations Used in Projects**

- 47 CFR Part 15
- ANSI C12 1-2001
- ANSI C12.10-2011
- ANSI C63.4-2003
- ASTM B117-11
- ASTM E860-07
- ASTM E1188-11
- ASTM E1459-92
- BS 7671:2008
- IEC 60320
- IEC 60227
- IEC 60228
- EN 50525
- ISEN 61000-4-2-2009
- IEEE C37.90.1-2002
- IEEE C62.11-2012

- IEEE Std 1-2000
- IEEE Std C62.41.2 - 2002
- IEEE 1547
- ISEN 61000-4-2-2009
- ISEN 61000-4-3-2006+A2-2010
- ISEN 61000-4-4-2004+A1-2010
- ISO 27037
- ISO 17020
- ISO 17025
- ISO 27000
- ISO 27001
- ISO 15801
- ISO 33000 series
- NEMA 250
- NESC
- NFPA 70
- NFPA 70E
- NFPA 921
- TCVN 7189-2009 CISPR 22-2006
- UL 1449
- UL 1703
- UL 1741
- UL 2735
- UL 489
- UL 50
- UL 508
- UL 61010-1
- UL 60950-1
- UL 746C
- UL 817

## Appendix B

## Prior Testimony of Brian D'Andrade

January 31, 2019

Dr. Brian D'Andrade, PMP, CISSP, CSQE,
CCNP, CCNA-Security, PE

Expert Experience

*Lumileds LLC v. Elec-Tech International Co., Ltd et al.,* Case No. 1-15-CV-278566.
Superior Court of the State of California, County of Santa Clara.  Report,
Deposition, Declarations and Trial Testimony.  November 2018.

*New Hampshire Electric Cooperative, Inc. v. Elster Solutions, LLC and Honeywell
International Inc*.  Civil Action No.: 1:16-CV-00440-PB.  Reports.  October 2018.

*Mesa Airlines Inc. (U.S.A.) v. MXI Technologies Ltd. (Canada),* ICC Arbitration No.
23507/MK.  Witness Statement.  September 2018.

*Logitech, Inc. v. United States*, Court No. 16-00017.  United States Court of
International Trade.  Report and Deposition.  September 2018.

*Inovateus Solar LLC v. Polamer Precision, Inc.,* Case No. 3:16-CV-00312-JD-MGG.
United States District Court, Northern District of Indiana, South Bend Division.
Report, Deposition and Affidavit.  August 2018.

*First Solar, Inc. v. Absolute Process Instruments, Inc.,* Case No. 1:17-CV-08518.
United States District Court.  Southern District of New York.  Report.  February
2018.

*Open Systems Technologies DE, LLC v. Transguard Insurance Company of
America,* Case No. 14-01405-CKB.  17th Circuit Court for Kent County, Michigan.
Trial Testimony.  June 2016.

**Appendix C**

**Materials Reviewed**

January 31, 2019

In addition to the materials referenced in footnotes through this report, I also reviewed the following documents:

1.    Plaintiffs' Third Amended Class Action Complaint, Filed May 5 2015

Plaintiffs' Expert Witness Disclosures

2.    Plaintiffs' Disclosure of Expert Witnesses dated August 6, 2018, the Sandy Report, dated August 6, 2018, and the Expert Report of Dr. Richard G. Kiekbusch, dated July 17 2018.

3.    2018-08-01 Verified Data v5 Plaintiffs' Expert Data.xlsx

Scripts and Database Files Relied Upon by the Sandy Report (SHA-1 Hash Values)

4.    HDS Database Files.docx - 50de25498af64d7a1832785044258a7eb2a3bcba

5.    OMS Database File "MCSP_DAILY_FULL_EXPDP.DMP" SHA-1 f44566f3f63319877f5b55e82419baebf746b10a

6.    Odyssey Database "Odyssey.bak" - e07e13f56e6dd4ccfe502351be808bc5616adc3c

7.    Odyssey2 Database "Odyssey2.bak" - 57c5926dedaf81fc99b3dca8dab756d4dbab8961

8.    DriverAnalysis Database "DriverAnalysis.bak" - e088e5207e3fa5a7b0e38097115660b2d2c6ef93

January 31, 2019

9.     01 - Populate HDSRelease.sql -

    43c4e46e7916e0eb7545e8561d389fe54f1f44dd

10.     02 - Populate HDSReleaseOrder.sql -

    7cb0a37ce6e8aa1d9c43bc486d64e43b3991d8ce

11.     02a - Populate HDSReleaseOtherAgency.sql -

    ada5106bbf315ad1f2eb4f70f0d5216ca0bc0481

12.     03 - Populate HDSSentence.sql -

    7f684b0789e5b825562c725259279660bbe17cbb

13.     04 - Populate HDSCase.sql -

    eaf6e37a116d079a755fa299b492a60d7dca6577

14.     05 - Populate HDSPerson.sql -

    e8fb6399afcf67d4e90ccf5a7aa122bacef82204

15. 06 - Populate HDSAddress.sql -

    c863ef824abc091da9e80b0b843dad87fd6fdb93

16.     07 - Merge on Gallery#.sql -

    c70cd1a7d9f1dcd10384d4810935b5f6e0d33388

17.     07a - Merge on CaseNumber.sql -

    6050570346d0d2297a724130887f3f1b688041d8

January 31, 2019

18.   08 - Merge on First Last SSN.sql -

272991d0ca8947d711e61f829f6e4cb191a6f591

19.   "09 - Merge on First Last BirthDate.sql" -

b634859b066512c204d0b6be33f99a8aab984c6d

20.   "10 - Merge on Identifying Data.sql" -

6ccdcfad56fc33b738b4340795d1d46e0ed8af22

21.   "11 - Populate HDSHold.sql" -

21b42c69c2d0d829e69d173f7486e24a432577ef

22.   "13 - Update Gallery#.sql" - 42f69f11251c3c946d678b6cc166678a131f7d11

23.   "qryResults.sql" - 506e75efcf399289976d93043a9769f9760b0dec

24.    "qryResults.sql" (second version) -

159551d58f9d38be1dd79e6f01e07116c6e81974

Interrogatory and Production Communications (4)

25.   Defendant's Answers to Plaintiffs' Interrogatories 4847-2215-8640

v.1.pdf, dated March 27, 2015.

26.   Plaintiffs' Response to Defendants' Third Request for Production of

Documents, dated September 7, 2018.

27.   Plaintiffs' Responses to Defendants' First Interrogatory and Request for

Production of Expert Witness Materials, dated October 18, 2018.

**January 31, 2019**

28.     Plaintiffs' Supplements to Interrogatory Responses and Supplement to

Document Production Request, dated November 30, 2018.

Declarations

29.     D#118 Declaration of James Martin in Support of Brief in Opposition to

Class Certification 4845-9647-6977 v.1.pdf

Plaintiffs' Sandy Report "Documents Considered" (27)

30.     Royce Cole Deposition

31.     Rachel Coss Deposition and Exhibits

32.     Louis Dezelan Deposition

33.     Sheriff John Layton Deposition

34.     Derek Peterson Deposition

35.     John Padfield Depositions

36.     Tanesha Creer Deposition and Exhibits

37.     Brooke Loyal Deposition and Exhibits

38.     Catherine Cox Deposition and Exhibits

39.     Melissa Roberts Deposition and Exhibits

40.     Defendants' Supplemental Document Production, pages 1286-1365

**January 31, 2019**

41.    JUSTIS JIMS Line Packets, Updates, and Audits, MCOS-E-54581-54617

42.    JUSTIS JIMS Release, MCSO-E 54654-54678

43.    JUSTIS JIMS Second Checks, MCSO-E 54702-54725

44.    MCSO OMS Sentencing Module, MCSO 1355-13662

45.    Inmate Records Manual

46.    Inmate Records Training Checklist

47.    Inmate Records Supervisor Policy, JUSTIS-JIMS, MCSO 5294-5309
       Inmate Records

48.    Release Deputy Post Orders, MCSO 8008-8012

49.    Schematic Diagram of OMS Program

50.    Copy of Event Codes

51.    Jail Records OMS Bookout Procedure (1 page summary of info in James
       Martin and Tammy Woods Depositions; 9 pages of Derrick Peterson
       Deposition)

52.    CORE Process Modeling and Use Cases '

53.    Justice Information System Inquiry Manual

54.    JUSTIS-JIMS Manual

January 31, 2019

55.    Driver v. Marion Cty. Sheriff ,859 F.3d 489 (7th Cir. 2017)

56.    Expert Report of Dr. Richard G. Kiekbusch

Plaintiffs' Supplemental Documents (44)

57.    2nd set of search terms Amended and sent to Def.pdf

58.    Acknowldgement of Training Work Floe2496.pdf

59.    Case_Plan_User_Manual_-_ V_1 0.pdf

60.    Codes for CORE.pdf

61.    Copy of Copy of Event Codes.xlsx

62.    Core Documents.pdf

63.    Cox Email 2582.pdf

64.    Cox Email 6758_1900_01_01_00_00_6758 1.pdf

65.    Cox Email6984_1900_01_01_00_00_6984.pdf

66.    Cox Email 8954_1900_01_01_00_00_8954.pdf

67.    Cox Email 17938_1900_01_01_00_00_17938.pdf

68.    Cox Email 21641_1900_01_01_00_00_21641.pdf

69.    Defs' Ex Derek Peterson Aff.pdf

January 31, 2019

70.   Defs' Ex Tammy Wood Aff.pdf

71.   Dezelaninmatepopulationchart.pdf

72.   Emails re Facts and Assumptions.pdf

73.   Emails re MC cases.pdf

74.   Ex 53 and Derek Peterson Depo portion re Bus Req.pdf

75.   FinalReport-MCSOinmateReleaseProcedures PadffiledReport.pdf

76.   Functional requirment.pdf

77.   Important Points from Jan 29 2018 Depositions (1).pdf

78.   Jail Records Book Out Procedure.pdf

79.   Justis Manual.pdf

80.   Juvenile_Reports_User_Manual_-_ V4.pdf

81.   Line Packets Updates and Audits 2626.pdf

82.   OMS Functionality.pdf

83.   Payne Letter.pdf

84.   RedactedMCSO-N000000172ACopyofcountforthecurrentmonth.xlsx

85.   Release 2nd Checks 2866.pdf

January 31, 2019

86.     Release First Checks 2810.pdf

87.     Resp to Plaintiffs' Fourth Request for Production to Defendant Marioin

        County Sheriff.pdf

88.     Robinson Email 47341_1900_01_01_00_00_ 47341.pdf

89.     Robintte Emil 424.pdf

90.     Roembke Dep Exhibits.pdf

91.     Screen Shots.pdf

92.     Sentencing Order Dotson.pdf

93.     Stennet Email 25415_1900_01_01_00_00_25415.pdf

94.     Stennet Email 31323_1900_01_01_00_00_31323.pdf

95.     Sunshine Anderson.pdf

96.     Tammy Wood Email 615.pdf

97.     Thornsberry Email 38609_1900_01_01_00_00_38609.pdf

98.     Training Manual.pdf

99.     Training.pdf

100.    UsefulStatisticsfromtheOdyssey, JY edit.pdf

**January 31, 2019**

Documents from Other Cases (2)

    101.   055-2 Second Declaration of Derek Peterson - 4820-7235-9810.1.pdf

    102.   Levy Declaration of Derek Peterson 4823-4249-3046 v.1 Signed - 4844-7563-2502.1.pdf

Other Documents

    103.   Steven Henderson Deposition

## Appendix D

## SQL Code Generated

January 31, 2019

The following SQL scripts are disclosed as digital files. Their SHA-1 hash values are provided here to verify their integrity:

0 - calculate_tableSizes.sql - f208429f6a23d98b332ad88a6583096774b7e10a

1 - populate_qryResults.sql - e74fcd5fd9512ad86754e051e4e5581725ac96a2

2 - identify_time_served.sql - 6b1967108d5c81152ccc49760cecbf9716b236b5

3 - identify_releasedate_issues_exclude_time_served.sql - a896216ea64695840fe26d303e91e065a3d31cf7

4 - identify_unverifiable_releasedates_exclude_time_served.sql - 236b058fcc0565ebba6ceb4f069add211476df62

5 - idenfity_mc_and_non-mc_case_numbers_exclude_time_served.sql - 8a5863c77262fd120a262ea65dbe333a56b73cf7

## Appendix E

## Analysis of Databases and SQL Queries Produced by Plaintiffs

January 31, 2019

**OMS Database**

1.    The OMS database was provided in a file labeled "MCSP_DAILY_FULL_EXPDP.DMP," which was compressed as "MCSO-OMS-Oracle-Expdp.zip." The database was decompressed, imported into the Oracle database, and then a subset of tables, as disclosed below, was migrated to Microsoft SQL Server 2017 without errors.

2.    The OMS database contained 132 schemas. One of these schemas, labeled "EVOOMS," contained 1,529 tables. I limited my analysis of the OMS database to four tables within the EVOOMS schema. Three of the OMS tables were used by Plaintiffs' Experts and one was used to verify Plaintiffs' Experts methodology. All tables were originally associated with a schema named EVOOMS, but the schema was renamed DBO (*i.e.*, the default schema name for databases in Microsoft SQL). Furthermore, the tables were imported into a database named "OMS2" to match the syntax of Mr. Henderson's SQL scripts.[63]

3.    Table 1 shows column and row counts for the OMS tables relevant to my analysis of Plaintiffs' allegations.

---

[63] Henderson Deposition, p. 44:19-21.

January 31, 2019

**Table 1.   Column and row count of OMS tables provided**

| OMS Table Name | Columns | Rows |
|---|---|---|
| **BOOKING** | 115 | 824,602 |
| **SOC_INMATE_ADDR** | 16 | 947,472 |
| **DETAINER** | 40 | 166,113 |
| **CASE_MASTER** | 57 | 921,566 |

4.    The OMS BOOKING table was used in SQL scripts S1 and S5; the OMS SOC_INMATE_ADDR table was used in SQL script S6; and the OMS DETAINER table was used in SQL script S11, as discussed below in this appendix.

5.    The OMS CASE_MASTER table was not used in any of SQL scripts used to generate SFR. Based on my communications with the Marion County Sheriff's Office Chief Information Officer, Derek Peterson, I understood the CASE_MASTER table to be useful in analyzing the Sandy Report.[64]

**Odyssey and Odyssey2 Databases**

6.    The Odyssey and Odyssey2 databases were provided in a file labeled "Odyssey.bak" and "Odyssey2.bak," which were compressed as "Odyssey.zip" and "Odyssey2.zip," respectively. The databases were decompressed and imported into Microsoft SQL Server 2017 using Microsoft SQL Server Management Studio 17.

---

[64] Based on my communications with Derek Peterson on September 7 2018, October 29, 2018 and November 29, 2018.

January 31, 2019

7.   The Odyssey and Odyssey2 databases both contained 13 schemas. A schema labeled "dbo" contained 40 tables for the Odyssey database and 5 tables for the Odyssey2 database. I limited my analysis to the following 10 tables relied upon by the SQL scripts provided by Plaintiffs' Experts.

8.   Table 2 provides column and row counts for the Odyssey and Odyssey2 tables relevant to my analysis of the Sandy Report.

**Table 2.   Column and row counts for Odyssey and Odyssey2 tables provided by Plaintiffs' Experts**

| Odyssey / Odyssey2 Table Name | Columns (Odyssey) | Columns (Odyssey2) | Rows (Odyssey) | Rows Odyssey2 |
|---|---|---|---|---|
| **49CRHCriminalActions** | 21 | 19 | 5,578,082 | 1,601,231 |
| **49CRHCriminalSentenceData** | 22 | 22 | 72,415 | 103,229 |
| **49CRHCriminalCaseData** | 36 | 36 | 441,107 | 89,760 |
| **PartyGallery** | 3 | 3 | 656,270 | 656,270 |
| **49CRHCriminalDefendantData** | 40 | 36 | 489,096 | 93,316 |

9.   The 49CRHCriminalActions tables were used in S2 and S2a; the 49CRHCriminalSentenceData tables were used in SQL script 3; the 49CRHCriminalCaseData tables were used in S3 and S4; the PartyGallery tables were used in S5; and the 49CRHCriminalDefendantData tables were used in S5 and S6, as discussed below in this appendix.

January 31, 2019

**Driver Analysis**

10.  The Driver Analysis database was provided in a file labeled "DriverAnalysis.bak," which was compressed as "DriverAnalysis.zip." The database was decompressed and imported into Microsoft SQL Server 2017 using Microsoft SQL Server Management Studio 17.

11.  Table 3 provides column and row counts for the DriverAnalysis tables provided by Plaintiffs' Experts.

**Table 3.   Column and row counts for DriverAnalysis tables as provided by Plaintiffs' Experts**

| DriverAnalysis Table Name | Columns | Rows |
|---|---|---|
| HDSRelease | 7 | 250,895 |
| HDSReleaseOrder | 5 | 122,819 |
| HDSReleaseOtherAgency | 5 | 39,769 |
| HDSSentence | 8 | 97,802 |
| HDSCase | 3 | 291,990 |
| HDSPerson | 19 | 504,849 |
| HDSAddress | 7 | 870,134 |
| HDSOMSHold | 7 | 166,113 |

**01 - Populate HDSRelease.sql**

12.  "01 - Populate HDSRelease.sql" ("S1") contained 15 lines of T-SQL code. The script copies data from the OMS2 BOOKING table into the DriverAnalysis HDSRelease table. The information copied was limited to rows where the inmate release date was on or after December 18, 2012.

January 31, 2019

**02 - Populate HDSReleaseOrder.sql**

13. "02 - Populate HDSReleaseOrder.sql" ("S2") contained 22 lines of T-SQL code. The script copies data from the Odyssey and Odyssey2 49CRHCriminalActions tables into the DriverAnalysis HDSReleaseOrder table. Data from the following columns are copied to the table HDSReleaseOrder if the release code is "CBP" (*i.e.*, cash bond paid), "ORC" (*i.e.*, order to release from custody), or "SBP" (*i.e.*, surety bond paid).

**02a - Populate HDSReleaseOtherAgency.sql**

14. "02a - Populate HDSReleaseOtherAgency.sql" ("S2a") contained 22 lines of T-SQL code. It is identical to S2 with the exception that data are copied to the DriverAnalysis table, HDSReleaseOtherAgency, if the release code is "ORCOA," "SBDOA," "ARJTRNO," or "OGPR."

**03 - Populate HDSSentence.sql**

15. "03 - Populate HDSSentence.sql" ("S3") contained 48 lines of T-SQL code. The script copies data from the Odyssey and Odyssey2 49CRHCriminalSentenceData and 49CRHCriminalCaseData tables to the DriverAnalysis HDSSentence table.

January 31, 2019

### 04 - Populate HDSCase.sql

16. "04 - Populate HDSCase.sql" ("S4") contained 15 lines of T-SQL code. The script copies data from the Odyssey and Odyssey2 49CRHCriminalCaseData tables to the DriverAnalysis HDSCase table.

### 05 - Populate HDSPerson.sql

17. "05 - Populate HDSPerson.sql" ("S5") contained 77 lines of T-SQL code. Its intended purpose is to copy data from the Odyssey and Odyssey2 49CRHCriminalDefendantData tables and the OMS2 BOOKING table into the DriverAnalysis HDSPerson table.

18. This script would not run as received. On lines 23–25, the script queries a "name" column in Odyssey2 49CRHCriminalDefendantData table that does not exist in the Odyssey2 database file provided. The nonexistent column was "name" "FirstName," "MiddleName," and "LastName." Plaintiffs' Experts either did not provide the correct version of S5 or did not provide the correct version of the Odyssey2 49CRHCriminalDefendantData table. Furthermore, if the Odyssey2 table did contain a "name" column originally, this indicates that Plaintiffs' Experts modified the Odyssey2 database after allegedly importing Odyssey database data from text files.

January 31, 2019



Figure 3.     Screenshot of Odyssey2 49CRHCriminalDefendantData showing "FirstName," "MiddleName," and "LastName," columns (in red box). These columns were found in place of a "name" field as was referenced in "PF5."

**06 - Populate HDSAddress.sql**

19. "06 - Populate HDSAddress.sql" ("S6") contains 51 lines of T-SQL code. This script copies address information from the Odyssey and Odyssey2 49CRHCriminalDefendantData tables to the DriverAnalysisHDSAddress table. It standardizes the address; for example, it maps different spellings of Indianapolis to the correct one.

**07 - Merge on Gallery#.sql**

20. "07 - Merge on Gallery#.sql" ("S7") contains 36 lines of T-SQL code. This script modifies the HDSPerson table. It assigns a number in the column HDSMergedPersonID column for each row that has a gallery

number (except the entries "000000000000" and "000000000001"). If two rows have the same gallery number, they are given the same HDSMergedPersonID.

### 07a - Merge on CaseNumber.sql

21.  "07a - Merge on CaseNumber.sql" ("S7a") contained 59 lines of T-SQL code. This script modifies the DriverAnalysis HDSPerson table. It loops through each row that does not yet have an HDSMergedPersonID and identifies rows in HDSPerson that have the same CaseID. The HDSMergedPersonID is updated to the value of HDSMergedPersonID in the matching rows, or if one does not exist, a new HDSMergedPersonID is created.

### 08 - Merge on First Last SSN.sql

22.  "08 - Merge on First Last SSN.sql" ("S8") contained 76 lines of T-SQL code. This script modifies the DriverAnalysis HDSPerson table. It loops through each row that does not yet have an HDSMergedPersonID and identifies rows in HDSPerson that have matching FirstName, LastName, and last four digits of the social security number ("SSN"). The HDSMergedPersonID is updated to the value of HDSMergedPersonID in the matching rows, or if one does not exist, a new HDSMergedPersonID is created.

January 31, 2019

### 09 - Merge on First Last BirthDate.sql

23.  "09 - Merge on First Last BirthDate.sql" ("S9") contained 75 lines of T-SQL code. This script modifies the DriverAnalysis HDSPerson table. It loops through each row that does not yet have an HDSMergedPersonID and identifies rows in HDSPerson that have matching FirstName, LastName, and birth date. The HDSMergedPersonID is updated to the value of HDSMergedPersonID in the matching rows, or if one does not exist, a new HDSMergedPersonID is created.

### 10 - Merge on Identifying Data.sql

24.  "10 - Merge on Identifying Data.sql" ("S10") contained 141 lines of T-SQL code. This script modifies the DriverAnalysis HDSPerson table. It loops through each row that does not yet have a HDSMergedPersonID and calculates a "MatchQuality" based on 14 matching conditions. These conditions include ones that were previously used to match records— namely, gallery number, case number, name, address, and SSN. MatchQuality is calculated as the sum of values assigned for matching condition. If the value of MatchQuality is greater than 0.9, then the allegedly matching records are associated with a HDSMergedPersonID. Furthermore, some matching conditions were assigned different values for full and partial matches. No information was provided on how these values were assigned.

January 31, 2019

25. Table 4 shows the numeric values associated with full and partial matches when calculating MatchQuality.

**Table 4.   Numerical values associated with full or partial matches on parameters**

| Matching Condition | Match Value for Full Match | Match Value for Partial Match |
|---|---|---|
| CaseNumber | 0.9 | 0.2 |
| Gallery# | 0.9 | 0 |
| SSN | 0.6 | 0.2 |
| LastName, | 0.3 | 0.1 |
| FirstName | 0.3 | 0.1 |
| MiddleName | 0.3 | 0.1 |
| Race | 0.02 | 0 |
| Ethnicity | 0.01 | 0 |
| Sex | 0.01 | 0 |
| BirthDate | 0.3 | 0 |
| Address1 | 0.4 | 0.1 |
| Address2 | 0.2 | 0.1 |
| City and State | 0.02 | 0.01 |
| Zip | 0.1 | 0 |

26. In "HDS Database Files.docx," which was provided with the databases and scripts, Plaintiffs' Experts note the following with regard to this script: "For speed purposes, we would run this several times with additional filters, requiring that there be a perfect match on one of each of these fields, one at a time, then we would remove the filter to consider everyone remaining."

27. The above statement from Plaintiffs' Experts indicates that S10, as provided, does not disclose a reproducible methodology and, moreover, is not based on any standard. Plaintiffs' Experts do not indicate

January 31, 2019

what the "additional filters" were and thus do not fully disclose their methodology.

### 11 - Populate HDSHold.sql

28.  "11 - Populate HDSHold.sql" ("S11") contained six lines of T-SQL code. This script copies information from the OMS2Detainer table to the DriverAnalysis HDSOMSHold table.

### 13 - Update Gallery#.sql

29.  "13 - Update Gallery#.sql" ("S13") contained 13 lines of T-SQL code. This script modifies the DriverAnalysis HDSPerson table. It groups the rows in HDSPerson based on HDSMergedPersonID and sets the gallery number of rows that do not have a gallery number to the gallery number of the group.

### qryResults.sql (Received September 2018)

30.  "qryResults.sql" ("SQR") contained 101 lines of T-SQL code. It is intended to generate the SFR. This script, however, would not run as received. The script has a syntax error on line 32. The first part of the line reads ",CASE WHEN homs.HasDetType =1 ,." Additionally, the query provides a statement to output FirstName and LastName on line 4; however, it does not select tables to provide these data. Because of these issues, this script could not have been used to generate SFR.

January 31, 2019

**qryResults.sql (Version 2 Received January 21 2019)**

31. "qryResults.sql" ("SQRv2") contained 149 lines of T-SQL code. It is intended to generate SFR from tables in the DriverAnalysis database. This script was found to output a table of 42,170 results, which appeared consistent with SFR.