**MICHAEL DRIVER, TERRY
CLAYTON, MICHAEL BOYD,
NICHOLAS SWORDS, and ROY
SHOFNER, individually and as
representatives of a class of all similarly
situated individuals, Plaintiffs**

**v.**

**THE MARION COUNTY SHERIFF,
and, THE CONSOLIDIATED CITY OF
INDIANAPOLIS AND MARION
COUNTY, Defendant.
CAUSE NO. 1:14-cv-2076-RLY-MJD**

## Plaintiffs' Supplemental Expert Disclosure
## Experts' Response to D'Andrade Reports

## Robert Sandy, Emeritus Professor of Economics, IUPUI
## Steven Henderson, Henderson Data Solutions
## May 10, 2019

**Introduction**

Defendants' expert Brian D'Andrade's criticisms of Plaintiffs' Experts' Report reveal his basic misunderstanding of the problems in the Marion County Jail's data and of our methods at arriving at inmate time to release data. Some of his criticisms were aimed at insignificant issues while others were directed at conservative choices we made that *understated* the size of the potential plaintiff class. Mr. D'Andrade failed to identify a single incorrect calculation in our data of the TimeToRelease inmates from the Marion County Jail. Nor did he even attempt to compute the time periods it took the Sheriff to release inmates from the jail. (see D'Andrade deposition, p 19, 13-22) Instead he brought up theoretically possible errors that turn out to have either no effect, or an indiscernibly small potential effect, and criticized our conservative decisions to not overstate the number of inmates or the times it took to release them.

Mr. D'Andrade's many complaints about conservative choices we made that reduce the potential plaintiff class are a crucial difference between us. When we, out of an abundance of caution, make a choice that we know reduces the size of the potential plaintiff class we are trying to make our results as reliable as possible. Similarly, when we made choices that reduced the calculated TimeToRelease when there was any uncertainty about the sentence length, we were being conservative. Mr. D'Andrade somehow views those choices as making the results unreliable. We believe "reliable" means avoiding errors and avoiding any overstatement of an inmate's time to release. In these regards, our numbers are extremely accurate and reliable.

EXHIBIT
5
Blumberg No. 5118

Plaintiffs' Expert's Report was served on Defendants on August 6, 2018. Dkt. 267. Defendants' Expert Brian D'Andrade's report is dated January 31, 2019. He supplemented that report on April 12, 2019.  In this Supplement to our original report we address Mr. D'Andrade's overall conclusion "that the allegations of the Sandy Report are generally unreliable and based on unrepeatable methodology" (*paragraph 82*). Mr. D'Andrade frequently uses the synonym "not reproducible" (*paragraphs 3, 27, 48, 49, 51, 70, 71, 79*).  Similar concerns are raised in his Supplemental report (*paragraphs 14, 40, 69, 78*). We will address all of the points set forth in both the original and his supplemental report.

There are two basic problems with Mr. D'Andrade's conclusions. First, he criticized us for failing to do something we were neither asked to do nor tried to do. Second, he criticized us when we made conservative choices that reduced the size of the potential plaintiff class, which we did when there was any possible uncertainty about the time it took to release particular inmates.

Mr. D'Andrade's Figure 1 on page 26 of his original report illustrates the first basic problem. We were asked to provide all of the database scripts we used to create our results. His Figure 1 highlights in red a script labelled HDSPerson ("Script 5") that Mr. D'Andrade claims he could not run. Since all of the scripts need to be able to run to produce the final results, his box labelled "Final Results" is also in red. Hence, he concludes that our results are "not reproducible." Since we used two sets of OMS data (we termed them OMS and OMS2) that covered different time periods, we simply changed the label name to use the same code for the first data source as used for the second data source. The original Script 5 required the user to change the file name in the instructions and account for the difference in inmate name formats across the two OMS datasets. We were never asked to create a set of self-executing scripts. Since Mr. D'Andrade prefers a set of self-executing scripts, we subsequently provided them to him.[1]

---

[1] The delivery of Script 5 is described in an e-mail of March 5, 2019, from Plaintiff's attorney Richard Waples to Defendants' attorney Anthony Overholt. The relevant passages are:

"Tony: In response to your motion to compel we have decided to produce the documents requested. We will be hand delivering to you today the requested old scripts and the other materials you have requested. I will file a document responsive to the motion indicating that we are producing the documents. . . .

The second [attached] document is a revised script 5, named: '05-Populate HDSPerson.squl.'  Our expert Steven Henderson has created this revised script because your expert Mr. D'Andrade was not able to run the earlier version. Mr. Henderson explains: 'Attached is an updated copy of the script #5 he wanted. This one will run on its own without modification. My summary of his critique is this. The script we provided him was not defective, because it was intended to be run with manual adjustments as it was run. Creating a repeatable list of scripts which could be run by a third party without modification or guidance was not originally our goal. That said, this script will meet his desires as a courtesy.'"

Rich"

In his Supplement Mr. D'Andrade came back to allegedly problematic Script 5. Note, his Supplement is dated April 12, 2019, more than a month after we provided the defendants with the revised self-executing Script 5. He wrote, "Plaintiffs' experts, however, have not explained why they refer to the OMS database as "OMS2" as opposed to simply naming it "OMS," which is how Plaintiffs' experts refer to this database in the minimal documentation that they did provide." (*Supplement, paragraph 43*). In his deposition Mr. D'Andrade admitted that he understood why we used the two names and that he was unaware when he wrote his Supplement that the data came to us in two batches (*Supplement*, page 49, lines 15-20). The original name of OMS in our "minimal" documentation goes back to when there was only one data set. Note, the two sets of the Odyssey data came in slightly different formats. One contained first and last name columns. The other had full the inmate's name all in one column. The original Script 5 only covered one of those scenarios, but the updated version we provided him covered both data sets and ran flawlessly.

We are describing in detail what happened, or rather what did not happen, with Script 5 because it is crucial to Mr. D'Andrade's claim that our work is not reproducible. As detailed in footnote 1, a self-executing version of Script 5 was delivered to the defendants' counsel on March 5, 2019. In his deposition Mr. D'Andrade, was asked if he had received the updated version of Script 5 before he had written his supplemental report. The question and his response were

·7· Q· · Okay.· I'm trying to -- after your initial report,
·8· · · ·did you receive a modified Script 5?· It's just
·9· · · ·that you couldn't -- it didn't run on the Odyssey
10· · · ·database, or you just never received the Script 5?
11· A· · I never received it.

D'Andrade Depo. 55-56.

To summarize, our main points regarding Script 5 are:

The original Script 5 could have been run by anyone familiar with database programming. As a courtesy, and in response to Mr. D'Andrade's criticism, we created and provided to defendants a self-executing version of Script 5 on March 5, 2019. Mr. D'Andrade had not received that version before his supplemental report a month later or even by the time of his deposition on April 30, 2019. Thus, Mr. D'Andrade's complaints about not being able to reproduce our  results in his Supplemental Report are invalid. Defense counsel, not plaintiffs' experts, are the cause of Mr. D'Andrade never receiving the modified Script 5.

The second basic problem with Mr. D'Andrade's conclusions, tied to our making conservative choices, occurs at least four times. These will be detailed below. An example is the choice of which sentence to use when an inmate has more than one sentence recorded for the same crime. Multiple sentences for the same crime are possible if a judge changes a sentence

before an inmate is released. Normally, the last sentence issued would be the operative sentence. Since we could not be absolutely certain that the last sentence superseded all of the previous sentences, we used the sentence with *the last release date* to calculate the TimeToRelease, even though any earlier sentences in the same case were most likely superseded by the last issued sentence. This conservative choice reduces the duration of TimeToRelease for any inmate who has more than one sentence for a given crime and their last sentence has an earlier release date.

**Detailed Responses to Mr. D'Andrade's Report and Supplement**

**Mr. D'Andrade Did Not Have Odyssey Files Because Defense Counsel Failed to Provide Them to Him**

In order to determine if he could match our results, Mr. D'Andrade wanted to start with the same information we started with: the text files containing the Odyssey data and the OMS data in Oracle format. Initially Mr. D'Andrade was not able to follow his plan because he was not given the Odyssey text files. (*paragraph 46*). Mr. D'Andrade's overall conclusion that our work is "unrepeatable" includes his inability to start with these text files. As shown below, his lack of these files was not the fault of plaintiffs, but rests entirely upon defendants.

The Indiana Supreme Court's Office of Judicial Administration provided the text file version of the Odyssey data to the plaintiffs in two different data dumps. Plaintiffs' counsel was charged by the Division of State Court Administrator's Office for Data received in November 2016 and on December 20, 2017. The charge for the first data dump (Odyssey One) was $5,106 and the charge for the second data dump (Odyssey Two) was $2,955.51. Plaintiffs' counsel offered the initial data to the defendants in 2016, but it was not until three years later, on February 25, 2019, a month *after* Mr. D'Andrade's initial report, that defense counsel finally responded and made arrangements to receive this data.[2] Mr. D'Andrade's complaint, that he lacked the text files versions of the Odyssey data sets prior to his first report should be directed at defense counsel, not the plaintiffs.

---

[2] On November 18, 2016 Defense Counsel Tony Overholt (TO) emailed Plaintiffs' Counsel John P Young (JPY) asking for a copy of Odyssey data plaintiffs received from the Indiana State Administrator's office. On November 18, 2016 JPY emailed TO and told him if defendants were willing to split the cost of receiving the data plaintiffs would provide it. There were a few emails exchanged about the size of the data received, and then Mr. Overholt never responded that defendants would pay for their share for the data and did not request the data. It was not until February 2019 that TO again asked for the Odyssey Data. On February 5, 2019 JPY emailed TO telling him plaintiffs could send him the data bases. JPY asked if TO wanted one or both of the data dumps we received and provided him with our costs for the data. TO told JPY that he had to check with his "people" to see what was wanted. On February 25, 2019 Mr. Overholt emailed JPY that they wanted both data dumps and would like to receive it via a down load link. On February 25, 2019, JPY sent TO the download link.

**Checksums are a Red Herring**

Access to the source text files is part of the broader issue of data integrity, which is a major alleged concern in Mr. D'Andrade's report. He repeatedly mentions difficulties in checking our work for data integrity (*paragraphs 4, 41, 46, 55, 70, and 78*). He states that ". . . it is standard practice to provide checksum files in order to determine if the data have been modified or corrupted." (*paragraph 70*). Checksums are an arcane feature of database transfers tied to the machine-level code used to store data. A key feature of checksum routines is that even a miniscule difference between the source data and the version recorded as received will generate an obvious difference in the checksum value.

One possible source of error in transferring large data sets, transmission errors, could in theory raise or lower the number of inmates calculated to be held beyond six hours. However, transmission errors via a hard drive handover are very rare, approximately 1 in 10,000,000 data bits.[3] Our key metric, TimeToRelease, is the elapsed time between the release order and the actual release. Note, we dropped any TimeToRelease results that were over 100 hours. If a transmission error on any variable used to calculate TimeToRelease caused an error in that calculation, it is likely that the erroneous observation would have been dropped due to that restriction or to the possible transmission error causing a negative value for TimeToRelease, i.e. the release date/time being before the release order date/time. Any remaining transmission errors could affect only an individual inmate's calculated TimeToRelease, i.e. TimeToRelease values for one inmate for a given incarceration were calculated separately. Thus, any transmission error would not propagate errors for other inmate's calculations. Such hypothetical transmission errors could, at most, cause an indiscernible change in the number of inmates held beyond any given cutoff. Based on the one-in-ten-million data bits rate of errors, the expected number of TimeToRelease values in our entire data set with 42,170 values with a transmission error would be less than 5 records, even without allowing for our dropping cases that had more than 100 hours.[4] If transmission errors were a real issue in terms of causing an overstatement of either the number of inmates in the plaintiff class or the TimeToRelease calculations, as opposed to a purely theoretical issue, Mr. D'Andrade could have identified any transmission errors by rerunning our scripts on the original data from the Court and comparing our results to his own. He did not do so; instead he raised  the theoretical but insignificant possibility of errors tied to alleged data integrity concerns.

If Mr. D'Andrade's complaint is solely that we did not follow industry practice to guard against transmission errors, that practice would make no difference. Industry practice would have been for checksums to have been provided by the data owners before they were handed over to us. Note, checksums for the data files were not provided by either the Indiana Supreme Court *or the Marion County Sheriff*. That makes Mr. D'Andrade's argument that we should have provided

---

[3] Data integrity, Bernd Panzer-Steindel, CERN/IT Draft 1.3 8. April 2007, at:
https://indico.cern.ch/event/13797/contributions/1362288/attachments/115080/163419/Data_integrity_v3.pdf

[4] An exact count depends on how many bytes are used to store the date/time data in each system.

checksums *after* these files came into our possession a red herring. Since the source data did not come with checksum, any checksum we would have added would not provide an iota of data integrity. The insinuation behind Mr. D'Andrade's complaints about the lack of data integrity is that we could have inflated the TimeToRelease values, as opposed to the possible but infinitesimally rare transmission errors mentioned above. We used the word "insinuation" because Mr. D'Andrade does not make a direct accusation. It is implied by his use of the ambiguous word "modified" the data. In any event, his implicit criticism is unfair and unfounded.

To make our irrelevance-of-any-checksum-created-by-us argument more intelligible to readers trained in the law, consider how the data integrity issue posed by the lack of checksums *differs* from the more familiar legal problem of maintaining the chain of custody of evidence. In his deposition Mr. D'Andrade described the checksum as being similar to maintaining the chain of custody for evidence (Depo page 42, lines 11-13). A broken link in the chain in the custody of evidence leaves open the possibility that the evidence was altered, plus no way disproving that it had been altered. Hence, maintaining the chain of custody is vital. In contrast, any possible tampering with the source data, even without checksums from the source, would be easily discovered. Moreover, a substantial overstatement is easily detected, even without the benefit of checksums. A small sample of TimeToRelease values calculated from the public portal, say of 100 inmates randomly selected from the 20,974 records with over 6 hours of TimeToRelease, would reveal some overstatements with a probability of 0.999973439.[5] Alternatively, the source data could also be reordered from the Indiana Supreme Court and checked. The easy methods of checking our results, combined with the fact that any checksum provided by us would have no data integrity value, is why Mr. D'Andrade's argument is a red herring.

In our database work we were able to calculate the TimeToRelease for 42,170 inmates. Simple economic logic suggests that we would not bother with inflating the 20,974 we found to have been held 6 or more hours by some small percentage. Suppose, *entirely for the sake of argument*, that we wanted to inflate the figure on the number of inmates held for six or more hours by 1%. A tiny inflation of the number of over-detained inmates, anything like 1%, makes no economic sense because there is no real payoff. Gaining 209 inmates in the class action on top of the 20,974 is trivial in financial terms. Suppose instead, *entirely for the sake of argument*, that we wanted to inflate the figure on the number of inmates held for six or more hours by a substantial amount, say 10%. This non-trivial gain would have to be sought in spite of our having no financial interest in producing a higher number and having our reputations at stake if our tampering were discovered and, as described above, would be easy to detect.

**Plaintiffs' Inmate Matching Was Extraordinarily Accurate**

In paragraph 54 Mr. D'Andrade criticizes our matching process across OMS and Odyssey for records without an inmate gallery number. The gallery numbers matched for 99.2% of the inmates we included in our TimeToRelease results. The remaining 0.8%, or 584 out of 42,170 releases, were matched using the criteria first name, last name, birthdate, last four digits

---

[5] This probability is based on the binomial distribution using a sample of 100 and a probability of overstatement of 0.1

of the social security number, race, and sex. Mr. D'Andrade described our point system to identify matches as "arbitrary" and "subjective," in an apparent and unfair attempt to create doubt regarding the accuracy of these matches. In his deposition Steven Henderson was asked if he had consulted any reference works on how to choose matching variables or assign the points. Since the variables available for a point-system match will vary across databases and types of applications, the lack of references specific to matching jail and court databases is to be expected. There are more general reference works on the methods for matching individuals across two data sets when there is no reliable common ID variable. The seminal paper for this problem is by Newcombe et al in 1959.[6] Some of the more recent papers rely on fuzzy logic and probability to match records that are similar but not identical.[7]

In his deposition Steven Henderson explained that he had considerable experience finding matches across databases when he was employed by Blue Cross of Tennessee and their databases had lost access to the full social security numbers as an identifier. Mr. D'Andrade's claim, that the matches made our point system unreliable, is simply not true. It is easy to show that our matches were completely accurate. Thus, Mr. D'Andrade criticism of the subjectivity of our point system is empty. Among the 584 records that lacked a gallery number, only 18 records were not identical across all of the matching criteria. Only those 18 relied on the point system to assign a subjective probability to a match. The number of records that did not match on every variable is small enough to simply present them for inspection Here are those 18 records:

| Odyssey-LastName | OMS-LastName | Odyssey-FirstName | OMS-FirstName | Odyssey-BirthDate | OMS-BirthDate | Odyssey-Race | OMS-Race | Odyssey-Sex | OMS-Sex |
|---|---|---|---|---|---|---|---|---|---|
| BUHLER | Buhler | COURTNEY | Courtney | 8/22/91 | 8/22/91 | Black | White | F | F |
| CATT | Catt | JOSHUA | Joshua | 4/16/79 | 4/16/79 | Black | White | M | M |
| DEJESUS | DEJESUS | JUAN | JUAN | 9/27/79 | 9/27/79 | Black | White | M | M |
| ESTRADA | ESTRADA | CARLOS | CARLOS | 2/25/90 | 2/26/90 | White | White | M | M |
| HARRIS | Harris | DAVID | David | 7/6/97 | 7/6/97 | Black | White | M | M |
| HERNANDEZ | Hernandez | ELISEO | Eliseo | 6/14/88 | 6/14/88 | H | White | M | M |
| HULLIDAY | Holliday | LB | L | 1/14/91 | 1/14/91 | Black | Black | M | M |
| JOHNSON | Johnson | JOANNE | Joann | 9/13/96 | 9/13/96 | Black | Black | F | F |
| KENDALL | KENDALL | KATHRYN | KATHRYN | 4/22/92 | 4/22/92 | White | Black | F | F |
| LAWRENCE | Lawrence | TALANA | Talana | 8/24/96 | 8/24/96 | Black | Black | M | F |
| MCCULLEY | McCulley | SHANA | Shana | 1/1/88 | NULL | Black | NULL | F | NULL |
| MCGARR | McGarr | BRANDY | Brandy | 9/2/73 | 8/2/73 | White | White | F | F |
| NODLIN | Modlin | MISTY | Misty | 1/31/87 | 1/31/87 | Black | Black | F | F |

[6] Newcombe, H. B., J. M. Kennedy, S. J. Axford, and A. P. James (1959), "Automatic Linkage of Vital Records," *Science*, **130**, pp. 954-959.
[7] Xiaoyi Wang and Jiying Ling, "Multiple valued logic approach for matching patient records in multiple databases," *Journal of Biomedical Informatics*, 45, Issue 2, April 2012, Pages 224-230. https://www.sciencedirect.com/science/article/pii/S1532046411001754 and
William E. Winkler U.S. Bureau of the Census, MATCHING AND RECORD LINKAGE, https://www.census.gov/srd/papers/pdf/rr93-8.pdf

| OSORIO-GONZALEZ | Osorio-Gonzalez | ADALBERTO | Adalberto | 4/12/87 | 4/12/87 | H | Unavailable | M | M |
|---|---|---|---|---|---|---|---|---|---|
| PHILLIPS | PHILLIPS | SHAQUILLE | SHAQUILLE | 2/26/92 | 2/26/92 | Black | Black | M | F |
| PRYOR | Pryor | AARON | Aaron | 6/10/68 | 6/10/66 | Black | Black | M | M |
| STULL | STULL | SAMANTHA | SAMANTHA | 5/22/98 | 5/22/98 | White | Asian | F | F |
| WEBSTER | WEBSTER | TOBEY | TOBY | 8/28/71 | 8/28/71 | Black | Black | M | M |

In these 18 records the mismatches on individual criteria are shown in red. Some records have obvious typos in a name field, e.g. Hulliday versus Holliday in the 6th record. Some match on every criterion except race, e.g. the first record. Three records do not match on birthdates because one digit is off, the 4th, 12th, and 16th records. The clear typos shown above, e.g. TOBEY versus TOBY in the last record, show that our point system, also called a fuzzy logic match, is finding the same inmates across the two data sets. We are 100% confident that our 42,170 matches primarily using the gallery number, (99.2%), then complete matches on other variables, (0.9%) and then fuzzy logic for remaining 18 cases, are all correct.

**Plaintiffs Did Not Modify Original Data but Rather Preserved Them**

In paragraph 55 Mr. D'Andrade remarked that we created some data tables during our analysis, which again could affect data integrity. Every created table is indicated with letters HDS, for Henderson Data Services, in the table name. We never modified any of the original data, i.e. the tables without the HDS in the name. Since the tables we created were clearly marked and we provided the code for their creation, they pose no risk to the integrity of the data. Far from destroying the integrity of the Odyssey database, as Mr. D'Andrade alleges, the creation of intermediate tables based on the source data along with the commands for their creation is standard operating procedure.

**Plaintiffs' Use of Sentences with the Last Release Date Was Conservative**

In paragraph 56 Mr. D'Andrade described our work as "inconsistent" because on page 5 of our report we referred to the "most recent" sentence per case being the "relevant record" while we used the sentence with the last release date for a case in calculating time to release. As mentioned in our introduction above, while the most recent sentence is the most relevant in that it likely superseded an earlier sentence for the same cause, there is no harm or inconsistency in using the sentence with the last release date in our TimeToRelease calculations. The last-release-date sentence obviously reduces the calculated TimeToRelease. *We used the sentence with the last sentence to be as conservative as possible.* Our calculations are both consistent and conservative. Our use of the term "relevant" record in our report was perhaps unclear, but as Mr. D'Andrade found in the database script, there was no ambiguity in what we did.

**Plaintiffs' Restriction of Sentences to Time Served was Conservative**

In paragraph 60 Mr. D'Andrade criticized our use of a formula for calculating sentence length because we acknowledged that the formula had not been consistently applied by judges, and because we did not apply it to any inmate whose release was after the date derived from the formula. These criticisms have no validity. The problem we addressed was that some inmates did

not have a release code, in spite of having been released. This situation occurs whenever an
inmate is released for time served. We can infer that an inmate was released for time served by
calculating if the Appropriate Release Date calculated in the formula below matches the actual time
served. The formula we applied was used in a majority of Marion county criminal cases:

Appropriate Release Date = Sentence Commence Date + (Term − Suspended)/2 − Jail Credit

The exceptions are sentences for which there is no credit at all instead of the 1-for-2.
Quoting our report "We applied the above formula to determine which cases had sentences for
time served. If an inmate was released without a release code being entered and the results of the
above formula equaled 0, that implies that the sentence was for time served." p. 5. We did not
include any cases in which the above formula yielded a positive amount of remaining sentence
days where there was a release with no release code. We excluded 499 records for which the
actual release was later than the date calculated from the above formula, which we termed a
"future release". These would be the cases in which there was no credit. There is one Marion
County judge who always used a "straight time" formula, i.e. no credit for all crimes. The count
of excluded cases is in our report on page 8. We were conservative by including only the releases
that we were sure were for time served. This is the second instance of Mr. D'Andrade criticizing
our work when we were being conservative.

In Paragraph 60 of his original report Mr. D'Andrade complains that we introduced no
evidence that the formula we used was valid for inmates released for time served. The evidence
is that formula lines up with the actual releases dates for 988 inmates who were released without
any release code, i.e. yields a value of 0 for the appropriate release date using the time served as
the "Term" in the above formula. The formula never yielded a negative number for the
appropriate release date. The formula yielded a "future release" in 499 cases. Again, these 499
were cases that did not have a 1-for-2 credit. Since we did not use those 499 records, our formula
was valid for every case we included.

Also, in paragraph 60 Mr. D'Andrade describes finding 1,874 results in which there were
multiple release orders "for the same case (or sometimes two different cases associated with an
inmate's incarceration)." In our calculations if there were multiple release orders for the same
inmate for different cases associated with one incarceration our clock for starting the calculations
for TimeToRelease is date/time for the case with the last release order.

Within a case we did take the earliest release order if that order implied an immediate
release, such as "ORC" an Order to Release from Custody. It is possible that a judge changed his
or her mind about releasing an inmate immediately and, given the inordinate amount of time it
can take the Marion County Sheriff to carry out a release order, a latter release order superseded
the supposedly immediate release order. This intervention must have been a rare event.

**Plaintiffs' Data Was Verified and Reverified**

Mr. D'Andrade first complained about the brevity of our description of our data
verification process in paragraph 75 of his initial report. This was a fair criticism. In response,
we gave defendants the spreadsheets and documents we had created during the data verification

process. These spreadsheets often had short notes or instructions written during the verification, such as "check the first five cases," that were not meant to be a description of the overall process. In his Supplemental Report Mr. D'Andrade devoted 5 pages (paragraphs 49 to 69) to the alleged inadequacies of our verification process. These paragraphs reveal a willingness to jump to conclusions about our verification process from the short notes along with a willingness to assume that we had no idea what we were doing. An example is, "Plaintiffs' experts lack sufficient understanding of statistical testing methods" (Supplement paragraph 69).

To address his complaints, in this Response we provide an overview of the verification process and the step-by-step details down to the exact fields on screens of the publicly available data portals supported by computer screen shots. This detailed description is intended to avoid being accused that we failed to describe any step of the verification process. It is in Appendix A.

Here in the body of our report we include an overview of the validation process, the results, and the statistical issues raised by Mr. D'Andrade.

The validation process had two parts. The first was fine tuning our algorithm. The fine tuning was to check if our algorithm for calculating TimeToRelease had any problems. Mr. Henderson worked on batches of records defined by the complexity of release process in terms of holds, multiple cases for the same inmate, and the absence of a release order. There were 14 batches or "scenarios". These are listed on page 8 of our initial report. For the purposes of fine tuning it was sufficient to give Alison Shine data sets for one scenario and ask her to check the first five cases. These could be ordered randomly or listed in descending order of the calculated TimeToRelease.

These manual lookups were a time consuming and meticulous process. Ms. Shine had to check if a temporary case number (called an MC case number) had been replaced with a regular case number. She checked for cases being merged. She checked for holds of all types. She verified that date for the release order was correct and that the date for the release from jail was correct. She checked if there were pending cases. She could not check the time of the release order because the time is not included in the Odyssey public portal. The Odyssey data we received from the Indiana Supreme Court did have the date and time of the entry of release orders. In the fine-tuning part Ms. Shine looked for errors and, if found, determined their causes. For example, she found that our algorithm did not include the ICE holds and that consequently some of the examples with high values for TimeToRelease in a particular scenario had erroneously high TimeToRelease values. She would then e-mail or phone Mr. Henderson about the problem. Mr. Henderson would modify the algorithm to account for things such as ICE holds and then send Ms. Shine a new spreadsheet to test for the same scenario. This fine tuning was an iterative process that kept going until Ms. Shine did not find any errors in the single scenario data. In the last pass of the fine tuning she checked 65 cases across the 7 scenarios used in the final matching. It was that last pass that was the basis for our statement that 100% of the records we tested had no errors.

Mr. D'Andrade's complaints about our sample sizes being too small, inferred from the notes for Alison Shine by Steve Henderson, and that therefore one could not have any confidence in the results were misdirected. Those notes were mostly about the fine tuning before the final pass. Nevertheless, we agree that our initial description of this process was too brief and that a

larger sample size would be needed to infer a probability about the error rate in the population. We include the expanded explanation here and the results of a larger validation sample below.

Additionally, to address Mr. D'Andrade's criticism that our sample sizes for the validation process were too small, we rechecked our work utilizing a random sample across all of the scenarios of 1,000 of the 42,172 jail stays for which we computed a TimeToRelease. The mean TimeToRelease in the sample was 10.14 hours. The mean time in the population was 9.93 hours. A statistical test of whether the mean of the random sample could have drawn from the population with a known mean of 10.14 hours and a known standard deviation of 11.937 hours yields a z score of 0.5437. The hypothesis that the sample mean could have been randomly drawn in a sample of 1,000 observations from the known population cannot be rejected at any conventional significance level. The prob value, which Mr. D'Andrade said that we should be reporting, is 0.2924.

The results of our test was that none of the 1,000 cases tested had an error. There were 18 cases which could not be confirmed because the public portals on either the court or jail side did not have a current record of the case. Nevertheless, these 18 files were in the original data files provided to us by the Sheriff (OMS) and the Indiana Supreme Court (Odyssey). The reason for the absence of a current public record for these 18 files cannot be determined. We understand that they cannot be due to an expungement because records of jail stays are never expunged.

In paragraph 62 Mr. D'Andrade states that he could not find 3,935 case numbers in Case_Master and that for these cases there may have been no incarceration recorded in the Marion County Jails Offender Management System (OMS). We did not link our tables in the same way that Mr. D'Andrade did. We never used the OMS Case Master because we found it to be unreliable. The 3,935 cases that he could not link did have incarceration records in our data.

## MC Cause Numbers Were Used When Inmates Were Ordered Released and Were Released with Only an MC Cause Number and No Regular Cause Number

In paragraph 63 Mr. D'Andrade asserts that we were inconsistent by saying that we did not include anyone with MC (temporary) cause numbers. We did not use the MC cases when there was a regular cause number for the same jail stay. We did include the individuals who had both an MC and a regular cause number, using only the regular cause number. Our report states. "We did not include any release data associated with inmates who had MC cause numbers as well as regular cause numbers. **Instead, release data associated with the regular cause numbers were used.** (bold face added) The only exception to this was if the detainee had only a MC cause number but no regular cause number associated with a jail stay. We included TimetoRelease data for these inmates who had only MC cause numbers and associated Release Codes and actual Release dates and times." The 3,458 jail stays that Mr. D'Andrade references in his paragraph 63 are all based on the data from the regular cause number, as indicated in the boldface above. As for the inmates with only MC cause numbers, it makes sense to include such individual's TimeToRelease as they were detained and ordered released. In these entirely-MC situations we simply measured the time it took the Sheriff to release the inmate after a court had ordered their release, accounting for any holds or detainers, as we did for the other inmates in our study. It is important to note that Mr. D'Andrade never identified a single error in our

TimeToRelease calculations for inmates who were released with only a MC cause number. This is another theoretical concern on his part that has no effect on the calculations.

**Mr. D'Andrade's Concerns about SQL Server Software is Specious**

In paragraph 70 Mr. D'Andrade complains that we did not specify the versions of software used. The software was SQL Server 2014 Standard 64 bit, version# 12.0.4100.1. This complaint is another example of Mr. D'Andrade raising an issue that, at best, is a remote theoretical possibility, but has no effect in this case. Our calculations consist entirely of counts of records that match a criterion, i.e. simple addition. What Mr. D'Andrade has done is apply what could be a legitimate concern in duplicating results in complex calculations to simple calculations for which that concern is irrelevant. His stated concern over not being able to reproduce our results because we did not list our software version number is specious.

**Plaintiffs Data Was Appropriately Cleaned with Scripts, Leaving the Original Data Intact**

In paragraph 71 Mr. D'Andrade asserts that the cleaning of the data we did could not be reproduced. This assertion is false. All of the data cleaning we did was through the scripts we provided. Again, we are being accused of doing something we never did nor intended to do.

**Mr. Henderson Provided the Database Work for Plaintiffs' Report**

In paragraph 76 Mr. D'Andrade quoted Mr. Henderson's deposition, "Mr. Henderson indicated '[He] did not write any of the physical document in its final draft" (Deposition, p. 8, lines 16-18). To clarify, Mr. Henderson did write some of the text of the report, particularly the parts related to his database work. However, he did not assemble the final report. That is what he meant by "write any of the physical document in its final draft".

**Plaintiffs' Matching of Inmates by Gallery Numbers was Extraordinarily Accurate**

In paragraph 77 Mr. D'Andrade asserts that our method of matching inmates is different from what the jail uses. This assertion is correct. The difficulties the Marion County Jail staff had in matching its records with the Court's records is part of the reason the processing of inmate releases took so long. If we stuck to the Jail's matching method we would have had fewer matches. Our method of matching is more accurate. The Jail relied primarily on the CaseNumber for its matching. Gallery numbers are unique to an individual, but individuals can have multiple CaseNumbers. We found the match accuracy to be much lower for CaseNumber than for the Gallery number. For example, looking at releases from the Booking table through 12-18-12, 201,351 of them matched to an Odyssey case by Gallery#.  Only 176,266 of them matched on CaseNumber. Using the CaseNumber reduces the number of matches by slightly over 25,000 jail stays. We can see examples of this problem in the 3,900 records submitted by D'Andrade where he found that the CaseNumber did not match, but we did find a match using the Gallery#.

**Plaintiffs' Understood and Made Appropriate Use of Statistics**

In his Supplemental report Mr. D'Andrade raised an entirely new and yet again specious concern. He claims that "Unfortunately, it appears that Plaintiffs' experts do not properly understand how to actually perform statistically-significant testing." (*Supplement paragraph 56*). Mr. D'Andrade is complaining that we failed to do something we had no reason to do, as well as complaining when we made a choice that reduced the size of the plaintiff class. His complaint also reveals a fundamental misunderstanding of the nature of the data. As for his claim that we do not properly understand how to perform statistically-significant testing, the claim could more reasonably be applied to Mr. D'Andrade. In his deposition he was asked how he would define the true threshold and what statistical test he would apply to determine the accuracy of the estimate of that threshold. This was Mr. D'Andrade's opportunity to enlighten us on what test he thought we should have applied. The questions and answers on this topic run from page 45 line 7 to page 49 line 9. Beyond stating that he expected more statistical testing, Mr. D'Andrade failed to describe what he wanted us to do.

The OMS data contained some obvious errors that could have caused overstatements of the TimeToRelease if plaintiffs had not found and avoided using those records. The OMS software apparently lacked the internal checks to catch nonsensical entries. When we examined the records with the highest TimeToRelease values, as high as 25 years, we found obvious erroneous entries for the date of the release order or the date of the actual release, such as dates that were before the inmate was born or the year 1900. We quickly realized that we had to set a cutoff for the TimeToRelease values to avoid these data entry errors. We settled on the cutoff of 100 hours because we found no errors in the records we tested below that cutoff. We knew that there were legitimate records of inmates with TimeToRelease values above 100 hours, including one of the named plaintiffs in the case. *We chose the 100 hours as a cutoff to be conservative.*

Our claim that there were zero errors in the records we had validated is a statement about the sample. It is not, as Mr. D'Andrade erroneously asserts, an inference about the population of records from which we drew the sample. Mr. D'Andrade chides us for not identifying the "true" (*Supplement paragraph 58*) threshold. A straightforward and sharp definition of the "true" threshold at which errors begin would be the lowest value of TimeToRelease that contains an error. By error we mean overstatement of the TimeToRelease. Finding the lowest value with an error in the TimeToRelease among the 42,170 jail stay records we were able to match across the Odyssey and OMS data is a needle-in-a-haystack problem. To have a prob-value of 0.01 for our chosen cutoff of 100 hours we would have had to manually validate 99% of the 42,170 records below the 100-hour cutoff and have then found zero errors in that sample. Suppose, *entirely for the sake of argument*, that there was *one* error in the records below the cutoff. What practical difference would having one error in the range of 0 to 100 hours of TimeToRelease calculations make? Our validation of 1,000 records below the cutoff was sufficient to show that errors were extremely rare below the cutoff.

If Mr. D'Andrade meant the lowest value of TimeToRelease in the data as the true threshold he would be faulting us for not searching for the "true" cutoff and calculating its prob-value, he would be effectively asking for a manual validation of nearly the entire set of TimeToRelease values from the records we were able to match. That would be needlessly expensive and serve no purpose. Knowing that 'true cutoff' has no practical benefit. Other

definitions of the "true" cutoff are all somewhat arbitrary. Suppose the data listed in ascending order of TimeToRelease had a very low rate of errors, say 1 per 1,000 records, and that rate rose slowly as the TimeToRelease values increased, say to 2 per 1,000 by the 42,170 record, which is up to our 100 hours cutoff. Suppose further that the error rate increased sharply at some TimeToRelease value, such as at 110 hours and was 10 errors per 1,000. This supposed would plot as a nearly horizontal line for the rate of errors per 1,000 cases and then tilt upward at 100 hours.

Mr. D'Andrade's complaint that we should have tested for the true cutoff and calculated the prob-value for our sample reveals both a hazy understanding of the statistical issues in this problem and a gross misinterpretation of the statement that there were zero errors among the records we validated below the 100-hour cutoff. Such an inflection point, as described above, is consistent with Mr. D'Andrade's vague description of the true threshold (deposition page 47, lines 19-23) "

19. . . .what I mean by true
20· · · ·threshold is if I had a statistical data set, I
21· · · ·could understand where there would be some
22· · · ·possibility that data would have more variation or
23· · · ·more prone to error.

The problem posed by defining the true threshold as the point at which the rate of errors has a sharp increase is that testing for that point requires sampling across the range of values of TimeToRelease. It converts the problem of finding one "needle in the haystack" in the range of 0 to 100 hours for TimeToRelease values to finding the needle or a few needles at every step of distribution of ranges, i.e. TimeToRelease for the first 1,000 values of TimeToRelease, for the 2nd 1,000 values of TimeToRelease, and so on. The sample size required to pin down with a high level of confidence precisely where the rate of error rises sharply would be enormous.

Yet again, Mr. D'Andrade is criticizing us for conservative decision. He is again criticizing us for failing to do work we never intended to do and had no practical reason for doing. Our 100 hour cutoff was well below the level at which we were finding a high rate of errors during the fine tuning process. This cutoff was chosen to be conservative. We knew that it reduced the size of the plaintiff class. Mr. D'Andrade refers to our threshold as arbitrary (deposition page 49)

·        4· · · ·But it's within Professor Sandy and
·        5· · · ·Mr. Henderson's brain what they meant by a hundred
·        6· · · ·hours is a threshold because it's pulled out of
·        7· · · ·thin air.·

While we do not know the "true" cutoff under either the definition of the lowest value of TimeToRelease or the value at which the rate of errors sharply increases, we do know that time to release calculations below the 100 hours cutoff had zero errors in the validation for 1,000 randomly selected jail stays. The probability of finding zero errors in a random sample of size 1,000 for a range of values of the true number proportion of errors is shown in the chart below. If

the true error rate is below 4 per thousand the probability of getting zero errors in a sample of 1,000 is near zero. Having a large sample yield zero errors in the validation process doesn't prove that there are zero errors in the population. However, it does show that it is very likely that the true rate of errors in the population is below 4 per 1,000. We think our algorithm yields zero errors because we were so conservative in our assumptions. However, validation is so time consuming (the process is described above) that it is not practical to prove that there are zero errors. Proof would require hand validating every one of the 42,170 matched records.





### Plaintiffs' Numerical Inconsistencies were Minor, do not Affect the Conclusions, and are Corrected Below

Paragraphs 65 to 69 in the D'Andrade report have the heading "Numeric Inconsistencies Found in the Sandy Report". We will address them in order.

The claimed numerical inconsistency referenced in paragraph 65 is entirely an issue of semantics. The sentence "There were 20,974 inmates, or 48%, who were held more than 6 hours." is correct. It refers to TimeToRelease more than 6 hours. The Stata command that yields the 20,974 is "count if HoursToRelease >6". The Table 1 heading reads "After x Hours Count Still Detained." The "after" refers to after that full hour has expired. The Stata command that generates the value 19,188 is "count if HoursToRelease >=7". The two descriptions were meant to refer to different cutoffs. The numbers in Table 1 and in the Chart are all correct.

Mr. D'Andrade's paragraph 66 correctly identifies an error in the last full paragraph on page 13 of our report. The percentages in that sentence listed for more than 6 hours came from

the penultimate version of the data set. Note however, that Chart 2 and Table 2 are correct. They were both based on the final version of the data set. The same problem of not updating a reference in the body after changing the data occurs in a sentence flagged by Mr. D'Andrade in paragraph 67. That sentence was also based on the penultimate version of the data set. Again, Chart 3 and Table 3 are based on the final version of the data.

Lastly, D'Andrade's paragraph 67 refers to an error in a Table 3, which is reproduced below.

| Hours | Sentenced to Time Served % | ORC % | CBP % | SBP % |
|---|---|---|---|---|
| 0 | 100.00% | 100.00% | 100.00% | 100.00% |
| 1 | 97.57% | 86.55% | 95.25% | 98.33% |
| 2 | 95.23% | 70.52% | 87.83% | 95.35% |
| 3 | 92.90% | 58.75% | 81.69% | 91.58% |
| 4 | 90.57% | 50.14% | 76.30% | 87.97% |
| 5 | 87.53% | 43.74% | 70.92% | 82.46% |
| 6 | 84.28% | 38.52% | 65.77% | 77.72% |
| 7 | 82.96% | 34.29% | 59.92% | 72.32% |
| 8 | 81.34% | 30.40% | 54.50% | 66.59% |
| 9 | 78.40% | 27.19% | 49.14% | 61.31% |
| 10 | 76.06% | 24.46% | 43.93% | 56.04% |
| 11 | 72.72% | 22.17% | 39.89% | 51.49% |
| 12 | 68.26% | 20.25% | 36.02% | 46.62% |
| 13 | 65.82% | 18.77% | 32.30% | 41.65% |
| 14 | 62.68% | 17.37% | 28.97% | 37.93% |
| 15 | 58.22% | 16.17% | 26.31% | 34.41% |
| 16 | 54.36% | 15.12% | 23.55% | 31.40% |
| 17 | 50.71% | 14.18% | 21.37% | 28.36% |
| 18 | 48.17% | 13.12% | 18.84% | 25.64% |
| 19 | 46.45% | 12.10% | *18.84%* | 23.06% |
| 20 | 44.52% | 11.12% | *16.66%* | 20.55% |
| 21 | 41.78% | 10.44% | *14.95%* | 18.03% |
| 22 | 40.06% | 9.78% | *13.16%* | 16.01% |
| 23 | 36.11% | 9.00% | *11.64%* | 13.91% |
| 24 | 33.98% | 8.34% | 9.08% | 12.56% |

We did make an error in cutting and pasting a formula in a spreadsheet which affected five cells. The incorrect values are italicized and shown in red. The correct values are:

16.66%
14.95%
13.16%
11.64%
10.24%

Note, the errors Mr. D'Andrade identified make no difference to the conclusions to the question addressed in Chart 3, whether the type of release order made a difference in how long an inmate was held. These conclusions are in the last full paragraph of 15 of our report. Nor does this error affect any of the statistics on the number of inmates and the calculations of the time it took the Sheriff to release them from jail

In paragraph 69 Mr. D'Andrade speculates on the basis of the non-error in his paragraph 65 and the inconsequential errors described in paragraphs 66 and 67 that there may be other errors that he could not identify and that therefore our report cannot be relied upon. This is a specious argument. All of our conclusions are correct. These include: how many inmates were held more than 6 hours (the 20,974), that 2014 was the worst year in terms of unreasonable HourstoRelease, and that even the best release category (ORC) had 2,202 inmates being held beyond 24 hours. Moreover, even if we had relied on the erroneous individual numbers cited in paragraphs 66, 67, those erroneous numbers would have made no difference to the conclusions.

In his Supplement in paragraphs 71 through 74 Mr. D'Andrade points to discrepancies between figures in a spreadsheet and our report. For example, regarding paragraph 71, our count of 42,170 matched cases is correct. The 42,065 total Mr. D'Andrade calculated came from an earlier iteration in the matching process. While our report editing certainly had room for improvement, the discrepancy does not affect the accuracy of our results. As we have stated again and again, Mr. D'Andrade could have looked for errors in our results but either never found any or never bothered to look. Instead, he cites discrepancies that make no difference to the results or the conclusions. His theme is that if we made errors by having cited number from an older iteration of our matching process our actual work is suspect. We reiterate that our results are correct. We presume that if he found any errors in our results, he would have presented them.

**Conclusion**

The elephant in the room that Mr. D'Andrade would prefer to ignore is that for the time period of our study, June 6 of 2014 to November 30 of 2017, 48% of the Marion County inmates were held for more than 6 hours after the court had ordered their release. This percentage was determined after carefully eliminating the effects of holds and eliminating any possible ambiguous cases, and after making consistently conservative assumptions. Instead, Mr. D'Andrade focuses on trivialities, such as infinitesimal transmission errors, a column heading for script that he could easily adapt to the second OMS data set, or darkly hinting that we could have "manipulated" the data. In his telling our results cannot be "relied" upon and are not "repeatable." They can be utterly relied to have *understated* the counts of inmates held for unreasonable times after their release orders. In short, Mr. D'Andrade's criticism of our reliability and reproducibility amounts to much ado about nothing.

Most importantly, Mr. D'Andrade fails to identify a single incorrect TimetoRelease calculation of the 42,170 inmates in our study. Moreover, he fails to present his own competing calculation of the time it took the Sheriff to release inmates in his jail after receiving an order to

do so from a Court. Our numbers are based upon the databases actually used by the courts and the Sheriff, and we are confident in our results.

Dr. Robert Sandy

May 10, 2019

Appendix A

Procedure followed by Alison Shine for verifying data.
   Sources of Data:
   1. Excel spreadsheet electronically provided by Steven Henderson. This spreadsheet
   contains data regarding 42,170 jail stays
   2. Odyssey (My Case) public portal, and
   3. Inmate Look Up public portal.

   1. I received an Excel spreadsheet (spreadsheet) from Steven Henderson electronically.
This spreadsheet contains data regarding 42,170 jail stays.  I started the process by selecting a
cause number from column D in the spreadsheet provided by Steven Henderson for any person
listed on that spreadsheet.  The spreadsheet was provided to me with the names of the individuals
randomized.

   2. I highlight the cause number using my mouse and right click to copy the highlighted
cause number. I then open the Odyssey public portal (MyCase) by typing "mycase.in.gov" into
the search bar of my web browser. I then hit "enter" on my computer keyboard.

   3. An interim page may, or may not, pop up which includes the words "I'm not a robot"
with a square empty box to the left. When this page opens, I place my mouse curser on this box
and left click.  This operation allows the Page with the words "Case Search (beta)" to open.

   4. On the page with the words "Case Search (beta)", one sees a "search by:" option.
There are three options, Case, Name, and Attorney.   Normally the "Case" option, being the first
in the row of three options, is already opened when the page is opened.  If it is not, I place my
mouse cursor on the word "Case" and left click the mouse.  With the "Case" option one is given
several more options.  I use the "Case Number" option which has a blank rectangular box to the
right side of the words "Case Number". I place my mouse cursor in this box and right click.  I
then place my mouse cursor on the "Paste" option and left click.  By this operation, the
previously copied cause number (See paragraph 2) is pasted into the "Case Number" box. When
this is performed and the case number is in the rectangle to the right of "Case Number," I do one
of two things, both of which result in the same result. The first is to press enter. The second is to
put my mouse cursor on the scroll bar on the far right side of the page and scroll down until the
word "Search" contained in a rectangular box is revealed.  I then place my mouse cursor on the
word "Search" and left click the mouse. (In this description, case number and cause number are
used interchangeably and reference the same number).

   5. This action results in another page opening.  This page is includes the words "Search
Results" in bold type in the upper left corner of the page.  This page provides information about
the case.  This information includes, but is not limited to, the name of the case (This is in blue
color and is designated as "State of Indiana v. _____ ((the name of the defendant). This blue
colored name of the case is a link to the case chronology).  Other information on this page
includes the case number, charges filed, the status of the case, and the names of the attorneys.

6. Next, I place my mouse cursor on the blue case name link and left click my mouse. This action causes the page titled "Case Summary" to open. This page includes, but is not limited to, the following information: the defendant's name, address, and date charges were filed.

7. Next, I scroll down this page to find the date the individual was ordered released. This is information is under a heading "Order to Release from Custody".

8. Next, I refer back to the spreadsheet provided by Steven Henderson to verify the date in Column F, "Release Order Date", on the spreadsheet is the same as the date in the "Order to Release from Custody" heading on the "Case Summary" page in mycase.in.gov to make sure they are the same. If they are the same, I place a lower case "x" in column G to signify the two dates match.

9. If the two dates do not match, I highlight that and notify the team.

10. In performing this function I have encountered a non-match of the dates on four occasions among the 1000 records I have reviewed for validation. Each occasion was a failure to obtain a jail record "Inmate Lookup." In what was available to the public the jail stay wasn't available so it could not be verified.  The cases were in MyCase (Odyssey) but not Inmate Look up.

11.  After I have verified that the "Court Ordered to Release from Custody" date on mycase.in.gov matches the date in column F "Release Order Date" on the spreadsheet, I leave the mycase.in.gov portal.  I can do this one of two ways.  The first is to place my mouse curser on the "-" icon at the top right corner of the "Case Summary Page".  This causes the page to minimize for later retrieval.  In the alternative, I could place my mouse curser on the "X" icon in the right upper corner and left click.  This will cause the page and website to close.

12. After I have either minimized or closed the mycase.in.gov portal, the next step is to verify the date in column H "Release Date" matches the "Release Date" for the same individual in Inmate Lookup.

13. To verify this, first I identify the gallery number from Column C "Gallery" on the spreadsheet of the same person for whom I completed steps 1-11 above.

14. Next I open "Inmate Lookup". I do this by typing "inmateinfo.indy.gov/IML" into my web browser search bar. This opens a page in "Inmate Lookup" titled "Inmate Database Search". I am presented with two options.  Option 1 and Option 2. I ignore option 1 and focus on Option 2. The rectangular box of Option 2 is designated "search by unique identifier or value". In the "select identifier" box, I place my mouse curser on the upside down triangle in the rectangular box to the right of the words, "Select Identifier". I left click my mouse curser and a list of options are presented to me. I place my mouse curser on the words, "Permanent Number" and left click my mouse curser.  Next, in the rectangular box to the left of the word, "Value", I enter six zeros (000000) followed by the inmate's gallery number. I next place my mouse curser on the box to the left of the words "include released inmates" and left click my mouse curser. Next I place my mouse curser on the word, "Search" and left click. (attachment 1).

15. When I perform this function a page titled "Inmate Database Search Results" opens. This page provides a record of each Marion County Jail stay for that particular inmate (attachment 2). Within the rectangular box on this page is a column entitled "Release date. The release date column displays the date the inmate was released for each jail stay. I place my mouse curser on the date that matches the date in Column H on the spreadsheet, and left click. This opens a page titled "Inmate Information"

16. Next, on the "Inmate Information" page I look for the "Release Date" in the section titled "Incarceration Information". The "Release Date" under "Incarceration Information" contains both the date of release and the time of release. Next, I compare the "Release Date" on the "Inmate Information" page in "Inmate Lookup" with the release date listed in column H of the spreadsheet. If they match, I indicate this by putting a lower case "x" in column I on the spreadsheet. If they do not match, I notify the team. If the information from column H does not match the information on inmate lookup, it is likely there will be information in the "detainer information" box which is located further down the "Inmate Information" page.

17. In the 1,000 cases I have checked so far in my validation process there has been a match between the Spreadsheet Column H "Release Date" and the "Release Date" listed on the "Inmate Information" page of "Inmate Lookup", for each person I have analyzed. Further, there has been no detainer information in the detainer information box for any of these individuals.

18. When I encounter an MC cause number, I open "Inmate Lookup". I do this by typing "inmateinfo.indy.gov/IML" into my web browser search bar. This opens a page in "Inmate Lookup" titled "Inmate Database Search". I am presented with two options. Option 1 and Option 2. I ignore option 1 and focus on Option 2. The rectangular box of Option 2 is designated "search by unique identifier or value". In the "select identifier" box, I place my mouse curser on the upside down triangle in the rectangular box to the right of the words, "Select Identifier". I left click my mouse curser and a list of options are presented to me. I place my mouse curser on the words, "Permanent Number" and left click my mouse curser. Next, in the rectangular box to the left of the word, "Value", I enter six zeros (000000) followed by the inmate's gallery number. I next place my mouse curser on the box to the left of the words "include released inmates" and left click my mouse curser. Next I place my mouse curser on the word, "Search" and left click. (attachment 1).

19. When I perform this function a page titled "Inmate Database Search Results" opens. This page provides a record of each Marion County Jail stay for that particular inmate (attachment 2). Within the rectangular box on this page is a column entitled "Release date. The release date column displays the date the inmate was released for each jail stay. I place my mouse curser on the date that matches the date in Column H on the spreadsheet, and left click. This opens a page titled "Inmate Information".

20. This page provides specific details about the jail stay, including, but not limited to date of birth, detainer information (any holds preventing release), and the charge information which lists the cause numbers related to the inmate's jail stay (attachment 3). On the bottom left

hand side of this page there is a heading, "Charge Information." Under the heading "Case Number" is found the permanent case number.

Supporting Screen Shots:



# Case Summary

« BackNew SearchRefine Search

## State of Indiana v. ANTHONY QUINN SMITH

| | |
|---|---|
| Case Number | 49G14-1603-F6-011751 |
| Court | Marion Superior Court, Criminal Division 14 |
| Type | F6 - Felony 6 |
| Filed | 03/28/2016 |
| Status | 06/16/2016 , Decided |
| Reference | Prosecutor Case Management Number |
| | 49G14-DM1211466 |
| | Police Agency Number |
| | DP160033211 |
| Related | Co-Defendant Case |
| | 49G14-1603-F6-011749 |

## Parties to the Case

Show all party details

| | |
|---|---|
| Defendant | SMITH, ANTHONY QUINN |
| State Plaintiff | State of Indiana |

## Charges

Show all charge details

| 01 | 03/23/2016 | 35-48-4-6(a)/MA: Possession of Cocaine |
|---|---|---|
| 02 | 03/23/2016 | 35-48-4-11(a)(1)/MB: Possession of Marijuana |

## Chronological Case Summary

| 03/28/2016 | Case Opened as a New Filing |
|---|---|
| 03/29/2016 | Information Filed |
| | CHARGING INFORMATION |

File Stamp:
03/29/2016

03/29/2016  **Probable Cause Affidavit Filed**
File Stamp:
03/29/2016

03/29/2016  **Information Filed**
CRIMINAL HISTORY
File Stamp:
03/29/2016

03/30/2016  **Court Sets Bond**
$500 cash
Party:
SMITH, ANTHONY QUINN

03/30/2016  **Initial Hearing**
Session:
03/30/2016 1:00 PM, Judicial Officer: Hurley, Robert Patrick - PT
Result:
Commenced and concluded

03/30/2016  **Hearing Scheduling Activity**
Initial Hearing scheduled for 03/30/2016 at 1:00 PM.

03/30/2016  **Advisement of Rights Conducted**
Judicial Officer:
Hurley, Robert Patrick - PT

03/30/2016  **Indigent Counsel Appointed at County Expense**

03/30/2016  **Omnibus Date**
05/14/16

03/30/2016  **Hearing Scheduling Activity**
Pretrial Conference scheduled for 04/07/2016 at 1:00 PM.

03/31/2016  **Notice Filed**
STATE'S NOTICE OF DISCOVERY
File Stamp:
03/31/2016

04/06/2016  **Appearance Filed**
Attorney:
Frantz, Amanda Michelle

|  |  |
|---|---|
|  | For Party:<br>SMITH, ANTHONY QUINN<br>File Stamp:<br>04/04/2016 |
| 04/07/2016 | **Pretrial Conference**<br>Session:<br>04/07/2016 1:00 PM, Judicial Officer: Christ, John Michael-C<br>Result:<br>Commenced and concluded |
| 04/07/2016 | **Order to Release From Custody**<br>AS TO THIS CASE ONLY<br>Judicial Officer:<br>Christ, John Michael-C<br>Order Signed:<br>04/07/2016 |
| 04/07/2016 | **Report to Probation** |