UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MICHAEL DRIVER, TERRY CLAYTON, | ) |
| MICHAEL BOYD, NICHOLAS SWORDS, and | ) |
| ROY SHOFNER, individually and as | ) |
| representatives of a class of all similarly situated | ) |
| individuals, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 1:14-cv-02076-RLY-MJD |
| | ) |
| THE MARION COUNTY SHERIFF, and THE | ) |
| CONSOLIDATED CITY OF INDIANAPOLIS | ) |
| AND MARION COUNTY, | ) |
| | ) |
| Defendants | ) |

**DEFENDANTS' BRIEF IN IN SUPPORT OF MOTION TO EXCLUDE EXPERTS AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION REGARDING COMPUTER ISSUES**

## Procedural History and Summary of Issues

After the Seventh Circuit remanded this case for further proceedings in June 2017 on the question of computer issues causing processing delays, this Court set new deadlines for the disclosure of expert witness reports and for discovery generally.  To that end, Plaintiffs produced two new reports from one of their three testifying experts, Robert Sandy, that they claim to support their argument that there are widespread over-detentions as a result of the conversion to new computer systems in 2014 that manage the Marion County Superior Court's criminal cases and all of the related systems used by the Superior Court's criminal justice partners.[1]

---

[1]This Court previously certified two classes. The first involved those inmates who are returned to the jail for processing after a court ordered their releases. The second involved those inmates who are ordered released to self-report to community corrections but held in jail for days until community corrections is ready to process them. This

The Sandy reports, however, do no such thing.  In fact, those reports must be excluded in their entirety for two reasons.  First, Plaintiffs' experts repeatedly violated Rule 26's disclosure requirements and the deadlines set by this Court.  *The expert who built the computer database that is the foundation of their case and that Plaintiffs say establishes the Defendants' liability, never produced a Rule 26 report at all, and Plaintiffs' validation expert produced a non-compliant Rule 26 report that was nine months late.*  Plaintiffs' experts withheld materials underpinning the opinions and, in fact, are withholding key materials even now.  Their willful violation of Rule 26's mandatory disclosure requirements requires exclusion of their reports.  Without those reports, Plaintiffs' claim of systemic over-detentions completely collapses.

Plaintiffs also violated the discovery rules by failing to disclose key evidence in response to Defendants' expert discovery requests despite their claim that they produced all discoverable materials in response to a motion to compel.  This willful discovery violation—warranting Rule 37 sanctions—provides a separate basis for excluding the reports.

Even if this Court ignores the violations of Rule 26 and the discovery rules, all of which caused significant prejudice to Defendants, Plaintiffs' expert opinions must be disregarded for an independent reason – they are not admissible under *Daubert's* standard for the admission of expert testimony as established by Fed. R. Evid. 702; *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); and *Kumho Tire* Co. *v. Carmichael*, 526 U.S. 137 (1999).  The reports from Plaintiffs' experts are flawed to their core. Sandy's methodology is entirely unsound, and the results of his analysis could not be replicated using Sandy's own data and methods (in part because Plaintiffs

---

memorandum does not challenge that certification decision. Instead, issues involving those two certified classes are addressed in Defendants' summary judgment brief.

failed to timely produce to Defendants' experts the necessary information to make their database

reproducible).  None of this is surprising given the lack of scientific rigor used by Sandy and the

others involved in preparing the Plaintiffs' reports.   Because Plaintiffs' attempt to obtain class

certification rests entirely on the inadmissible Sandy Reports, their exclusion requires that this

Court deny class certification.

<u>Statement of Facts</u>

**A.  The goal of Plaintiffs' experts was to create a new database they could use to determine the length of each absent class member's stay in the Marion County Jail after the Marion Superior Court ordered that class member to be released. However, this database that Plaintiffs rely on to determine whether an inmate is over-detained fails to account for many of the factors that can cause an over-detention to be the fault of non-parties.**

As this Court knows from its initial ruling on class certification and the many filings made

by the parties during the almost five years this case has been pending, the Marion County Superior

Courts (the "MSC") fixed its intention to migrate from the JUSTIS case management system that

all Marion County criminal justice agencies were able to use, to the Odyssey system that the

Indiana Supreme Court was promoting as a uniform case platform for criminal courts across the

state.

As explained in the Defendants' motion for summary judgment, Amitav Thamba, the IT

Director for the Marion County Superior Courts, took charge of the project with the intent for the

Courts to "create our own interface directly with Odyssey … to link up with OMS in the Jail."

Filing No. 348-9, MCSO-R000002. The Superior Court specifically anticipated for Odyssey to

send to OMS information regarding "regarding case status, release conditions etc." Odyssey and

OMS were contemplated to be a direct information exchange.  However, Defendants explained

throughout this litigation that these two systems – Odyssey and OMS – could not generate a list of

inmates that identified the amount of time it took to process releases after a court ordered those releases.

In an attempt to solve the problem of identifying inmates who were supposedly over-detained in order to meet their class certification burden, Plaintiffs retained experts, first Plaintiff Michael Boyd and later Steve Henderson, to construct a database that conjoined the Odyssey and OMS systems and then generated a list of all inmates and their detention times.  Another expert, Alison Shine, then attempted to conduct the required validation the database results by, among other things, checking that information against information about criminal cases contained in certain publicly available databases.

Plaintiffs cannot receive class certification on this issue for multiple reasons.  First, there cannot be a certified class of inmates based upon the issue of computer problems relating to the conversion to Odyssey and OMS because each inmate's case must be evaluated individually for the myriad of factors that impact an inmate's processing for release. For example, an inmate's own actions, such as his or her use of multiple aliases, refusal to cooperate with MCSO staff, or other issues, can also cause processing delays.

Even more significant for this purported class action is the fact that Defendants established that errors by court staff or other non-parties to the litigation (such as MSC or Prosecutor's staff) caused release delays in individual cases. That is important because processing errors by non-parties cannot be attributed to the Defendants, and Plaintiffs' database does nothing to identify and attempt to eliminate any over-detention that was the result of a non-party.

The fact that MSC staff were backdating orders, and that Plaintiffs' database does nothing to identify those backdating events and eliminate them from their claims against

Defendants, is particularly troubling aspect of Sandy's flawed methodology.   Defendants

have identified many instances where MSC staff were backdating entries, *i.e.*, court staff

changed court orders to make it appear that orders were issued earlier than they actually

were so that it appeared from the records that it was the MCSO, rather than a court, that

was the cause of a delayed release.   Defendants were able to identify some backdating

situations by performing reviews of individual inmate cases, including the timing of entries

into Odyssey and OMS.   However, Plaintiffs' database does not examine specific inmate

records, or any audit trails[2] within Odyssey and OMS, to identify whether and how often

backdating occurred in an attempt to eliminate over-detentions caused by court staff.

Plaintiffs' complete failure to develop a system for identifying over-detentions that

eliminates the acts of non-defendants who caused possible over-detentions, shows that Plaintiffs'

methodology is fundamentally flawed. Indeed, Plaintiffs have ignored many of the factors that

could result in release delays when creating their database that supposedly calculates how long it

took to release an inmate from the Jail after the Marion County Superior Court ordered that

inmate to be released.

But, Plaintiffs' experts and their counsel committed other errors so egregious that this

Court must exclude Plaintiffs' experts and their reports for reasons entirely separate from the

failings identified above.

**B.   Plaintiffs' experts repeatedly violated Rule 26 by failing to produce the data, reports, and factual materials they reviewed and considered before and during the process of building their database – a database that is the very foundation of their experts'**

---

[2]An "audit trail" is a "generic term for recording (logging) a sequence of activities. In computer and network contexts, an audit trail tracks the sequence of activities on a system, such as user log-ins and log-outs. More expansive audit trail mechanisms would record each user's activity in detail – what commands were issued to the system, what records and files were accessed or modified, etc." Filing No. 352-11, MCSO-N000000382.

**claims that thousands of inmates have been over-detained and that Plaintiffs can identify each inmate and the length of their alleged over-detention.**

Again, Plaintiffs developed a database that they claim provides the information they need to prove their case, even though it fails to consider any of the factors outlined in Section A, *supra*. To create that database, they first enlisted Plaintiff Michael Boyd to build it. (Filing No. 361-1, Exhibit 1, Shine Dep. pp. 11-13, 16, 23-25, 56-57; Filing No. 318-3, Henderson Dep. pp. 10-11.) Later, they hired an IT consultant, Steven Henderson, who completed it.

While Plaintiffs had three experts working for them, only one submitted a signed report as required by Rule 26. That report, filed in August 2018, was authored and signed by Dr. Robert Sandy, a professor of Economics at IUPUI in Indianapolis who is not a database expert and who did not perform any of the work attempting to confirm that the database generated an accurate list of inmate release times (that list is hereinafter referred to as the "Henderson Spreadsheet").

The following timeline sets the stage for Plaintiffs' Rule 26 and discovery violations that require exclusion of their experts. Shorn of reliance upon that database, their request for class certification on the issue of alleged IT failures caused by the Odyssey conversion fails.

| *August 6, 2018* | Plaintiffs produced the Sandy Report and the Henderson Spreadsheet that purports to identify thousands of inmates who were over-detained |
|---|---|
| | • The Sandy Report (Filing No. 351-2, p. 1) stated that "Ms. Shine worked on checking the accuracy of the data and the time to release calculations by comparing them to detailed records for individual inmates." |
| | • No description of Ms. Shine's methodology, or actual "records for individual inmates," were identified. Shine did not prepare her own Rule 26 report that identified her work and her methods used to validate the database results. |

|  |  |
|---|---|
|  | • The Sandy Report (*id.*, p. 7) stated that "Sets of random samples of individual cases ... were analyzed independently to determine the appropriate and actual release dates[.]" No description of how the "random samples" were drawn, actual methodology considered to be "analyzed independently," or the "random samples" themselves, were identified.<br><br>• The Sandy Report (*id.*, p. 4) stated that a "large amount of time was spent cleaning and formatting data to make it usable for matching." No specific methodology for "cleaning and formatting" was provided, and no quantification was provided as to how much data needed "cleaning and formatting."<br><br>• The Sandy Report (*id*, p. 7) stated that "the OMS database was joined to the Odyssey database and then releasable events were determined." No methodology for "joining" the two databases was provided, and Henderson never provides a Rule 26 Report to explain his work.<br><br>• The Sandy Report (*id*, p. 7) then stated, "it was necessary to determine the date and time of the Court's Release Order or Event[.]" No specific data element or methodology was provided to document how each such "date and time" was determined.<br><br>• The Sandy Report (*id*, p. 7) stated that release scenarios were identified, and "we randomized the order of the cases presented for testing to ensure statistical validity." No method was described to document how an "order of cases" was either determined or "randomized," and no specific "cases" or "order of cases" or scenario descriptions were identified. |
| *September 6, 2018* | Defendants' First Interrogatory and Request for Production of Expert Witness Materials (Filing No. 361-2, Exhibit 2) requested disclosure of "each step that any plaintiffs' expert took to create databases from the data files produced by the defendants or state court administration," including "all rules, tools or procedures used to validate data[.]" |

| | |
|---|---|
| *September 7, 2018* | Plaintiffs produced certain data files and scripts[3] used to compile their final database and related spreadsheet of inmate detention periods. |
| *October 18, 2018* | Plaintiffs refused to produce ***any*** expert materials beyond their final report, and the data and scripts used to generate their final spreadsheet of alleged inmate detention periods (Filing No. 361-3, Exhibit 3, Plaintiffs' Responses to Defendants' First Interrogatory and Request for Production of Expert Witness Materials). ***No underlying data or methods about creating Plaintiffs' data tables or resulting database were ever provided by Henderson or anyone else.*** |
| *November 6, 2018* | Defendants' Rule 37.1 letter (Filing No. 318-5) identified the categories of information Plaintiffs did not provide but were required to provide under Rule 26. |
| *November 30, 2019* | Plaintiffs' supplemental production of expert materials failed to include any scripts or data files by Plaintiffs' experts, apart from those already produced as being used to assemble data and generate their final spreadsheet of alleged over-detentions. |
| *January 17, 2019* | Deposition of Plaintiffs' expert Steven Henderson (Filing No. 318-3) reveals that Plaintiffs' scripts, and use thereof, were not intended to be reproducible. |
| *January 28, 2019* | Defendants' Rule 37.1 letter (Filing No. 318-6) outlined continuing deficiencies in Plaintiffs' failure to produce expert materials. |
| *January 31, 2019* | Defendants provided the expert report of Dr. Brian D'Andrade (the "D'Andrade Report") (Filing No. 351-3), which concluded (pp. 2-3): "the Sandy Report is based upon unrepeatable methodology and unreliable data which are indicative of a potentially high error rate. Thus, it is my opinion that the Sandy Report and its conclusions cannot be relied upon to a reasonable degree of engineering |

---

[3] "'Scripts' are known to be 'interpretable' [computer] programs." *Eolas Technologies, Inc. v. Adobe Systems, Inc.*, 810 F.Supp.2d 795, 814 (E.D. Texas 2011). A "script" also may be described as "A sequence of instructions, ranging from a simple list of operating system commands to full-blown programming language statements, which can be executed automatically by an interpreter." Nat'l Inst. of Standards and Technology, https://csrc.nist.gov/glossary/term/Script (last visited July 05, 2019). Thus, in layman's terms, a "script" is simply a program that directs a computer to perform certain operations and generate certain results. Plaintiffs did not provide any explanation or methodology by which they decided to use "scripts" in the compilation of the Sandy Report and, more importantly, never provided in any Rule 26 report the methodology showing how the program was created and designed.

|  | certainty as to how long inmates have been detained at the Marion County jails beyond the time a court ordered their releases." |
|---|---|
| *February 12, 2019* | Plaintiffs reiterated that only the final scripts and data sets that compiled their experts' final results would be disclosed (Filing No. 318-7). |

| *February 26, 2019* | Defendants' filed a motion to compel production of data and information that Plaintiffs had refused to provide regarding their methodologies and underlying data. (Filing No. 317). |
|---|---|
| *March 05, 2019* | Plaintiffs agreed to produce scripts and data files that were used to generate and ostensibly validate Plaintiffs' final scripts and data sets (Filing No. 361-4, Exhibit 4, R. Waples email to A. Overholt).  On March 6, 2019, Plaintiffs provided almost 150 data files and more than 800 pages of PDF documents not previously disclosed, including over 100 earlier versions of Henderson's script.  Plaintiffs also produced some earlier versions of Henderson's spreadsheet that allegedly identified inmate over-detentions.  The documents were offered without objection, and no indication that additional documents were still being withheld. |
| *April 12, 2019* | Defendants were granted leave by this Court to submit a Supplemental Expert Report (the "D'Andrade Supplemental Report") because of Plaintiffs' delay in producing the materials they handed over on March 5 (Filing No. 351-4). That supplemental report explained, among other things, that Plaintiffs' production of additional scripts and data sets still did not provide a way to reproduce their expert's work in "cleaning and formatting," then compiling inmate data. |
| *May 10, 2019* | Plaintiffs previously received court permission to serve a expert rebuttal report.  Instead of filing a report limited to criticisms of the D'Andrade Supp. Report, Plaintiffs filed a Supplemental Expert Report (the "Sandy Supplemental Report") (Filing No. 351-5) that offered ***new expert opinions by disclosing an entirely new effort to validate Plaintiffs' expert methodology after Defendants' expert attacked his methods***.  In part, Plaintiffs' experts created for the first time a new "random sample" of 1,000 inmate records.  Plaintiffs did not provide any methodology to explain how they identified "a random sample across all of the scenarios of 1,000 of the 42,172 jail stays for which we |

| | | |
|---|---|---|
| | | computed a TimeToRelease[,]" Sandy Supplemental Report, at 11, or why 1,000 was a statistically significant number such that it was sufficient to validate the database over-detention results. |
| May 17, 2019 | | The deposition of Robert Sandy revealed that he did not ask for or receive scripts from Henderson because, as he acknowledged, he is "not a database expert" and he had no role in data cleaning, even though he admitted "you couldn't do this work without data cleaning." (Filing No. 351-26, pp. 36-37.) |
| May 29, 2019 | | Another of Plaintiffs' experts, Alison Shine, was deposed. (Filing No. 361-1, Exhibit 1, *supra*.) She revealed that there are perhaps 250 versions of the Henderson spreadsheet even though Plaintiffs produced only 31.[4]  Shine also testified there were email exchanges between her, Boyd, and Henderson, and that Boyd also created spreadsheets used to identify alleged over-detentions.  Those documents were not produced even though Shine, and apparently Henderson, relied upon them.  Because Henderson never produce a Rule 26 Report, Defendants still cannot confirm exactly what documents and information he reviewed in completing his work. |
| June 7, 2019 | | Plaintiffs' counsel sends correspondence enclosing additional Shine documents and admits the documents include her work "on checking the accuracy of earlier runs and scripts of inmates, and she has many older such spreadsheets and working papers." (Filing No. 361-5, Exhibit 5.) |

The Sandy Reports are not based upon any direct analysis of the courts' Odyssey database, the Sheriff's OMS database, or the CORE/DEXTER interface that the courts mandated to provide indirect access to Odyssey data. Nor do the Sandy Reports address any issues arising from indirect data exchange, system outages, or back-dating issues.

Instead, Plaintiffs' allegations of over-detentions are based wholly upon calculations from an artificial database that they selectively compiled after "cleaning and formatting" the Odyssey and OMS data that they received from the MSC and Defendants, respectively. To this day, they

---

[4]Plaintiffs' March 5, 2019 supplemental production included these in a "3-4 Excel CDs" folder.

have not produced all of the materials that they employed in compiling data to create their

artificial database and resulting spreadsheet.  A report identifying Henderson's work and methods

has never been produced.  Additional facts illustrating Plaintiffs' failures are set forth below.

1.  *Plaintiffs object to Defendants' detailed discovery requests seeking to force Plaintiffs to present the data and methodology underlying their work that Rule 26 required them to produce.*

After receiving the Sandy Report, Defendants propounded an Interrogatory and related

request for production of documents that sought to learn:

each step that any plaintiffs' expert took to create databases from the data files produced by the defendants or state court administration, including:

a.      all schema details for each database;

b.      all rules, tools or procedures used to parse the data files for edit, import or transformation of data from the data files into each database;

c.      all rules, tools or procedures used to edit, import or transform data from the data files into each database; and

d.      all rules, tools or procedures used to validate data from the data files after import into each database.

Filing No. 361-2, Exhibit 2, *supra*.

The  related  document  request  sought  "All  documents  which  were  prepared,  received,

communicated, or otherwise used in connection with any step identified in Answer to Interrogatory

No. 1." *Id.* Plaintiffs' Response dated October 18, 2018 (Filing No. 361-3, Exhibit 3, *supra*), reiterated

their end-result data files and scripts that they had produced on September 7, 2018. However,

Plaintiffs objected to producing any additional information on purported grounds that it constituted

"drafts of the final product protected from disclosure by Fed. R. Civ. P. 26(b)(4)(B) *Id.*

On November 6, 2018, defense counsel pointedly asked whether Plaintiffs had produced the "specific data compared" to publicly available inmate records (Filing No. 318-5, *supra*). Plaintiffs made a supplemental production of documents on November 30, but those materials did not include any additional versions of the scripts and database that their experts used to compile their spreadsheet list of alleged inmate detention periods. Following the deposition of Plaintiffs' expert Steven Henderson on January 17, 2019, Defendants again requested complete production of documents underlying Plaintiffs' expert processes and calculations (Filing No. 318-6, *supra*).

After plaintiffs' counsel again refused to produce any expert materials apart from those used in their final calculations (Filing No. 318-7, *supra*), on February 26, 2019, Defendants filed their motion to compel production of documents relating to long-requested gaps in Plaintiffs' production of scripts and logs documenting their "cleaning" and other data processing.  (Filing No. 317.)

> 2. *Plaintiffs produce withheld materials in response to the motion to compel and do not assert any objections or notify Defendants that additional materials are still being withheld.*

On March 5, 2019, Plaintiffs abruptly abandoned their long-standing objection to production of expert materials and produced some – but still not all – of the methods and data that had been created and executed in the assembly of Plaintiffs' databases and calculation of their alleged inmate over-detentions. Plaintiffs' counsel also provided an explanation from Henderson that showed why D'Andrade could not validate Henderson's work by replicating the database, Henderson spreadsheet, and then studying them:

> The script we provided [Dr. D'Andrade] was not defective, because it was *intended to be run with manual adjustments as it was run*. Creating a repeatable list of scripts which could be run by a third party without modification or guidance was not originally our goal.

Filing No. 361-4, Exhibit 4, *supra*.  However, to this day, Plaintiffs never provided any data or methods on how to "modify" or "guide" the scripts to generate results Plaintiffs as part of Sandy's October 2018 report.[5]

    **C. Alison Shine failed to produce a timely report and failed to produce relevant data and an explanation of the methods allegedly used in her work. Even her late "report" filed as an appendix to the May 10, 2019, Sandy Supplemental Report did not disclose all of the sources of information she relied upon. Without Ms. Shine's opinions, the Sandy report lacks any support establishing that the database created by Henderson does what it claims to do – showing how long inmates were detained after a court ordered their releases.**

    Recognizing that the work of Steve Henderson and Robert Sandy would need to be independently validated to try to confirm that the database Henderson created does what they say it does, Plaintiffs retained the expert services of Alison Shine to independently validate their work. Recognizing her role as a testifying expert, Plaintiffs' counsel provided a list of cases where Ms. Shine had testified, they later supplemented that disclosure, and then in May 2019, presented her for a deposition.

    The August 2018 Sandy Report (Filing No. 351-2, *supra*, p. 7) described Shine's by saying only that she:

> performed manual validation of computerized results. Sets of random samples of individual cases by type of release code were analyzed independently to determine the appropriate and actual release dates and then compared with our calculated results.

---

[5] When providing this expert information on March 5, 2019, Plaintiffs also produced what they claim was a new, self-executing script that would allow D'Andrade to reproduce Plaintiffs' final results as contained in the August 2018 report. However, that new script was dated February 20, 2019, and therefore could not have been used to generate the Sandy Report and the Henderson spreadsheet from August 2018.  Moreover, the script itself appears to be identical to the August 2018 script. Therefore, D'Andrade did not consider it. Filing No. 361-6, Exhibit 6 (D'Andrade Dep., p. 55; D'Andrade Errata sheet, p. 3).

But, in addition to not submitting an expert report from her in August 2018, Plaintiffs failed to produce *any* work papers or data and information relied upon by Shine until the deadline arrived for them to respond to the motion to compel in March 2019. The documents they produced in March 2019 did not describe any method for sampling or otherwise validating a representative view of the integrity of Plaintiffs' data calculations as a whole or the data "cleaning" that was performed.

After receiving Defendants' second expert report, Sandy submitted his Supplemental Report that was a direct response to the criticism in the D'Andrade Supplemental Report about the lack of independent validation of the database results and the absence of statistical methods and analysis.[6] The Sandy Supplemental Report (Filing No. 351-5, *supra*, p. 10) stated for the first time that Shine's:

> manual lookups were a time consuming and meticulous process. Ms. Shine had to check if a temporary case number (called an MC case number) had been replaced with a regular case number. She checked for cases being merged. She checked for holds of all types. She verified that date for the release order was correct and that the date for the release from jail was correct. She checked if there were pending cases. She could not check the time of the release order because the time is not included in the Odyssey public portal. The Odyssey data we received from the Indiana Supreme Court did have the date and time of the entry of release orders.

Sandy then conceded that he had not done any testing of Plaintiffs' data set as a whole, and set forth a completely new, 1,000-sample review to "infer a probability about the error rate in the population." *Id.*, at 11. This 1,000-sample review was performed exclusively by Shine. (Filing No. 361-1, Exhibit 1, *supra*, Shine Dep. pp. 55-56.)

---

[6]Mr. Henderson himself has never been identified as an expert in statistics or statistical methods.

The Shine Appendix did not comply with Rule 26.  She did not sign the Appendix as required by the Rule, and as discussed further below, she reviewed materials that she did not identify in the Appendix, a fact Defendants did not learn about until her deposition.[7]

In her deposition, Shine also confirmed that her "validation" of 1,000 inmate cases was chosen simply because that was the total she could accomplish in the time allowed to her. *Id.*, p. 56.  She estimated that during the litigation, she received more than 100 but fewer than 500 spreadsheets to review and to provide comment. *Id.*, p. 62 ("My guesstimate would be 250"). She has had no statistical training (*id.*, p. 68), and until April 2019, her "validation" of Plaintiffs' calculations consisted of looking at approximately 5-10 of the records on each of the spreadsheets delivered to her. *Id.*, at 66.  Plaintiffs finally produced some of these Shine methodology materials on June 7, *2019*, less than 10 days before discovery closed.  (Filing No. 361-5, Exhibit 5, *supra*.) This belated disclosure providing for the first time a statistical analysis of the data left Defendants unable to have their statistical expert, Dr. Ralph O'Brien, examine it. Being nine months late, the Shine Appendix also could not be considered and critiqued by D'Andrade.

There is no question that Plaintiffs (1) failed to produce any report from Alison Shine that met all the requirements of Rule 26; (2) produced a document from Alison Shine nine months late with the result being that Defendants had no opportunity to have their own experts analyze and critique her work; and (3) recognized the August 2018 Sandy report was so defective that they needed to produce a brand new report from Sandy nine months late that contains new opinions, statistical methods, and evidence.

---

[7]Shine was disqualified as an expert witness in a separate over-detention case brought by one of the putative *Driver* class members because in that case she also failed to disclose in her expert report all of the information she reviewed in preparing her opinions and because she lacked the basic knowledge of the Odyssey and OMS systems to give an opinion.  *See Levy v. Marion County Sheriff*, No. 17-cv-03090, 2019 WL 535706, *3 (S.D. Ind. Feb. 11, 2019).

The prejudice resulting from Plaintiffs sandbagging of the Defendants cannot be disputed – all of this new material was either hidden from Defendants or was produced so late in the process that Defendants had no chance to muster their defenses against it.  Rule 26 mandates that Plaintiffs' intentional decisions to produce the information late (or in the case of their methods, to not produce it at all) must result in exclusion of all of the information in the Sandy Reports, including the Shine Appendix.

### D.  Defendants' expert identified a myriad of flaws in Plaintiffs' reports, proving that Plaintiffs' database cannot be replicated and therefore cannot be tested and verified as required by *Daubert.*

On January 31, 2019, Defendants' expert D'Andrade Report concluded:

> the 42,170 results disclosed in the Sandy Report could not be reproduced from the database files because the code was either incompatible with the database files provided, incompletely disclosed, or contained syntax errors. Thus, the allegations of the Sandy Report cannot be verified and are not reliable.

Filing No. 351-3, *supra*, D'Andrade Report, p. 1.

Additionally,

> Plaintiffs' Experts were not careful in preserving the integrity of the digital evidence they were provided. For example, I observed that one of the database files containing forensic evidence from the Indiana Court's Odyssey database system had been modified to an unknown extent. Generally, I found that the methodology of Plaintiffs' Experts was not fully documented and inconsistent with the text of the Sandy Report. I also found that the Sandy Report was internally inconsistent in certain aspects. For example, numbers were not consistent between tables and text in the report. These issues further demonstrate that the conclusions contained in the Sandy Report are not reliable.

*Id.*, pp. 1-2.

> Finally, through my own analysis of the databases, I found thousands of instances where the results disclosed by Plaintiffs' Experts were inconsistent with the methodology disclosed in their report. In particular, I identified

3,458 incarceration results that were associated with both temporary and permanent case numbers; the Sandy Report claims to have ruled out results of this nature. I also identified 6,797 instances of results that had other types of issues. The details of those findings are omitted in this section for brevity, but are disclosed later in this report.

*Id.*, p. 2.

After Plaintiffs produced some of their experts' underlying materials in March 2019, the

D'Andrade Supplemental Report (Filing No. 351-4, *supra*) added (p. 6):

The alteration of underlying data constitutes inappropriate practice when performing forensic analysis of evidence data, as such modification makes it difficult to verify that the underlying data has not been changed or altered during the course of analysis. Thus, that Mr. Henderson made explicit modifications to the databases, without carefully documenting how and when such modifications were made, further demonstrates that Plaintiffs' experts failed to use practices adequate to maintain the integrity of the data they analyzed.

Moreover:

I was unable to reproduce the Odyssey and Odyssey2 databases created by Plaintiffs' experts. For example, the Odyssey and Odyssey2 databases provided by Plaintiffs' experts contained a total of 46 tables, which is short of the 65 text files described above. In addition, a number of the text files were not unique. This indicates that Plaintiffs' experts either combined information from multiple text files or did not import all text files into the Odyssey database.

23.  Consequently, as a result of the failure of Plaintiffs' experts to actually disclose how they created the databases used in their analysis, it is impossible to reproduce the methodology that Plaintiffs' experts used when starting from the raw text files that were initially provided to Plaintiffs' experts.

*Id.*, p. 6.

The Sandy Supplemental Report purports to take issue with some of D'Andrade's specific

conclusions, and belittles others, but does not refute the fundamental points that Mr, D'Andrade

described. In order to calculate purported "TimeToRelease" values and impute fault to the Sheriff,

17

the Plaintiffs' experts engaged in wholesale data alteration (which they called "cleaning and

formatting"), and created wholly new data tables without disclosing the methods to create them.

Finally, as noted earlier, Henderson himself admitted that there was no way for DAndrade

to reproduce and validate Henderson's methods because the script produced by Plaintiffs had to

have manual adjustments and modifications as it was run, and no information about how to adjust

and modify the script was ever produced by Plaintiffs. (Filing No. 318-3, *supra*, Henderson Dep.

pp. 17-18, 48-49.)  Thus, even now, Defendants cannot put Henderson's work to the test by

replicating and testing his work that produced the spreadsheet serving as the basis for Sandy's

August 2018 Report.

## Argument

I.    STANDARDS FOR CLASS CERTIFICATION OF PLAINTIFFS' PROPOSED ADDITIONAL CLASS

"In order to certify a class, 'a district court must find that each requirement of Rule 23(a)

(numerosity, commonality, typicality, and adequacy of representation) is satisfied as well as one

subsection of Rule 23(b).'" *Driver v. Marion County Sheriff*, 859 F.3d 489, 490 (7th Cir. 2017). Here,

Plaintiffs request certification pursuant to Rule 23(b)(3), which applies when "the questions of law

or fact common to the members of the class predominate over any questions affecting only

individual members, and it is established that a class action is superior to other available methods

for the fair and efficient adjudication of the controversy."

Moreover, "a party seeking class certification 'must be prepared to prove that there are in

fact sufficiently numerous parties, common questions of law or fact, etc.'" *Driver*, at 493, *quoting*

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "To certify a class, the trial court must

satisfy itself 'after a rigorous analysis' that the Rule 23(a) prerequisites are established ... the court

should, of course, consider factual and legal issues comprising plaintiffs' cause of action insofar as those issues are necessary to a determination of the Rule 23 factors." *Id.* (citation omitted).

> The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case. An individual question is one where "members of a proposed class will need to present evidence that varies from member to member," while a common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof. The predominance inquiry "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues."

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016) (citations omitted).

In light of *Driver*, Plaintiffs have proffered one additional class of alleged over-detentions:

> all persons whose excessive detentions resulted from the inadequate computer system ... with detentions up to six hours after an order or event triggering a release to be presumed reasonable, and detentions in excess of six hours following an order or event triggering a release to be presumed unreasonable.

August 8, 2017, Plfs' Mot. to Amend Class Certification Order (Filing No. 197), at p. 6, ¶15.

Here, Plaintiffs cannot show through the use of the Sandy Reports and the Henderson Spreadsheet that the computer issues they complain of predominated over individual issues because, as addressed below, the only evidence Plaintiffs have is inadmissible.

II.   THE SANDY REPORT AND SUPPLEMENTAL REPORT ARE NOT ADMISSIBLE AS EXPERT OPINION TO SALVAGE PLAINTIFFS' CLAIMS

A.   **Plaintiffs' expert disclosures must be excluded as incomplete, untimely and evasive**

Discovery and use of expert reports and testimony are governed by Fed. R. Civ. P. 26(a)(2), and –(e)(2); 37; and Fed. R. Evid. 702.

Rule 26(a)(2)(B) requires that the expert's report must contain:

    (i)      A complete statement of all opinions the witness will express and the basis and reasons for them;

    (ii)     The facts or data considered by the witness in forming them;

    (iii)    Any exhibits that will be used to summarize or support them;

    (iv)    The witness's qualifications, including a list of all publications authored in the previous 10 years;

    (v)     A list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

    (vi)    A statement of the compensation to be paid for the study and testimony in the case.

Rule 26(e)(2) provides:

    ... For an expert witness whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

"In simple language, this means that the report must contain all information relating to 'how' and 'why' the expert reached the conclusions and opinions contained within the report; [and] the data or other information considered by the witness in forming the opinions. This means 'what' the expert saw, heard, considered, read, thought about or relied upon in reaching the conclusions and opinions contained within the report. This includes factual information given to the expert by the attorney in forming an opinion[.]" *Salgado by Salgado v. General Motors Corp.*, 150 F. 3d 735, 741 n. 6 (7th Cir. 1998) (citation omitted).  This disclosure extends to *all* non-privileged information reviewed by the expert even if not relied upon in completing a final report.  *Employees Committed to Justice v. Eastman Kodak Co.*, 251 F.R.D. 101, 108 (W.D.N.Y. 2008) ("When an expert

serves as a testifying witness, Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure requires disclosure of materials considered, reviewed or generated by the expert in forming the opinion, irrespective of whether the materials were actually relied on by the expert."); *Allstate Ins. Co. v. Electrolux Home Prods., Inc.*, 840 F. Supp. 2d 1072, 1080 (N.D. Ill. 2012), *citing* Fed. R. Civ. P. 26, Advisory Committee Note ¶ 2 (1993 Amendments).

Plaintiffs repeatedly ignored the straightforward commands of Rule 26 by failing to disclose facts reviewed or relied on by their experts and by failing to disclose their methods (or as to Shine, withholding her data and methods until they knew it was too late for Defendants to have the opportunity to critique them).  In fact, Henderson, who is perhaps the most important of Plaintiffs' experts in this case as he built the database that allegedly shows wide-spread over-detentions, never issued a Rule 26 report at all.  Plaintiffs' failure should be seen for what it is – a blatant attempt to hide Henderson and Shine's work from scrutiny because any close examination would reveal how deeply flawed it was.

Rule 37(a)(4) provides that "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer or respond." Rule 37(c)(1) provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless.

In this case, the Sandy reports must be disallowed because Plaintiffs' disclosures were – and to this day remain — incomplete.

1. *Exclusion of all testimony from Shine and Henderson is mandatory because Plaintiffs cannot show that the failure to produce reports data and methods from Henderson and Shine was justified or harmless.*

Upon receiving Plaintiffs' untimely expert materials in March 2019, Defendants discovered them to be incomplete. To this day, Plaintiffs have not accounted for their initial scripts used for "cleaning and formatting" data and compiling their database. This is true even though Plaintiffs said they were producing all of the material sought in the motion to compel, and even though they were under an obligation in the first instance under Rule 26 to produce all data relied upon by their experts.  Their stonewalling extends to Plaintiffs' complete failure to produce – or even identify as privileged – any of the work performed by their first data expert, Plaintiff Michael Boyd, and that was later shared with Henderson and Shine. Filing No. 361-1, Exhibit 1, *supra* (Shine Dep. pp. 11-13, 16, 23-25, 56-57, including Shine Dep. Exhibit 240).

"[T]he sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless." *David v. Caterpillar Inc.*, 324 F.3d 851, 857 (7th Cir. 2003)(citation and quotations omitted.)  In considering whether Defendants were prejudiced, this Court should consider whether "(1) the prejudice or surprise to [Defendants]; (2) the ability of [Defendants] to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date."

Defendants have been *extraordinarily* prejudiced by Plaintiffs' failures in not having Rule 26 Reports from Henderson and Shine.  As to Henderson, Defendants still have been unable to re-create Plaintiffs' database because Henderson never explained in a detailed report what methods and steps he used to create it.  He never provided the information about how the scripts needed to be "guided" in order to create the database that is the foundation of the August 2018 Sandy Report and Henderson spreadsheet.  Defendants still lack a detailed explanation of the steps taken

by Henderson to "clean" the data actually used to compile his final results. Thus, it is beyond question that all of the work underlying Sandy's Reports cannot be examined in any meaningful way to see if it actually does what Plaintiffs say it does – create an accurate of inmates who were over-detained and how long each of them was actually held.

The Supreme Court explained the importance of being able to reproduce an expert's conclusion by using that expert's data and methods:

> Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested. Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry.

*Daubert*, *supra* at 593 (citations and internal quotations omitted). By Plaintiffs failing to produce Rule 26 Reports, disclose their methods, and the data they relied on, Defendants have been unable to reproduce, analyze and critique Plaintiffs' work.  Other than taking Plaintiffs' word for it, Defendants have no way of determining whether Plaintiffs' methods and results have produced anything even remotely close to what they say – and Plaintiffs want millions of dollars from the Defendants based upon their experts' work.  Clearly, Defendants have established prejudice.

Moreover, because even today, Plaintiffs have not provided key information, Defendants cannot cure the prejudice.  For example, Defendants only learned about the meetings with Boyd and Henderson, the undisclosed Henderson spreadsheets, and the emails and other communications between them, and the earliest development of the Henderson spreadsheet by Boyd through Shine's deposition on May 29, 2019.

During that deposition, she testified that:

- As detailed by her billing records, she had multiple phone calls with Michael Boyd about his work on the database but kept notes of those calls and the information

discussed only on "post -it notes" that were never preserved and provided to
Defendants' counsel (Filing No. 361-1, Exhibit 1, *supra*, Shine Dep. p. 12).  Shine
worked with Boyd for two months on the project (*id.*, p. 24:19-21);

- She exchanged correspondence and emails with Michael Boyd where she provided
  information about what kinds of information she needed to do her work and
  information that Boyd would need for his database work. (*Id.*, p. 13.)  This
  correspondence was never produced;

- From her initial work with Boyd, Shine created her own versions of a spreadsheet
  but did not keep the earliest versions of those as she developed it (*id.*, pp. 14-17);

- She exchanged multiple emails with Boyd about the work. No emails were ever
  provided, and no objections were asserted by Plaintiffs when this information was
  requested through discovery and Plaintiffs said they produced all responsive
  documents in response to the motion to compel (*id.*, pp. 16-18);

- During the course of her validation work, she reviewed approximately 250 versions
  of Henderson's spreadsheets. (*id.*, p. 62.)  However, Defendants received only 31
  through discovery (*see*, Note 4, *supra* and accompanying text). This is true even
  though in response to Defendants' motion to compel, Plaintiffs agreed to produce
  the documents requested;

- In her Appendix to the May 2019 Sandy Report, Shine did not disclose all of the
  information she relied upon in reaching the conclusions in her report.  For
  instance, she testified in her deposition that she reviewed depositions of Deputy Jail
  Commander Tanesha Crear, but did not identify it in her report. Also she did not
  disclose *any* of the emails and other correspondence she exchanged with
  Henderson and Boyd.  *See* Filing No.  351-5, *supra*, Sandy Supplemental Report, p.
  19, App. A.

Finally, the timeline of events shows that the Plaintiffs' actions were intentional and

willful.  First, Shine said she drafted a report on her work in December 2017 (Filing No. 361-1,

Exhibit 1, *supra*, Shine Dep. p. 29), but it was not produced by the August 2018 expert report

deadline when Plaintiffs produced the first Sandy Report. Her preparation of a draft report shows

she knew eight months before the expert deadline what was expected of her, but yet she did not

produce it.

Second, by producing the Sandy Report by the August 2018 deadline, Plaintiffs demonstrated that they knew what Rule 26 demanded of them and the deadline for doing it. That Report disclosed Shine and Henderson as testifying experts and provided some of the information about them required by Rule 26, but ignored the fact that, as testifying experts, they had to produce their own reports.

Next, when Plaintiffs failed to identify in Sandy's August 2018 Report the data and methods underlying their experts' work, Defendants served discovery demanding the information that should have been disclosed under Rule 26. Instead of producing it then, Plaintiffs fought the discovery for many months until finally conceding in the face of a motion to compel that the material had to be provided. But, even then, Plaintiffs still withheld critical information on Henderson and Shine's data and methods.

In these circumstances, Plaintiffs' proffered expert reports are inadmissible because after misrepresenting Alison Shine's "validation," they rushed to provide a completely new process in May 2019. *See Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008) ("The purpose of Rule 26(a)(2) is to provide notice to opposing counsel—before the deposition—as to what the expert witness will testify."); *In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 371-72 (5th Cir. 2016) (ability to supplement does not exist to give parties a de facto extension of the disclosure deadline); *E.E.O.C. v. Freeman*, 778 F.3d 463, 467 n.7 (4th Cir. 2015) (party cannot use Rule 26(e) "as a loophole" to revise previous reports); *Williams v. TESCO Services, Inc.*, 719 F.3d 968, 976 (8th Cir. 2013) (supplemental report rejected because it "was materially altering, not merely clarifying his original report"); *Martinez-Serrano v. Quality Health Services Of Puerto Rico, Inc.*, 568 F.3d 278, 282–83 (1st Cir. 2009) (rejecting "addendum" that attempted to assert a new theory of liability).

In sum, "Courts distinguish 'true supplementation' (*e.g.*, correcting inadvertent errors or omissions) from gamesmanship and have repeatedly rejected attempts by parties to bolster their position at summary judgment by 'supplementing' an expert report with a 'new and improved' expert report."). *Petersen v. Midgett*, 140 F. Supp. 3d 490, 502 (E.D.N.C. 2015). *See also, Engler v. MTD Products, Inc.*, 304 F.R.D. 349, 356, 90 Fed. R. Serv. 3d 1022 (N.D.N.Y. 2015) ("[A]n expert report that discloses new opinions is in no way a mere supplement to a prior report."); *Mariscal v. Graco, Inc.*, 52 F. Supp. 3d 973, 983 (N.D. Cal. 2014) ("Defendant was entitled to a complete disclosure of all opinions—not a sneak preview of a moving target."); *Cohlmia v. Ardent Health Services, LLC*, 254 F.R.D. 426, 433 (N.D. Okla. 2008) ("Rule 26(e) does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report").

All of this shows Plaintiffs' intent to bury key information to stymie Defendants' ability to examine their experts' work.

> 2. *Henderson and Shine provide the foundation for Sandy's Reports.  Without their testimony, Sandy's Reports must be excluded.*

Both Henderson and Shine were required by Rule 26 to author their own timely reports. Neither did so.  Without their testimony about the database, spreadsheet, and the validation work supporting the admission of those materials, Sandy's reports have no evidentiary foundation at all. Therefore, both of Sandy's reports must be excluded as evidence in this case.[8]

---

[8]In fact, Sandy's August 2018 Report says almost nothing about the creation of the database at all.  That report says nothing about the creation and design of the scripts used to construct new data tables and Plaintiffs' resulting new database.  Remarkably, the term "script" does not even appear in the report.

In response, Plaintiffs may claim that the Sandy Report and Sandy Supplemental Report fulfill Henderson and Shine's Rule 26 obligations. If made, that argument will fail. Sandy testified he is not a database expert, and that Henderson was responsible for creating the scripts and database. Filing No. 361-7, Exhibit 7, Sandy Dep. pp. 23, 25. Because he lacks the knowledge and expertise to testify about the development, construction, design and efficacy of the database and resulting spreadsheet, he cannot provide the expert testimony sufficient to get those items into evidence. Instead, Henderson had to do so.

That conclusion is mandated by Rule 26. The Seventh Circuit has clearly established that one expert cannot serve merely as "the mouthpiece of a scientist in a different specialty." *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002). Where the soundness of the underlying expert judgment is in issue, the expert who evaluates the issue is "the one who should have testified." *Id.*, at 613, *quoting In re James Wilson Assoc.*, 965 F.2d 160, 172-173 (7th Cir. 1992).

That conclusion is rooted in the principle from "Federal Rule of Evidence 703 [which] contemplates that [the testifying expert] would be able to 'validate' the facts, data and opinions he relied upon during his testimony and be subject to cross-examination on them." *In re Imperial Credit Industries, Inc. Securities Litigation*, 252 F.Supp.2d 1005, 1017 n.5 (C.D. Cal. 2003). Sandy confirmed in his deposition that only Henderson and Shine were capable of addressing the expert work they performed. Therefore, *Dura* required them to each product a Rule 26 Report.

Similarly, Sandy cannot testify as an expert about Shine's work. He did not supervise her work, did not perform the work, and does not have the knowledge or expertise to perform the validation work she did. *Dura* precludes him from testifying on her behalf.

27

Sandy's reports must be excluded because he was nothing but a "mouthpiece" for Henderson and Shine in issuing his two reports.

> 3. *Sandy's decision not to provide a statistical analysis of Henderson and Shine's work until it was too late for Defendants to muster a challenge to that analysis is especially egregious.*

Sandy, Shine, and Henderson's repeated failures to follow Rule 26's disclosure requirements are only one reason to exclude the Sandy reports.  Instead of actually reviewing and analyzing even statistically valid samples of original Odyssey and OMS data—an individualized approach that analyzes each inmate's case on an individual basis—Plaintiffs' experts relied wholly upon an automated process of "cleaning and formatting" data through scripts, then using more scripts to compile an artificial database, and then counting alleged "Time[s]ToRelease" according to their artificial database.

Sandy, an economist who claims to be well-versed in statistical analysis, knew the critical importance of conducting statistical testing on a large data set to confirm its validity:

> Q: [V]erification is important because this is a very complicated case and to make sure your methodology works you've got to verify it, right?
>
> A: Yeah, that was the reason that Alison Shine was brought on. . .

(Filing No. 361-7, Exhibit 7, *supra*, Sandy Dep. p. 75:4-9.)

Yet, his August 2018 report did not include a statistical analysis using a random sample of statistically significant size based on Shine's validation work.  Instead, he waited until May 2019 – after Defendants submitted their supplemental expert report – to produce this analysis.  In fact, when Sandy was asked why information about Shine's validation work was not included in the August 2018 Report, he admitted it should have been. *Id.*, pp. 73-75; 75:6-21.

In fact, to describe Shine's work as a "statistical validation" effort is a great overstatement.

Ms. Shine has no statistical training, and undertook no true statistical analysis of Plaintiffs'

calculations. Instead, she purportedly reviewed 1,000 inmate matters from the Henderson

spreadsheet not because that number was statistically significant, but because that was the amount

of work she could complete in the limited time she had to do it. Filing No. 361-1, Exhibit 1, *supra*,

Shine Dep. p. 56.

By withholding information about Shine's "validation" work until May 2019, Plaintiffs

were able to file a wholly new report – not a rebuttal saying D'Andrade's conclusions were wrong.

Of course, by then, it was too late for Defendants to do anything to counter this surprise

disclosure. Defendants retained a statistics expert, Dr. Ralph O'Brien, early in the litigation.

However, they did not enlist Dr. O'Brien to provide any opinions on the first Sandy Report

because it was not until May 2019 that Plaintiffs came up with their attempt to support their work

with any necessary statistical analysis.  Again, Defendants were prejudiced, and Plaintiffs cannot

show their actions were harmless

With this statistical analysis excluded, the Sandy reports cannot be admitted into evidence.

Plaintiffs' failure to have an admissible analysis means they have no evidence that considers factors

outside Defendants' control that could have biased Plaintiffs' methodology. *See, Hostetler v. Johnson

Controls, Inc.,* 3:15-CV-226, 2016 WL 3662263 at *11 (N.D. Ind. July 11, 2016) ("For the survey's

results to be accurate, it must use a sampling method that ensures the sample is representative of

the entire population"). "Systematic error, or bias ... cannot be reduced by increasing sample size."

*Id.*, at *12 "As the party that bears the burden of proof and as the proponent of the expert

testimony, it is Plaintiffs' obligation to show that the sample is representative of the class and can

be reliably extrapolated to the class as a whole." *Id.*, at *15.

So the Sandy reports must be stricken in their entirety because the reports did not

"contain all information relating to 'how' and 'why' the expert reached the conclusions and

opinions contained within the report," *Salgado, supra*; and did not include everything "the expert

saw, heard, considered, read, thought about or relied upon in reaching the conclusions and

opinions contained within the report." *Id.* Even long after the reports, Plaintiffs have not made any

showing of how their pick-and-choose cases constituted any representative sample of the inmate

population as a whole.

### B.  Plaintiffs' expert disclosures are not admissible as Rule 702 expert opinion.

Beyond being incomplete, untimely and evasive, Plaintiffs' expert disclosures are not

admissible because their proffered "validation" expert – Alison Shine – is not qualified to opine on

the validity of the Sandy Report calculations of inmate over-detentions. Federal Rule of Evidence

702 provides that expert testimony is admissible if:

> (a)   the expert's scientific, technical, or other specialized knowledge will
> help the trier of fact to understand the evidence or to determine a fact in
> issue;
>
> (b)   the testimony is based on sufficient facts or data;
>
> (c)   the testimony is the product of reliable principles and methods; and
>
> (d)   the expert has reliably applied the principles and methods to the facts
> of the case.

Rule 702 "entails a preliminary assessment of whether the reasoning or methodology

underlying the testimony is scientifically valid or whether that reasoning or methodology properly

can be applied to the facts in issue ..." *Daubert, supra* at 592. *Daubert* principles apply equally to expert witnesses who will provide non-scientific testimony. *Manpower, Inc. v. Ins. Co. of Pennsylvania.*, 732 F.3d 796 (7th Cir. 2013).

> The rubric for evaluating the admissibility of expert evidence considers whether the expert was qualified, whether his methodology was scientifically reliable, and whether the testimony would have assisted the trier of fact in understanding the evidence or in determining the fact in issue.

*Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 817 (7th Cir. 2014).

The expert's testimony must have "'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Estate of Stuller v. United States*, 811 F.3d 890, 896 (7th Cir. 2016). "The testimony must 'fit the issue to which the expert is testifying [and be] tied to the facts of the case.'" *Id.*, at 819. "In deciding whether an expert employed a reliable method, the district court has discretion to consider "[w]hether the expert has adequately accounted for obvious alternative explanations."'" *Brown v. Burlington No. Santa Fe Ry. Co.*, 765 F.3d 765, 773 (7th Cir. 2014). It is appropriate to find that expert "opinions were unreliable because their 'underlying bases' were improperly based upon 'speculation' and 'unfounded inferences.'" *S.V. Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 783 (7th Cir. 2017).

"Federal Rule of Evidence 104 instructs that "[t]he court must decide any preliminary question about whether a witness is qualified ... or evidence is admissible." In *Levy v. Marion County Sheriff*, No. 17-cv-03090, 2019 WL 535706 (S.D. Ind. Feb. 11, 2019), this Court found that Ms. Shine:

> had no knowledge of how court information is transported to the MCSO through a database, what the entry of certain codes by court staff signifies, what certain codes mean ... how certain codes are communicated to the MCSO, what the MCSO does when it receives a code, what the release work flow is, ... and what the effect is when the court issues a new event

code that updates or amends a previous release order when the MCSO has
already processed an inmate for release[.]

2019 WL 535706, at *4.

As noted previously, Ms. Shine is not a statistics expert and has no familiarity with the actual

operation of the Odyssey or OMS system. For example, she has no knowledge of how records may

have been backdated in the Odyssey system:

    9.    Q.  From your work in this case, are you familiar with
    10.       the issue of some courts backdating court orders?
    11.   A.  Some courts backdating?
    12.   Q.  Did anyone ever talk to you about that?
    13.   A.  No. I didn't know that could happen.
    14.   Q.  Okay. So you never considered the issue of
    15.       backdating court orders in the analysis that you
    16.       did in any of your work?
    17.   A.  No. That would be outside of the scope of what I
    18.       was doing.

Filing No. 361-1, Exhibit 1, *supra*, Shine Depo. p. 55.

Although the Sandy Report and Supplemental Report state that Ms. Shine performed

validation work on inmate "TimeToRelease" calculations, she testified that she only looked up

public information on samples that were apparently pre-selected for her. And, the public

information available to her identified only release dates – not times. Ms. Shine's work in this

action therefore lacks any indicia of expertise, and her contributions to the Sandy Report cannot

be considered.

   C. **The Sandy Report does not show intentional over-detentions, or
deliberate indifference to over-detentions, based upon defendants'
allegedly "inadequate computer system."**

The complete failure of Plaintiffs' experts to identify and distinguish clerical backdating, Odyssey-related delays in releases, or other non-OMS factors, should doom Plaintiffs' claim for class-based adjudication.  As the Third Circuit explained in *Wharton v Danberg*:

> Class certification was denied on commonality grounds because some members of the proposed class were over-detained due to delays in the court system .... The Court found that there was no "common contention" the truth of which could "resolve an issue that is central to the validity of each one of the claims in one stroke."

854 F.3d 234, 240 (3rd Cir. 2017).

As shown, at least two factors inherent in the Odyssey system caused delays in the inmate release process beyond the control of these defendants. First, unlike Plaintiffs' artificial database, Odyssey recordkeeping was not based upon "gallery numbers" so inmate records needed to be cross-checked for accuracy.[9]

Second, Odyssey system outages inherently disrupted inmate releases because the MSC directed that releases should be made only in response to inquiries from the MSC.[10] The resulting inmate-by-inmate processing by hand, must be reviewed individually to assess the impact of each Odyssey outage.

<u>Conclusion</u>

---

[9] Filing No. 361-8, MCSO-R00069 (Exhibit 8); Filing No. 361-9, MCSO-N000000705 (Exhibit 9); Filing No. 361-10, CHDRV000589 (Exhibit 10); Filing No. 361-11, CHDRV000739 (Exhibit 11); Filing No. 361-12, MCSO-N000001602 (Exhibit 12). Also, during inmate processing, gallery numbers were subject to change. Filing No. 361-13, Sheriff_000191 (Exhibit 13). Plaintiffs' methodology therefore relied wholly upon creating artificial data tables and an artificial database that bypassed the realities of inmate processing and recordkeeping. *See* Filing No. 361-1, Exhibit 1, *supra*, Shine Depo. p. 14: "Well, in the beginning, the most important thing was the gallery number. I just said, 'I can't verify if someone was released on this date and time. Without a gallery number, it will take me infinity.'"

[10] Filing No. 361-14, MCSO-R000046 (Exhibit 14). Direct impact of this instruction is documented in an excerpt of the Henderson spreadsheet (Filing No. 361-15, (Exhibit 15), where during such an outage the alleged times-to-release ranged from less than 10 minutes to more than 70 hours. This Exhibit is an excerpt for that date (Sept. 16, 2014). The excerpt includes the relevant columns for the applicable "ReleaseOrderDate," and allegedly showing the amount of time it took to release an inmate after a court ordered his release during the Odyssey outage.

Plaintiffs' repeated, intentional violations of Rule 26 and the discovery rules require the wholesale exclusion of Plaintiffs' expert opinions.  Moreover, even if this Court does not exclude them based on Plaintiffs' willful actions in keeping information from Defendants, the reports themselves lack the necessary foundation for admissibility.  Plaintiffs' database and resulting spreadsheet showing alleged over-detentions cannot be replicated and verified.  Plaintiffs' failure to produce any admissible evidence that the results of their experts' work was fully validated and tested renders the results meaningless.

Without their experts' work, class certification is wholly inappropriate because each member of the purported class must be scrutinized individually at least for backdating, hardware outages, misspellings, or other typographical errors, which have nothing to do with Defendants' allegedly "inadequate computer system." Not only have Plaintiffs not put in the effort to perform this individualized analysis, such an individualized analysis is an anathema to the purpose of Rule 23 which is to adjudicate claims on the whole without the need for an assessment of liability o a case by case basis.  Class certification should be denied.

FROST BROWN TODD LLC

By: /s/ Anthony W. Overholt
Anthony W. Overholt, #16481-49
201 N. Illinois St., Suite 1900
Indianapolis, IN  46204
Tel. (317) 237-3800
Fax (317) 237-3900

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby that on this 29th day of July, 2019, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Richard A. Waples
Waples & Hanger
410 N. Audubon Road
Indianapolis, In 46219

John Young
Young & Young
128 N. Delaware St., 3rd Floor
Indianapolis, IN 46204

_/s/ Anthony W. Overholt_
Attorney for Defendants

LR02314.0629431   4826-4570-0765v1