UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHAEL DRIVER,<br>TERRY CLAYTON,<br>MICHAEL BOYD,<br>NICHOLAS SWORDS, and<br>ROY SHOFNER, individually and as<br>representatives of a class of all similarly<br>situated individuals,<br><br>Plaintiffs,<br><br>vs.<br><br>MARION COUNTY SHERIFF, and<br>CONSOLIDATED CITY OF<br>INDIANAPOLIS AND MARION<br>COUNTY,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 1:14-cv-02076-RLY-MJD |

**ENTRY ON THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT**

The Plaintiffs in this class action allege the policies and practices of the Marion

County Sheriff ("Sheriff" or "MCSO") caused them to be detained in the Marion County

Jail awaiting release for excessive periods of time, in violation of the Fourth Amendment,

the Fourteenth Amendment, and Indiana law.

On June 28, 2019, Plaintiffs filed a motion for partial summary judgment on their

over-detention claims and on their state law claims for false imprisonment and negligence

on behalf of all class members held six hours or more (or whatever period of time the

court sets) after legal authority for their incarceration ceased. On that same date,

Defendants cross-moved for summary judgment on Plaintiffs' over-detention claims and

1

on their Indiana state law claims for false imprisonment and negligence.  In addition, they argue, in relevant part, that: (1) Plaintiffs' over-detention claims arise under the Due Process Clause and not the Fourth Amendment; (2) the subclass represented by Terry Clayton should be decertified; and (3) subclass representative Roy Shofner's individual over-detention claim is without merit and the subclass should be decertified.  For the reasons explained below, Defendants' Motion for Summary Judgment is **GRANTED in part** and **DENIED in part** and Plaintiffs' Motion for Summary Judgment is **DENIED**.

## I.    Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Summary judgment is thus appropriate "if, on the evidence presented, no reasonable juror could return a verdict in [the non-moving party's] favor."  *Sorenson v. WD-40 Co.*, 792 F.3d 712, 722 (7th Cir. 2015).

In determining whether a genuine issue of fact exists, the court views the evidence and draws all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001).  A "court may not assess the credibility of witnesses, choose between competing inferences, or balance the relative weight of conflicting evidence[.]"  *Reid v. Neighborhood Assistance Corp. of America*, 749 F.3d 581, 586 (7th Cir. 2014) (quoting *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005)).

With respect to the claims upon which the parties cross-move for summary judgment, the ordinary standards for summary judgment remain unchanged: a court "construe[s] all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017).

## II.    Background

### A.    The Switch to Odyssey

For decades, the Marion County criminal courts used a system called "JUSTIS" to manage criminal case dockets.  JUSTIS was a DOS-based system developed exclusively for use in Marion County.  (Filing No. 119, Declaration of Derek Peterson ("Peterson Decl.") ¶ 4).  Other criminal agencies in Marion County either relied on JUSTIS directly or had computer systems that were fully integrated with JUSTIS so that information sharing between the courts and these other agencies was a virtually seamless process. Those other agencies or "stakeholders" included the Indianapolis Metropolitan Police Department, the Marion County Sheriff's Office, the Public Defender's Office, Community Corrections, and the Prosecutor's Office.  (*Id.* ¶ 5).  As a stakeholder, the MCSO had a computer program that worked with JUSTIS to manage inmate incarceration, internal jail movement, and releases.  It was called "JIMS" which stood for "Jail Information Management System."  (Filing No. 348-3, Deposition of Louis Dezelan ("Dezelan Dep.") at 10).

The Indiana Supreme Court had been working for years to bring an electronic case management system to courts across Indiana.  (Peterson Decl. ¶ 8).  The Court's Judicial

3

Technology and Automation Committee ("JTAC") explains on its website that the purpose of the Odyssey Case Management System is to "equip all Indiana courts with a 21st century case management system and to connect the courts' systems with each other and with those who need and use court information." http://www.in.gov/judiciary/jtac (last visited May 18, 2020). In August 2007,[1] the Marion County Courts, through an Executive Committee, decided to switch their software system to Odyssey, a windows-based court information technology system developed by Tyler Technologies. (Filing Nos. 351-27, Deposition of Amitav Thamba ("Thamba Dep.") at 10; Peterson Dep. at 65-67). The Executive Committee decided to migrate the Civil Courts to Odyssey in May 2013. (Peterson Decl. ¶ 8). At that time, it was anticipated that the Criminal Courts would "go live" three years later. (*Id.*).

In June 2013, the Marion County Courts decided to move up the Odyssey implementation deadline to June 1, 2014. (*Id.* ¶ 9). This decision, which moved up the implementation date by two years, was precipitated by the Indiana General Assembly's revamping of the Indiana criminal code. (*Id.* ¶ 9). Rather than upgrade JUSTIS to reflect the code changes, the Executive Committee thought the best course of action was to migrate to Odyssey. (*Id.* ¶ 10). Because JIMS would not be compatible with Odyssey,

---

[1] Defendants argue the Marion Superior Courts were considering options other than Odyssey before it chose OMS. The evidence it cites in support of this argument is from Thamba. He testified that in 2012, the Marion Superior Courts were considering other options. (Thamba Dep. at 58-59). But he clarified that those options were never brought before the Executive Committee. (*Id.* at 99-100 ("Q: And you say there were some discussions about doing something other than Odyssey that might've been discussed at the IT board. Was there any proposal to adopt some other program other than Odyssey? A: No, there was not.")).

the MCSO understood JIMS needed to be replaced. (*Id.* ¶ 11).  The MCSO chose jail

information management software called Offender Management System ("OMS").

### B.    MCSO Acquires OMS

The MCSO acquired OMS from Gel Tel Link ("GTL") which offered the software

to the Sheriff free of charge in exchange for the Sheriff's extension of GTL's contract for

inmate collect call services.  (Filing No. 158-11, Deposition of Louis Dezelan ("Dezelan

Dep.") at 14, 16-20; Filing No. 158-9, Deposition of Derek Peterson ("Peterson Dep.") at

34; Filing No 158-18, Deposition of Amitav Thamba ("Thamba Dep.") at 16).  The

contract for inmate collect-call services is lucrative for both parties.  GTL provides the

hardware, software, installation and maintenance of the phones and lines.  GTL, in turn,

charges the prisoners and their families for phone calls out of which the Sheriff receives

approximately $800,000 per year—revenues which become part of the inmate

commissary fund.  (Dezelan Dep. at 17-20).  The contract between OMS and GTL was

signed by the City's Controller and the Mayor's Office.  (Filing No. 347, Second

Declaration of Derek Peterson ¶ 3).

Barbara Thompson, the former Chief Contract Manager for the City's Information

Services Agency ("ISA"), testified that all City and Marion County agencies are

supposed to utilize the services of ISA in selecting and implementing information

technologies, including hardware and software. (Filing No. 158-16, Declaration of

Barbara Thompson ¶¶ 1, 3).  According to Thompson, the Sheriff did not consult with

ISA before acquiring OMS or otherwise vet the software to make sure it was compatible

with Odyssey.  (*Id.* ¶¶ 7, 8).  The Sheriff did not consult with his Chief Information

Officer, Derek Peterson, or the MCSO's applications manager, Geneva Roembke.[2]
(Peterson Dep. at 110 ("Q: Nobody, to the best of your knowledge, ever looked at that
issue, though, whether GTL's OMS worked with Odyssey before the sheriff acquired
Odyssey?  A: Not that I am aware of."); Filing No. 158-10, Deposition of Geneva
Roembke ("Roembke Dep.") at 5, 8 (Q: "Were you at all involved in the vetting if there
was any of OMS for the sheriff's department? A: No, I was not. Q: Do you understand
why they [the Sheriff] went with OMS as opposed to some other application?  A: No.")).

On the other hand, Col. Louis Dezelan, the Sheriff's chief administrative officer,
organized a demonstration of OMS prior to its acquisition.  (Dezelan Dep. at 21).  In
attendance were Amitav Thamba, the Marion Superior Courts' Chief Information
Technology Officer, and representatives from ISA subcontractor Daniels & Associates,
Inc. ("DAI").  (*Id.*).  Col. Dezelan testified "[t]hey told [him] the software was worth
having, that it did have the linkage necessary to tie up to link to Odyssey once Odyssey
came on board, and generally gave us a feeling of comfort that OMS would be a good
software to have."  (*Id.* at 22; *see also* Thamba Dep. at 89 ("If that's what you [Col.
Dezelan] want to go with, you know, we'll figure a way out to send information to you";
he did not express any reservations in that meeting); Filing No. 348-10, Deposition of Jim
Nelson at 26-27 ("OMS was a great product, I mean it could do pretty much anything that
JIMS could do[.]"); Filing No. 348-11, Deposition of Marvin Thornsberry at 18-19

---

[2]  Roembke worked for the MCSO 27 years.  (Roembke Dep. at 5).  After it merged with the IT
section of the ISA, she was hired by DAI to support the Sheriff's applications.  (*Id.*).  In July
2014, she was hired by ISA as the application services manager.  (*Id.* at 5-8).

("Again, the only input I gave was the fact that I thought [OMS] was -- technology-wise [OMS] was a sound system[.]").

## C.    CORE and OMS Interface Issues

One significant part of the process to replace JUSTIS and go live with new systems involved ISA's development of CORE (also referred to as DEXTER), which stood for "Courts Online Records Exchange."  (Peterson Decl. ¶ 13).  In an email dated August 22, 2013, Thamba introduced the idea of CORE to Col. Dezelan, Roembke, Nelson, and others.  (Filing No. 348-12, Email dated Aug. 22, 2013).  This computerized transfer system was meant to allow the various computer programs used by the stakeholders—the Indianapolis Metropolitan Police Department, the MCSO, the Public Defender's Office, Community Corrections, and the Prosecutor's Office—to exchange information with each other on Odyssey.  (*Id.* ("This is the product name we have given for the idea and product that we are creating to handle our move to Odyssey along with interfacing and integrating the myriad of systems and information bases we currently have in our County Judicial System."); Peterson Decl. ¶ 13).

In the Spring of 2014, because GTL was having issues building an interface between OMS and CORE/DEXTER, ISA stepped in to build the interface.  (Peterson Dep. at 35 ("It reached a head, I would say, maybe a couple months prior to GoLive. And that's when ISA stepped in and said we will build GTL's portion of the interface."); Thamba Dep. at 37).  By this time, ISA had retained Crowe Horwath LLP to serve as project manager of the data exchange portion of the transition to Odyssey.  (Peterson Dep. at 110; Filing No. 355-2, Email; Thamba Dep. at 57 (testifying that by October

7

2013, Crowe was hired "to work as project managers to detail out the scope of work for integration to bring up the Dexter framework").  Exchanges were still under development in February 2014 and March 2014.  (Filing No. 352-8, Email dated Feb. 20, 2014 (listing exchanges for June "go live," including, but not limited to, OMS booking data, OMS holds, OMS custody status/location, Odyssey court dates/events, and Odyssey warrant information); Filing No. 352-10, Email dated March 12, 2014 (Thamba: "I have designated the overall status for the project as AT RISK.  This is due to the fact that we are close to implementation and there are several programming tasks that are far from getting started.")).

In April 2014, Thamba acknowledged to County representatives that "not everything is going to be ready from a CORE perspective."  (Filing No. 352-14, Email dated April 22, 2014).  But the "go live" date—June 6, 2014—was firm.  (*Id.* (Thamba: "Absent a major catastrophic event, please dispel even the thought in your minds that we have any other option other than a 'go live' on June 6, 2014.")).  Thamba explained that "[f]or a lot of areas in the CORE project due to constraints on time, resources (money and adequate manpower on both the JTAC and Marion County side) will just need to be 'phased in' as we get the resources to get it done."  (Filing No. 353-1, Email dated April 24, 2014).  By May 2014, Ann Solzak of Crowe Horwath distributed a PowerPoint presentation which stated, "Each agency is responsible for establishing any workarounds (manual processes, reports, etc.) in order to access information that will not be available through CORE at go-live."  (Filing No. 353-3, PowerPoint presentation dated May 20, 2014, slide 13).

### D.    OMS Goes "Live" and Release Times Increase

When OMS went "live" in June 2014, OMS could not read certain codes entered by the Courts.  (Filing No. 158-1, Deposition of Sheriff John Layton ("Layton Dep.") at 54 ("The courts would say that they put in certain codes.  The codes didn't show up over on our side of the street, and vice versa, you know.").  The MCSO had to rely upon automated reports from Odyssey sent from the Courts on an hourly basis that listed all of the event codes—e.g., setting of bond—regardless of custody status.  (Peterson Decl. ¶ 14).  Those codes were then manually updated and processed by MCSO staff.  (*Id.*).  The MCSO also had to rely on emails, paper records, faxes, and telephone calls to gather information to make release decisions.  (*Id.*; Filing No. 116-3, Deposition of Tammy Wood ("Wood Dep.") at 12-13, 41).

After the "go-live" date, Jail Commander Royce Cole testified that average release times "increase[d] substantially."  (Filing No. 158-2, Deposition of Royce Cole ("Cole Dep.") at 13; *see also id.* at 14 (testifying that Release Major Tammy Wood reported to him that people in the jail were "backed up" because of the computer system)).  Although jails in other counties were also having issues with inmate tracking (as Odyssey was statewide), they were not experiencing the type of "major-major issues" that MCSO— which was the only county jail in Indiana to use OMS—was having.  (*Id.* at 20).  Col. Dezelan likewise identified an immediate increase in the Jail's daily population in June 2014.  (Dezelan Dep. at 50 (noting a spike in the inmate population "started shortly after the software products were implemented in June of 2014.")).  This change was evident to Byron Frierson, a bail bondsman who writes bonds for the release of inmates in Marion

9

County.  He testified that prior to June 2014—when the Sheriff's case management software changed from JIMS to OMS—"a bondsman could guarantee it would take from 4-12 hours to get the detainee out of the custody of the Marion County Sheriff."  (Filing No. 73-2, Affidavit of Byron Frierson ("Frierson Aff.") ¶ 6).   Mark Thompson, also a bondsman in Marion County, has had a similar experience.  (Filing No. 73-1, Affidavit of Mark Thompson ("Thompson Aff.") ¶¶ 5, 10 (testifying that when he "first started writing bonds in Marion County, the usual time from writing the bond to the release of the prisoner from the Marion County Jail was 2-4 hours"; now "it takes 2-3 days").

The Marion Superior Criminal Courts and public defenders complained to the Sheriff about delayed releases spanning from 1 to 6 days.  (Peterson Dep. at 146; *see also* Filing No. 73-18, Email dated June 17, 2014 at MCSO-E4519 (Marion Superior Judge Becky Pierson-Tracy: "We have families calling and telling us defs are still in jail when they were ordered released days ago."); Filing No. 73-18, Email dated June 20, 2014 at MCSO-E4092 (Public Defender Ann Sutton: "[Inmate] was ordered released yesterday 6/19 by Court 25.  He is still in custody.  The person at jail records just told me that he is in the 'release process' but she had no estimate of when he would be released.  She says that they are 1-2 days behind on releases (!!!!!) so they'll get to him when they can."). Filing No. 73-3, Affidavit of William E. Young ¶ 6 (stating delays "could be as few as 24 hours to as much as 72 hours").  *See also* Filing No. 73-15, Indiana Lawyer article (noting "[t]wo Marion Superior criminal court judges  . . . continue to be frustrated by delayed releases of arrestees detained after orders have been signed for their release"); (Filing Nos. 73-1, Thompson Aff. ¶ 11 (noting he and other bondsmen met with the

10

Sheriff to discuss the issue of over-detentions and that he "recognized a problem existed" but the issue was not resolved).

In September 2014, the Sheriff hired Purdue University Professor Jon Padfield, Ph.D., a process improvement expert, to assist with the inmate release process.  (*See* Filing No. 158-13, Padfield Study).  He also assigned additional staff to inmate records to decrease processing times.  (*See id.*; Filing No. 370-9, Declaration of Angela Grider ("Grider Decl.") ¶ 14 ("In 2015, the number of positions in Inmate Records was increased from forty-seven (47) to fifty-six (56).")).

### E.    OMS Deficiencies and Efforts to Replace It

In June 2015, Dr. Padfield identified a number of critical inmate release-related functions required of OMS by the Inmate Records division of the MCSO, the division responsible for booking and releasing inmates, that OMS either did not or could not do, including: (1) the ability to obtain release information automatically; (2) the ability to obtain sentencing information automatically; (3) the ability to check for open warrants during the release process; (4) the ability to prevent releases if there are open detainers; (5) the ability to display bond status; (6) the ability to calculate time-served; (7) the ability to have a checklist for releasing inmates.  (Filing No. 351-24, OMS Functional Limitations-Inmate Releases; Filing No. 351-22, Deposition of Jon Padfield at 22-25). OMS software was also missing numerous critical functions necessary for Inmate Booking.  (Filing No. 351-23, Functional Limitations-Inmate Booking) (listing 14 "Must Have" functions for Inmate Booking that were "Non Functioning" in OMS and 5 critical functions with which OMS had "Sporadic Issues")).

11

The MCSO was aware of the Odyssey Jail Management System ("Odyssey JMS"), which is also made by Tyler Technologies, as far back as 2006. (Peterson Dep. at 65). In early 2015, Col. Dezelan asked Peterson to look into Odyssey JMS. (*Id.* at 53). In March 2015, Peterson and Dr. Padfield held meetings with ISA and "staff from across the entire system, the jail system, to discuss what they need their jail management system to do. In essence, gathering their functional requirements." (*Id.*).

In April 2015, Dr. Padfield, Peterson, Jail Commander James Martin, and Inmate Records Chief Tammy Woods, traveled to Fulton County, Georgia, for a two-day evaluation of Fulton County's information technology system, which utilized Odyssey and Odyssey JMS. (Padfield Dep. at 5-7, 25; Peterson Dep. at 57-58). ISA did not attend. (Padfield Dep. at 38 ("For whatever reason, [ISA] declined to go and did not send anyone.")). After the demonstration, Peterson provided Tyler Technologies with the functional requirements document he put together with Dr. Padfield. (Peterson Dep. at 57). Tyler responded that Odyssey JMS could meet 90% of the requested business requirements. (*Id.*; *see also id.* at 54-55; Padfield Dep. at 5). Dr. Padfield, Peterson, Martin, Woods, as well as the Marion County Superior Courts, were in support of the MCSO acquiring Odyssey JMS. (Padfield Dep. at 35-38; Peterson Dep. at 206-08; Filing No. 158-14, Court's April 13, 2015 Correspondence). At that time, OMS was meeting only 50% of the business needs of the MCSO for inmate intake and releases. (Peterson Dep. at 57). For reasons not apparent from the record, the Sheriff stayed with OMS.

**F.     2017 RFP**

12

In June 2017, ISA started a process for Request for Proposals ("RFP") for a new jail information management software to replace OMS. (Filing No. 351-11, RFP-33SHF-130). The RFP noted the MCSO "would like to have installation, testing and training completed and full implementation completed by the end of 2018." (*Id.* ¶ 21.1.4.). Defendant City of Indianapolis and Marion County cancelled the RFP and did not produce any documents explaining the cancellation in response to Plaintiffs' discovery requests. (Filing No. 351-9, Defendants' Response to Request No. 77; Filing No. 351-10, Emails between counsel dated Jan. 9, 2019 (Overholt to Young: "I can answer the question about the status of OMS – it has not been replaced and the RFP process was cancelled.").

### G.    OMS' Impact on Release Times

On November 17, 2017, Thamba conducted a one-day study of the time it took the Sheriff to release inmates following the payment or posting of a bond. (Filing No. 235-3, Email dated Nov. 17, 2017). In an email to the Criminal Division Judges, Thamba reported, in relevant part:

> Sadly we are not shocked and some of these times and the delay in our opinion should be brought up with the Sheriff's office. We have individuals that have remained in custody for 46 hours, 36 hours, 20 hours, etc. even after they have posted bond.

(*Id.*).

Plaintiffs' experts calculated the time to release inmates from the Marion County Jail once the Courts had ordered a release or the inmate had paid a cash bond or posted a surety bond, and where there were no other holds, detainers, or warrants justifying the

continued detention of the individual, from June 6, 2014 through November 30, 2017.
(Filing No. 351-2, Justice Delayed, Report on Marion County Jail Inmate Release
Times).  Of the 42,170 inmates in this category, 3,971 (9.4%) were held longer than 24
hours and 10,726 (25%) were held longer than 12 hours, and 20, 974 (48%) were held
longer than 6 hours.  (Filing No. 351-2, Justice Delayed, Report on Marion County Jail
Inmate Release Times at 9-11).

All other facts necessary to a resolution of these motions will be addressed in the
Discussion Section.

## III.   Class Definition

Plaintiffs originally sought to certify five subclasses under Federal Rule of Civil
Procedure 23(a) and (b)(3).  At that time, the class was defined as:

All individuals who, from December 19, 2012, to the present, were held in
confinement by the Sheriff after legal authority for those detentions ceased
due to the Sheriff's policies or practices of:

(1)    re-arresting and imprisoning individuals who are released on their
own recognizance, found not guilty or acquitted, or who have had
their criminal charges vacated or dismissed;

(2)    keeping inmates imprisoned who the courts have released to
Community Corrections for electronic monitoring;

(3)    operating under a standard of 72 hours to release prisoners who are
ordered released;

(4)    not accepting cash or surety bonds but instead outsourcing the
payment and processing of these bonds to the Marion County Clerk;
and

(5)    employing a computer system inadequate for the purposes intended
with respect to the timely release of prisoners.

14

On September 30, 2016, the court granted certification as to the first two subclasses but denied certification as to the following three subclasses. Plaintiffs appealed the court's denial of certification for two of those three subclasses; specifically:

(1)     the Sheriff's practice of operating under a standard allowing up to 72 hours to release prisoners who are ordered released; and

(2)     the Sheriff's practice of employing a computer system inadequate for the purposes intended with respect to the timely release of prisoners.

Plaintiffs prevailed. *Driver v. Marion Cty. Sheriff*, 859 F.3d 489 (2017). On November 5, 2019, on remand from the Seventh Circuit, the court certified those subclasses. The class is, therefore, presently defined as:

All individuals who, from December 19, 2012 to the present, were held in confinement by the Sheriff after legal authority for those detentions ceased, due to the Sheriff's policies and practices of:

(1)     re-arresting and imprisoning individuals who are release on their own recognizance, found not guilty or acquitted, or who have had their criminal charges vacated or dismissed;

(2)     keeping inmates imprisoned who the court have released to Community Corrections for electronic monitoring;

(3)     the Sheriff's practice of operating under a standard allowing up to 72 hours to release prisoners who are ordered released; and

(4)     the Sheriff's practice of employing a computer system inadequate for the purposes intended with respect to the timely release of prisoners.

A brief discussion of the *Driver* opinion is important in understanding the legal parameters of the class. First, the Court rejected this court's denial of the fourth subclass (OMS) because the class definition was not identifiable. *Id.* at 494.

[The district court] held that '[t]he definition of the subclass that Plaintiffs advance is problematic because of the technical issues plaguing OMS is one of the overriding *reasons* for the over-detention of the *entire* class' . . . That, however, would be a basis to grant certification of the class as a whole rather

15

> than as a subclass, not to deny certification because it is not limited to a portion of the class. We have recognized that a class may lack definitiveness required for class certification if there is no way to know or readily ascertain who is a member of the class, but that issue is not apparent here. *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 495 (7th Cir. 2012). The class is defined by all persons whose excessive detention resulted from the inadequate computer system.

*Id.* (emphasis in original).

The Court also rejected this court's reliance on *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991) for the proposition that 48 hours was the critical period for defining the reasonableness of a detention. *Driver*, 859 F.3d at 491. *McLaughlin*, the Court reasoned, addressed the detention between the time of a warrantless arrest and the judicial determination of probable cause. *Id.* "That time period necessarily would include the time involved in processing and booking the defendant, determining the appropriate charge and preparing charging documents, assigning and transporting to court, and ultimately obtaining a judicial determination of probable cause." *Id.* But here, the class is composed of persons for whom legal authority to support the detention has ended due to, for example, a posted bond, acquittal after trial, or dismissal of charges. *Id.* The Court explained:

> For those persons, all that is left are the ministerial actions to accomplish that release which are within the control of jail officials. Evidence in the record indicates that the average time period to affect such a release is 2-4 hours in counties in general, and up to 6 hours if problems are encountered, but even if we doubled those times, release still would be accomplished within 12 hours. Because the tasks involved in the situation presented here are significantly less onerous and less time-consuming than the ones involved in *McLaughlin*, the 48-hour rule makes no sense in this context.

> ***

16

> *McLaughlin* recognized that at some point the State has no legitimate interest in detaining persons for an extended period of time, and if the regular practice exceeds that time period deemed constitutionally permissible, the State is not immune from systemic challenges such as a class action. 500 U.S. at 55, 59-59, 111 S.Ct. 1661. At some point well short of the 24-hour plus hours alleged here, there is no reason to believe that individual issues would account for that delay.

*Id.* at 491-92.

Relying on *Driver*, Plaintiffs first ask the court to find, as a matter of law, that any detention delayed more than six hours is presumptively unreasonable. The court disagrees. *Driver* did not hold that six hours was presumptively reasonable. Rather, it observed that average release times were between "2-4 hours in counties *in general* and up to 6 hours if problems are encountered[.]" *Id.* at 491 (emphasis added).

Based on the evidence of record, the court finds a presumptively reasonable time for purposes of this class action is less than 12 hours. As an initial matter, Marion County is the largest county in Indiana—far larger than most counties in Indiana. *See* worldpopulationreview.com /us-counties/in/ (last visited May 22, 2020). The Marion County Jail processes over 30,000 inmates per year. (*See* Filing No. 120, Declaration of Louis Dezelan ¶ 5 ("For the years 2012, 2013, 2014, and 2015, the Jail processed, on average, over 30,000 inmates per year.")). Jail Commander Cole testified that under the JIM/JUSTIS system, the time to process an inmate from the Jail after an order to release or other similar situation was generally between 4 and 6 hours, but 24 hours was on the "long end[.]" (Cole Dep. at 33-34). And bail bondsman Frierson testified that prior to OMS, he could bond a detainee out of the Marion County Jail or Community Corrections within 4-12 hours of writing the bond. (Frierson Aff. ¶ 6).

17

Additionally, a 12-hour demarcation point should adequately account for variables which can complicate the timing of a detainee's release, such as staffing levels during the time the inmate was to be processed; the number of holds on the inmate; the extent of the inmate's criminal history; the number of aliases used by the inmate; and whether there are any unusual circumstances present at the time the inmate is to be processed such as internet outages. *See McLaughlin*, 500 U.S. at 56 ("In evaluating whether a delay in a particular case is unreasonable, however, courts must allow a substantial degree of flexibility."). Therefore, this class action is limited to those Plaintiffs who were over-detained 12 hours or more.

## IV.   Discussion

### A.   Applicable Law

42 U.S.C. § 1983 provides a private cause of action against a person who, acting under color of state law, deprives an individual of any "rights, privileges, or immunities secured by the Constitution and laws" of the United States. *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994) (quoting 42 U.S.C. § 1983). To establish a claim under § 1983, a plaintiff must show that the defendant "(1) acted under the color of state law; and (2) deprived [plaintiff] of a constitutional right." *Estate of Perry v. Wenzel*, 872 F.3d 439, 452 (7th Cir. 2017). The parties dispute whether the Fourth Amendment or the Fourteenth Amendment's Due Process Clause applies to Plaintiffs' over-detention claims.

In *Manuel v. City of Joliet, Ill.*, 590 F. App'x 641 (7th Cir. 2015), plaintiff alleged that the City of Joliet and several of its police officers violated his Fourth Amendment rights by arresting him without probable cause and incarcerating him for seven weeks.

18

*Id.* at 642.  The Seventh Circuit held that his claims could not be brought under the Fourth Amendment because "once detention by reason of arrest turns into detention by reason of arraignment . . . the Fourth Amendment falls out of the picture and the detainee's claim that the detention is improper becomes a claim of malicious prosecution violative of due process." *Id.* at 643-44 (internal quotation marks and citation omitted). The Supreme Court reversed.  *Manuel v. City of Joliet, Ill.*, 137 S.Ct. 911, 919 (2017).  It held that a person like plaintiff may bring a claim for pretrial deprivation of liberty under the Fourth Amendment even after legal process commences.  *Id.* at 918.  "Legal process did not expunge [plaintiff's] Fourth Amendment claim because the process he received failed to establish what that Amendment makes essential for pretrial detention—probable cause to believe he committed a crime."  *Id.* at 919-20.

Four years later, in *Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019), the Seventh Circuit resolved an intra-circuit split and instructed that "[t]he injury of wrongful pretrial detention may be remedied under § 1983 as a violation of the Fourth Amendment, not the Due Process Clause." *Id.* at 479.  In so doing, it overruled a part of its decision in *Hurt v. Wise*, 880 F.3d 831 (7th Cir. 2018), which held that plaintiff's procedural due process claim based on pretrial detention could proceed.  *Id.*  The Court reasoned that "all § 1983 claims for wrongful detention—whether based on fabricated evidence or some other defect—sound in the Fourth Amendment."  *Id.  See also Levy v. Marion County Sheriff*, 940 F.3d 1002, 1007-08 (7th Cir. 2019) (noting with approval the district court's ruling that "the Fourth Amendment, not the Due Process Clause, governs a claim for wrongful pretrial detention"); *Driver*, 859 F.3d at 492 (analyzing Plaintiffs'

claims on interlocutory appeal under the Fourth Amendment); *Portis v. City of Chicago, Ill.*, 613 F.3d 702, 705 (7th Cir. 2010) (applying Fourth Amendment to arrestees' claim that the City had an unconstitutional policy of delaying release of persons arrested for fine-only offenses); *Harper v. Sheriff of Cook Cty.*, 581 F.3d 511, 515 (7th Cir. 2009) (applying Fourth Amendment to plaintiff's claim that Sheriff was unconstitutionally holding detainees after bond had been posted). *But see Wharton v. Danberg*, 854 F.3d 234, 247 (3d Cir. 2017) (finding "precedent is clear" in an over-detention case that "the treatment of pretrial detainees is governed by the Due Process Clause"); *Goldberg v. Hennepin Cty.*, 417 F.3d 808, 811 (8th Cir. 2005) (rejecting plaintiff's assertion that her detention was an unlawful seizure under the Fourth Amendment because she was held pursuant to a valid warrant; focus was on whether the county was deliberately indifferent to her due process rights). Based on Seventh Circuit precedent, the court is compelled to find that the Fourth Amendment applies to those Plaintiffs who were detained *pre-trial*.

This action also involves individuals who were acquitted at trial or had completed a sentence. Those individuals, by definition, are not pre-trial detainees. As such, their claims are not subject to the Fourth Amendment; their claims lie in the Fourteenth Amendment's Due Process Clause. *See Manuel*, 137 S.Ct. at 920 n.8 ("[O]nce a trial has occurred, the Fourth Amendment drops out: A person challenging the sufficiency of the evidence to support both a conviction and any ensuing incarceration does so under the Due Process Clause of the Fourteenth Amendment.").

Plaintiffs' claims, which are against the Sheriff in his official capacity and the Consolidated City of Indianapolis and Marion County, are municipal liability claims

under 42 U.S.C. § 1983.  *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).  To prevail on their *Monell* claims, Plaintiffs "must identify an action taken by the municipality, the requisite degree of culpability, and a causal link between the municipality's action and the deprivation of federal rights."  *Levy*, 904 F.3d at 1010.  In other words, Plaintiff must establish that the Defendants' policy or "practice of employing a computer system [OMS] inadequate for the purposes intended,"[3] *Driver*, 859 F.3d at 493, constituted deliberate indifference to a substantial risk of detainees' over-detention and that OMS in fact caused the over-detentions.  *Levy*, 904 F.3d at 1011.

### B.    Plaintiffs' Unreasonable Detention Claims

Defendants argue they did not violate the Plaintiff's constitutional rights because: (1) Defendants were not deliberately indifferent to a substantial risk of the Plaintiffs' over-detention; and (2) any delay Plaintiffs experienced was not their fault.  Plaintiffs argue just the opposite.

Plaintiffs presented evidence that the Sheriff knew the Courts were going to adopt Odyssey years before he chose OMS and that the Sheriff was aware of Odyssey JMS as far back as 2006.  (Peterson Dep. at 65).  They also presented evidence that Sheriff acquired OMS free of charge from GTL in exchange for the Sheriff's extension of GTL's contract for inmate collect call services OMS.  (Dezelan Dep. at 14, 16-20).  The contract is a money-maker for the MCSO with "commissions" totaling roughly $800,000 per year. (*Id.* at 17-20).

---

[3] At the class certification hearing held on October 9, 2019, Defendants conceded that the Sheriff's selection and use of the OMS computer system was a policy or practice.

Plaintiffs also presented evidence that the Sheriff bypassed the standard review process in choosing OMS.  Thompson, the former Chief Contract Manager of ISA, testified the Sheriff did not consult with ISA prior to the Sheriff's acquisition of OMS. (Thompson Decl. ¶ 6).  She testified that had the Sheriff consulted with ISA, "it would have discovered the compatibility issue and would have advised the Sheriff not to acquire OMS." (*Id.* ¶ 12).  The facts conflict, however, as to whether the Sheriff properly vetted OMS.  The Sheriff's chief administrative officer, Col. Dezelan, testified that he received assurances from Thamba, the Courts' IT Chief, and others at DAI that OMS would integrate with Odyssey.  (Dezelan Dep. at 22).  There is no evidence, however, that these individuals told the Sheriff that OMS was compatible with Odyssey or recommended the product to the Sheriff.  (*See* Thamba Dep. at 15).

At the time OMS went "live" in June 2014, all agree it was beset with technical issues, the most significant of which was its inability to interface with CORE/DEXTER, the computerized transfer system that would allow the various computer programs used by the stakeholders—the Indianapolis Metropolitan Police Department, the MCSO, the Public Defender's Office, Community Corrections, and the Prosecutor's Office—to exchange information with each other on Odyssey.  (Peterson Decl. ¶ 13).  As a result, the MCSO did not receive electronic court information, which required the MCSO staff to manually update and process the codes received from the Court and to rely on emails, paper records, faxes, and telephone calls to gather information to make release decisions. (*Id.* ¶ 14; Wood Dep. at 12-13, 41).  The Sheriff blames Thamba and the ISA/Courts for OMS' inability to receive electronic court information.  While it is true that before the "go

live" date the Sheriff was informed that the interface between OMS and CORE/DEXTER would not be up and running as of the June 2014 "go live" date, Peterson testified that the interface was functioning four to six months later. (Peterson Dep. at 35, 47). Peterson explained that "the problems [with delayed releases] got better, because [MCSO staff] did not have to rely on manual processes to find information," but over-detentions remained an issue. (*Id.* at 147 (testifying the problems with delayed releases continued up through his May 16, 2016 deposition)).

Plaintiffs also submitted evidence that the Sheriff did not switch from OMS to more compatible software even after becoming aware of an over-detention problem, an issue addressed by the *Driver* Court and supported by the evidence of record:

> Finally, the record contains evidence that the Sheriff chose to remain with OMS even in the face of the significant delays in release times, and did not take efforts to measure the magnitude of the problem. That delay in release often totaling 72 hours was significant both in the pure sense and in proportion to the time that the prisoners could be properly detained. For instance, the plaintiffs produced evidence of individuals who served short sentences for DUI convictions of 5–9 days, but for whom the 2–4 day delay in release increased their incarceration time by 40–50%. Another person was arrested and released by the court on bond two days later, but detained 3 more days awaiting release by the Sheriff, thus more than doubling the period of detention. . . . The delays resulted in complaints to the Sheriff's department by judges, defense counsel and family members, but in the face of those widespread excessive delays the Sheriff chose to continue with OMS rather than implement the compatible system [Odyssey JMS] recommended by its IT people.

*Id.* at 493-94.

The Sheriff responds that he did take measures to mitigate the problems with release delays. Such measures included retaining Dr. Padfield in October 2014 and January 2015, as well as assigning additional staff to inmate records to decrease

23

processing times.  (*See* Padfield Study; Padfield Dep. at 5; Grider ¶ 14).  But viewing the facts in the light most favorable to Plaintiffs, these measures do not appear to have solved the problems with OMS, as exemplified by Thambas' November 17, 2017 one-day study of over-detentions at the Jail.  (Filing No. 235-3, Email dated Nov. 17, 2017).

Where the need for different policies or procedures is "so obvious and the inadequacy so likely to result in the violation of constitutional rights," policymakers can "reasonably be said to have been deliberately indifferent."  *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).  Based on the evidence set forth above, the court finds a genuine issue of material fact exists as to whether Defendants' decision to retain OMS was deliberately indifferent to Plaintiffs' Fourth Amendment and Fourteenth Amendment rights.  Accordingly, the court must **DENY** Defendants' motion for summary judgment and **DENY** Plaintiffs' motion for summary judgment on Plaintiffs' over-detention claims.

### C.    State Law Claims for False Imprisonment and Negligence

Plaintiffs contend the facts in support of their over-detention claims also support their state law claims for false imprisonment and negligence.  Under Indiana law, "[f]alse imprisonment is the unlawful restraint upon one's freedom of movement or the deprivation of one's liberty without consent."  *Miller v. City of Anderson*, 777 N.E.2d 1100, 1104 (Ind. Ct. App. 2002).  Negligence is the breach of a duty to exercise reasonable care.  *See, e.g., Trout v. Buie*, 653 N.E.2d 1002, 1008 (Ind. Ct. App. 1995) ("Indiana courts have held that a sheriff, who is charged with the care and custody of a prisoner, has a duty to exercise reasonable care to preserve his prisoner's health and safety.").

24

Citing *Hinshaw v. Board of Commr's of Jay County*, 611 N.E.2d 637, 640 (Ind. 1993), Defendants argue they are immune under the Indiana Tort Claims Act, Ind. Code § 34-13-3-3(10), because the release delays at the Jail were caused by non-parties; namely Thamba "and other non-parties to this case." (Filing No. 354, Defendants' Brief in Support at 37). As the court explained in its over-detention analysis, the evidence in this case is not so clear-cut. Accordingly, the court must **DENY** Defendants' motion for summary judgment and **DENY** Plaintiffs' motion for summary judgment on Plaintiffs' false imprisonment and negligence claims.

**D.      Subclass Regarding Those Acquitted, Whose Charges Were Dismissed, or Were Released on Own Recognizance**

One of the subclasses certified by the court involved those inmates who were returned to the Jail for processing after a determination was made by a court to release them, either because of a not guilty determination at trial, release on a recognizance bond, or an order vacating or dismissing charges. Defendants argue it is not unconstitutional to require them to return to the Jail for processing. Plaintiffs agree but argue Defendants misapprehend their argument. What they object to is not the Sheriff's practice of processing these inmates "but rather reincarcerating them and delaying their processing for days." (Filing No. 371, Plaintiffs' Response at 24). Terry Clayton, the class representative, testified by affidavit that he was held nearly two days after having been found not guilty on December 10, 2014. (Filing No. 73-16, Affidavit of Terry Clayton ¶¶ 7-13).

In their Reply, Defendants observe "that this subclass is nothing more than a rephrasing of the class definition for the entire class—that the Defendants have computer processes that are inadequate for the timely processing of inmates for release."  (Filing No. 384, Defendants' Reply at 14; *see also Driver*, 859 F.3d at 494 ("The class is defined by all persons whose excessive detentions resulted from the inadequate computer system.").  The court agrees.  Accordingly, this subclass is **DECERTIFIED** and shall become part of the class whose over-detentions arose from the Sheriff's "determination to process releases through the OMS system."  *Driver*, 859 F.3d at 495; *see also id.* at 494 ("The class is defined by all persons whose excessive detentions resulted from the inadequate computer system.").

### E.    Subclass Regarding Inmates Who Were Sentenced to Be Released from Jail and Report to Community Corrections for Home Detention

Another subclass certified by the court involves the Sheriff's policy of keeping inmates imprisoned after the Courts have released them to Community Corrections for electronic monitoring.  The representative of this subclass, Roy Shofner, testified by affidavit that he was ordered to serve 9 days in the Marion County Jail to be followed by 170 days on home detention.  (Filing No. 73-7, Affidavit of Roy Shofner ¶ 11).  After he served the jail portion of his sentence, which ended on February 12, 2015, the Jail did not release him to self-report to Community Corrections until February 17, 2015.  (*Id.* ¶ 14).  He was told the Jail keeps inmates until Community Corrections is ready to process a group of such individuals because in the past, some inmates failed to self-report.  (*Id.* ¶¶ 16, 19).

Shofner's Order for Jail Commitment—Sentence reads: "[Shofner] is sentenced by the Court and is Ordered to serve 9 actual days in the Marion County Jail.  Defendant is to be Released on 2-12-15."  (Filing No. 372-8, Order for Jail Commitment-Sentence). Plaintiffs argue the court's Order was clear—"Defendant is to be Released on 2-12-15." In addition to the Commitment Order, they cite to the Chronological Case Summary for his case which states:

> Split Sentence as follows:  1st (9) actual days to be served in the Marion County Jail.  Defendant give [sic] one actual day credit.  Defendant to be Released on 2-12-15.  Followed by 170 days on Marion County Community Corrections/Home Detention.

(Filing No. 382-9, Chronological Case Summary at 6-7).  They claim Defendants would have had access to these documents[4] because they were required to review paper copies of such documents given the limitations of OMS.  (*See* Filing No. 158-7, Deposition of James Martin at 23-24 (OMS "turned records into a very difficult process.  And it is still a challenging process even today . . . having to go through stacks of paperwork hand by hand to make sure that they were making the right decisions."); Filing No. 151-8, BSC Sheriff Findings as of 5/12/2015 ("The Sheriff's Office has to revert to paper packets for Inmate records to make sure releases are done appropriately.")).

Defendants argue Shofner was not identified in that Order as a self-report. According to Chief Information Officer Peterson, if an inmate is a "self-report," he is released from the Sheriff's custody and reports on his own to Community Corrections

---

[4] Plaintiffs also cite the sentencing transcript, but the Sheriff would not have had access to the sentencing transcript that quickly.

typically by the next business day.  (Filing No. 347, Second Declaration of Derek Peterson ¶ 10).  If an inmate is not a "self-report," he is released subject to Community Corrections' "ability to process him for his placement on home detention."  (*Id.* ¶ 11). Any time spent in the Jail after the completion of his sentence would be credited again to the home detention portion of his sentence.  (*Id.*).  In addition, an email dated February 17, 2015, entitled MCCC PICKUPS FOR HD – GPS 2/17/2015, contains a list of inmates for "pickup."  Shofner was on that list.  (Filing No. 370-15, Email dated Feb. 15, 2015).

But the testimony of John Deiter, the Director of Marion County Community Corrections, appears to conflict with Peterson's.  In his April 29, 2016 declaration, he testified:

> Until recently, inmates sentenced to electronic monitoring also remained at the Marion County Jail or Jail II until the next business day if their sentences ended on a weekend or holiday.  However, due to population pressures at the Jail, [Community Corrections] has been working with the vendor it uses for electronic detention equipment.  Through those efforts, [Community Correction's] electronic detention equipment provider has been providing inmates with electronic detention equipment after hours and on weekends to get those inmates out of the Jail sooner.  Those inmates must then remain at their home until the next business day.  At that time, the inmates must report to [Community Corrections] for processing.

(Filing No. 117, Declaration of John Deiter ¶ 7).  Deiter says nothing about the importance of the words "self-report" in the jail commitment order for an inmate with a split sentence—part jail and part home detention—like Shofner.  He also implies that an inmate who has completed the jail portion of his sentence is entitled to be discharged home before reporting to Community Corrections for electronic monitoring.  His

testimony lends credence to Plaintiffs' argument that he should have been released on February 12,[5] 2015—certainly not February 17, 2015.

Beyond that, it is not clear whose policy caused Shofner's over-detention. Defendants maintain it was the policy of Community Corrections, a non-party; Plaintiffs maintain it was the policy of the Sheriff. The February 17 email submitted by Defendants does not provide enough detail to find for either party. Accordingly, on the present record, the court must **DENY** Defendants' Motion for Summary on Shofner's claim.

## V.   Conclusion

For the reasons set forth above, the court **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary Judgment (Filing No. 345). Defendants' Motion is: (1) **GRANTED** with respect to Defendants' request to **DECERTIFY** the subclass represented by Terry Clayton involving those inmates who, because they came from the Jail to court, were returned to the Jail for processing after a determination was made by a court to release them, either because of a not guilty determination at trial, release on a recognizance bond, or an order vacating or dismissing charges; (3) **DENIED** with respect to Plaintiffs' Fourth and Fourteenth Amendment over-detention claims; **DENIED** with respect Roy Shofner's over-detention claim and (4) **DENIED** with respect to Plaintiffs' state law false imprisonment and false arrest claims. Plaintiffs' Motion for Summary Judgment (Filing No. 349) is **DENIED**. Plaintiffs are **ORDERED** to amend their

---

[5] The court takes judicial notice the February 12, 2015 fell on Thursday.

proposed Notice to Class to comport with today's ruling within thirty (30) days of the

date of this Order.  Since OMS did not "go live" until June 2014, Plaintiffs will need to

change the temporal limitation of the class as well.


**SO ORDERED** this 3rd day of June 2020.


RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.